Muhammad U. Faridi (*pro hac vice* application to be submitted)
Henry J. Ricardo (admitted)
David S. Kleban (*pro hac vice* application to be submitted)
Christina M. Seda-Acosta (*pro hac vice* application to be submitted)
Kevin Opoku-Gyamfi (*pro hac vice* application to be submitted)
Maggie O'Neill (*pro hac vice* application to be submitted)
David Erroll (*pro hac vice* application to be submitted)
**PATTERSON BELKNAP WEBB & TYLER LLP**
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

Alanna Kaufman (*pro hac vice* application to be submitted)
Douglas E. Lieb (*pro hac vice* application to be submitted)
**KAUFMAN LIEB LEBOWITZ & FRICK LLP**
18 E. 48th Street, Suite 802
New York, New York 10017
(212) 660-2332

*Attorneys for Plaintiffs Kennetha Short and*
*Pernell Jones, Sr., in their capacity as administrators*
*of the Tyshon Jones*

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KENNETHA SHORT and PERNELL JONES, SR., in their capacity as administrators of the ESTATE OF TYSHON JONES,<br><br>                              Plaintiffs,<br><br>          – against –<br><br>CITY OF ROCHESTER,<br><br>                              Defendant. | 22 Civ. ____<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs Kennetha Short and Pernell Jones, Sr., in their capacity as Administrators of the Estate of Tyshon Jones, by their counsel, allege as follows:

## PRELIMINARY STATEMENT

1.      This lawsuit seeks redress for the death of Tyshon Jones, a young Black man with mental illness who was needlessly shot and killed by the Rochester Police Department ("RPD") in 2021.

2.      Tyshon is yet another victim of RPD's pervasive abuse of Rochester's Black and mentally ill populations.  The night he died, Tyshon was clearly experiencing a mental health crisis.  But rather than accommodating his disability, as required by law, RPD officers exacerbated it: they shone bright lights at him, repeatedly shouted at him through a megaphone, and surrounded him with police cars and officers.  They ignored his glaring need for help, and instead shot him five times.

3.      Tragically, the RPD's resort to deadly force was not an anomaly.  It was part of RPD's institutional policy and practice of using unconstitutionally excessive force, particularly against Black people and people with disabilities.

4.      Rochester's systemic policing problem is well documented.  It has been the subject of public outcry, political discourse, news reports, lawsuits, and mass protests. And while Rochester has responded with platitudes and lip service promising change and reform, it has repeatedly demonstrated its inability and unwillingness to repair the broken system of policing that continues to afflict and traumatize the Black and mentally ill in Rochester.

5.      For example, even though the same RPD officer who killed Tyshon was previously involved in incidents of excessive force against Black people, he continued to be employed by the RPD, leading to Tyshon's death.

6.      Tyshon was not the first Black and disabled person to be killed by the RPD, but he should be the last.  Tyshon's parents bring this lawsuit to seek accountability for Rochester's violations of Tyshon's rights under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, the United States Constitution, and New York state law.

## JURISDICTION AND VENUE

7.      This case is brought pursuant to 42 U.S.C. § 1983, Title II of the ADA, 42 U.S.C. § 12131, *et seq*, and Section 504 of the Rehabilitation Act, 29 U.S.C. 794, *et seq.*

8.      The Court has jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1343(a) because they arise under the Constitution and the laws of the United States and present one or more federal questions.

9.      The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a) because they relate to the federal claims and arise from the same case and controversy.

10.     Plaintiffs seek monetary damages, attorneys' fees, and costs under 42 U.S.C. §§ 1983 and 1988, 29 U.S.C. § 794a, and 42 U.S.C. § 12133.

11.     Venue lies in the Western District of New York under 28 U.S.C. § 1391(b)(2) because the relevant events occurred in Rochester, New York.

## PARTIES

12.     Kennetha Short and Pernell Jones, Sr., are the parents of the late Tyshon Jones. On June 15, 2021, the Monroe County Surrogate's Court in Rochester, New York appointed Ms. Short and Mr. Jones as administrators of the Estate of Tyshon Jones, empowering them to bring this action.  The Surrogate's Court also granted Plaintiffs Limited Letters of Administration on June 15, 2021.

3

13.     Defendant City of Rochester ("Rochester" or the "City") is a municipal corporation organized under the laws of the State of New York.  The City is authorized by law to maintain the RPD, which acts as the City's agent for law enforcement and provides municipal police services within the City's borders.  Rochester is located within the Western District of New York.

14.     Plaintiffs have complied with all conditions precedent to suit under the General Municipal Law by serving a timely notice of claim upon the City on or about June 4, 2021, and testifying at hearings under General Municipal Law § 50-h on or about August 17, 2021.

## APPLICABLE LAW

### A.     The American with Disabilities Act and the Rehabilitation Act

15.     In 1990, Congress enacted the ADA—a landmark civil rights law—"to provide a clear and comprehensive national mandate for elimination of discrimination against individuals with disabilities."  42 U.S.C. 12101(b)(1).  The ADA has been described as "a milestone on the path to a more decent, tolerant, progressive society."  *Board of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 375 (2001) (Kennedy, J., concurring).  Title II of the ADA prescribes that no individual with a disability "shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. §12132.

16.     The ADA defines "public entity" to include "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local governments."  42 U.S.C. § 12131(1)(A) and (B).  By its plain terms, the ADA applies to law enforcement agencies.  *See United States v. Gonzales*, 520 U.S. 1, 5 (1997) (ADA uses the term "any" in its ordinary "expansive" sense); *Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 209

4

(1998) (ADA contains no "exception that could cast the coverage of" law enforcement entities "into doubt").

17.    The legislative history of the ADA also confirms that Congress contemplated that Title II would apply to law enforcement operations.  The House Report specified that Title II's anti-discrimination provision would "extend . . . to *all* actions of the state and local governments."  H.R. Rep. No. 485, 101st Cong., 2d Sess. Pt. 2, at 84 (1990) (emphasis added).  The report further singled out arrests as an example of an activity where "discriminatory treatment based on disability can be avoided by proper training."  *Id.* Pt. 3, at 50.  In addition, legislators emphasized that Title II would address discrimination in law enforcement, including arrests of individuals with disabilities.  *See, e.g.*, 136 Cong. Rec. 11,461 (1990) ("Many times, deaf persons who are arrested are put in handcuffs.  But many deaf persons who are arrested use their hands to communicate. . . .  These mistakes . . . constitute discrimination."); *id.* at E1913, E1916 (daily ed. June 3, 1990) ("[P]ersons who have epilepsy are sometimes inappropriately arrested because police officers have not received proper training to recognize seizures and to respond to them.").

18.    Because law enforcement entities are subject to Title II, they must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability."  28 C.F.R. § 35.130(b)(7).  That requirement extends to the arrest of an individual with a disability.  In the context of a person with a known psychiatric disability who is in crisis, the ADA requires that police employ widely accepted policing practices that use containment, coordination, communication, and time to seek safe resolutions.  In other words, "[i]ncluding individuals with disabilities among people who count in composing 'We the People,' Congress understood . . . would sometimes require not

5

blindfolded equality, but responsiveness to difference; not indifference, but accommodation."
*Tennessee v. Lane*, 541 U.S. 509, 536 (2004) (Ginsberg, J., concurring).

19.     Section 504 of the Rehabilitation Act applies to public entities that receive
"Federal financial assistance."  29 U.S.C. § 794(a).  Section 504 provides that "[n]o otherwise
qualified individual with a disability . . . shall, solely by reason of her or his disability, be
excluded from the participation in, be denied the benefits of, or be subjected to discrimination
under any program or activity."  *Id*.  In regard to claims of police misconduct, Title II has been
held to be similar in substance to the Rehabilitation Act.  In addition, the ADA provides that the
"remedies, procedures, and rights" of the Rehabilitation Act "shall be the remedies, procedures,
and rights" provided to plaintiffs under the ADA.  42 U.S.C. § 12133.

20.     Upon information and belief, the City of Rochester and RPD receive federal
financial assistance, and thus Section 504 of the Rehabilitation Act applies to them.

**B.     Section 1983 and *Monell* Liability**

21.     Municipalities may be held liable under 42 U.S.C. § 1983 where an "action
pursuant to official municipal policy of some nature caused a constitutional tort."  *Monell v.
Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).  Section 1983 was enacted to
"afford a federal right in federal courts because, by reason of prejudice, passion, neglect,
intolerance or otherwise," local governments were not protecting the rights afforded by the 14th
Amendment of individuals, and in particular, Black people.  *Monroe v. Pape*, 365 U.S. 167
(1961) (overruled on other grounds).  *Monell* liability is intended to capture "not … only where
the official policy or ordinance is itself unconstitutional [but also] [w]here a city's official policy
is constitutional, but the city causes its employees to apply it unconstitutionally, such that the
unconstitutional application might itself be considered municipal policy."  *Amnesty Am. v. Town*

*of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) (Sotomayor, J.).  These practices and procedures need not be formally adopted for liability to attach.  *Id*.

22.     Municipalities are subject to *Monell* liability when they adopt or ratify the unconstitutional actions of their employees, often demonstrated by an "official policy or custom" that deprives individuals of their rights under the constitution.  *Id*. at 126.  While there are several ways for a party to demonstrate a municipality's "official policy or custom," as relevant here, a party may establish such a custom, and in turn, a *Monell* claim, by showing deliberate indifference in the form of acquiescence on the part of the municipality, or deliberate indifference in the form of failure to provide adequate training to officers.  *Id*. at 125-26.

23.     A municipality is liable for a *Monell* claim under the theory of acquiescence "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice.'"  Where this occurs, "that acquiescence may be properly thought of as a city 'policy or custom' that is actionable under § 1983."  *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (internal quotations omitted).

24.     A municipality is liable for a *Monell* claim under the theory of failure to train if "a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or . . . there is a history of employees mishandling the situation"; and "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights."  *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007).

**C.     New York State Law**

25.     New York law allows a private cause of action for the wrongful death of another,

*Chong v. NYCTA*, 83 A.D.2d 546, 547 (2d Dept 1981), and recognizes tort law claims for assault

and battery. The City is liable for intentional torts committed by its employees within the scope

of their employment under the theory of *respondeat superior. E.g.*, *Tardif v. City of New York*,

344 F. Supp. 3d 579, 592-93 (S.D.N.Y. 2018).

## FACTUAL BACKGROUND

### A.    Tyshon Jones

26.    Tyshon was born and raised in Rochester in 1991.  He attended Rochester public

schools and graduated from the Wilson Magnet High School in Rochester in 2009.  As a child

and adolescent, he was active, driven, and social, regularly signing up for the various programs

available through his high school.  Tyshon's favorite subject in school was science, and he was

involved in a science enrichment program, which included project competitions among students.

Following his graduation from high school, Tyshon took college courses at Monroe Community

College and at the SUNY Brockport Rochester Educational Opportunity Center ("EOC").  In

June 2013, he graduated from the EOC with a Certificate in Culinary Arts.

27.    Tyshon comes from a family with significant roots in the City of Rochester.  His

parents were both born and raised in Rochester and have lived there their entire lives.  His

mother is a Licensed Practical Nurse and full-time student at SUNY Brockport, majoring in

Health Care Administration.  His father is a Medical Sales Consultant for a leading medical

device and pharmaceutical company.

28.    Tyshon, like his family, had strong ties to Rochester's religious community and

was a deeply religious person, having attended a number of churches in Rochester, including the

Winton Road Church, Faith Temple, Aenon Baptist Church, and God's Vision Ministries.  He

also served as a youth member at many of these congregations.  Even after Tyshon's mental-

health issues manifested, his spirituality continued to play a prominent role in his life.

29.     Tyshon first began to struggle with mental health issues when he was about 18 years old.  On information and belief, he was eventually diagnosed with PTSD, anxiety, and borderline personality disorder.  His mother also believes he exhibited signs of schizophrenia.

30.     As Tyshon's mental illness became more apparent during his young adulthood, his parents noticed a shift in his character.  Tyshon became disconnected from his family and friends and the activities of daily life.

31.     Growing up, Tyshon spent much of his time with his cousins who often gathered at his home with him and his brothers.  But as challenges with his mental health grew, he became withdrawn and subdued.  Tyshon began to remove himself from social gatherings, sitting outside or retreating to his room when his family arrived.  What were once lengthy conversations with his family members became more limited to polite and brief greetings, and it became harder for him to interact in social settings.  Around his mid-20s, he communicated to his mother that he found social environments anxiety-provoking.

32.     While Tyshon sought care and received mental health treatment prior to his death, to attend his appointments he had to go to a large, bustling building, and wait in a reception area that was at times full.  This was incredibly difficult for him, which led him to obtain care intermittently.  He also sought and obtained social services relating to his disabilities, but received these on an intermittent basis as well because his illness made it difficult for him to follow through with the logistical aspects of seeking and receiving these services.

33.     Tyshon's mental-health issues also impacted his life in other meaningful ways. Although he attempted to seek employment at different times, his mental state made it difficult for him to maintain a job.  Tyshon often went to the local store and purchased cases of food in

bulk, which he carted around in a trolley and gave to the homeless.  On occasion he also went to

the Open Door Mission, the shelter near the place where he was killed, to hand out food he had

bought.  Tyshon did not drink or smoke and was generally opposed to the use of medicine or

controlled substances, often seeking natural remedies to address any sickness he experienced.

34.     In the years leading up to Tyshon's death, he lived together with his mother,

grandmother and great-grandmother.  Approximately two months before his death, his great-

grandmother passed.  A few days prior to his death, his grandmother also passed, and she was

scheduled to be buried later the same morning that he died.  Both women passed in home

hospice, and Tyshon witnessed them pass away.  He was very close to them, and their deaths

took a toll on Tyshon's already compromised mental state.

**B.     Tyshon Falls Victim to Rochester's Pattern of Police Brutality**

35.     Around 4:00 p.m. on March 9, 2021, a few days after learning of his

grandmother's death, Tyshon was spotted despondently walking around the Town of Gates, just

outside Rochester, without any shoes.  A concerned Gates resident purchased a meal for Tyshon,

but a security guard at a residential building, who saw that Tyshon was visibly distressed, called

the police.

36.     When the Gates police located Tyshon, they brought him to a local shelter on

Hobart Street in Rochester.  When the police arrived at the shelter with Tyshon, he was provided

with shoes and ultimately granted entry as a guest without incident.  Upon information and

belief, Tyshon spent the rest of the afternoon and most of the evening at the Hobart Street

shelter.

37.     As the day went on, Tyshon's mental distress became more acute, and around

midnight on March 10, Tyshon voluntarily left the shelter on Hobart Street.

38.     By 2:00 a.m., Tyshon had arrived at a different shelter, the Open Door Mission (the "Mission"), located at 210 West Main Street.  The Mission is a nonprofit organization that provides emergency food and services, primarily to Rochester's homeless community.  Many of the people who receive services from the Mission suffer from some form of mental illness.

39.     The RPD is familiar with the population of people served by the Mission and the fact that many individuals who use the Mission's services also struggle with mental illness.

40.     When Tyshon arrived at the Mission, he was greeted by an employee, Allen Woodruff.  When Mr. Woodruff opened the door, Tyshon walked inside to the kitchen, grabbed a bucket of ordinary kitchen knives used for food preparation at the shelter, and then left.  He did not encounter any other guests, nor did he harm or attempt to harm any guests or staff at the Mission.

41.     After Tyshon left, Mr. Woodruff called the police and reported that Tyshon had taken knives from the Mission.

42.     Several nearby officers were dispatched to the Mission, including Officers Drake, Audrey Jackson, Sir Glynn, and Jared Carello, who all arrived on the scene shortly before 3:00 a.m.

43.     Upon information and belief, the officers responded to the scene not for the purpose of arresting Tyshon for any offense associated with walking out of the shelter with the knives (which would have amounted, at most, to petit larceny), but rather to ensure the physical safety of Tyshon and any other persons around him.

44.     Around 3:03 a.m., Officer Drake located Tyshon and it was clear that he was in severe mental distress.  Officer Drake radioed to dispatch that he had located Tyshon at the intersection of Cascade Drive and Industrial Street and he was "actively cutting himself."

11

45.     When Officer Drake and the other officers encountered Tyshon, the street was deserted.  No other civilians were present, and Officer Drake knew as much.

46.     The responding officers were not equipped to engage Tyshon in his mental state at the time.  Acknowledging this, a fellow officer said to Officer Drake, "just get in your car, Drake, and let's back off."  But Officer Drake did not do so.  Instead, Officer Drake, flanked by Officers Glynn and Jackson, surrounded Tyshon, shined bright lights in his eyes, and pointed their guns at him as they drew him out on to the empty, well-lit West Main Street.

47.     Tyshon was clearly experiencing a severe mental health episode.  In clear distress, Tyshon stated that he was "dangerous" and repeatedly begged the officers to "just shoot [him]." He told the officers that if they did not kill him, he would have to kill them "for Jesus."

48.     Additional officers who were called to the scene blocked off vehicular traffic.  As Officer Drake and the officers guided Tyshon out on to West Main Street, there was nothing but open road behind them.

49.     Officers Drake, Glynn, and Jackson shouted various commands at Tyshon and told him to drop the knife he had in hand, which he was using to cut himself.  But Tyshon, who presented as suicidal, did not acknowledge their requests and drew closer to Officer Drake. Thereafter, Officer Drake hopped onto the sidewalk and walked backwards towards a wall.

50.     Tyshon continued to walk towards Officer Drake, who was on the sidewalk at the time.  As Tyshon began to follow Officer Drake onto the sidewalk, Drake fired five fatal shots, striking Tyshon once in the chest, twice in the abdomen, once in the groin, and once in his arm, killing him.

51.     On information and belief, none of the responding officers on the scene before Tyshon was shot were armed with tasers.

12

52.     On information and belief, none of the responding officers on the scene before Tyshon was shot were armed with other nonlethal weapons that could have been used to disable Tyshon.

53.     No police officer attempted to take any physical measures to remove the knife from Tyshon's possession, other than shooting him.

54.     A beanbag gun later arrived on the scene, but it was too late.  Officer Drake had already fatally wounded Tyshon.  Tyshon was transported to the University of Rochester Medical Center where he was pronounced dead by 4:30 a.m.

55.     On the night leading up to the shooting, Tyshon's mother was aware that he had not returned home.  But unaware that he was experiencing a mental-health crisis, she spent that evening preparing for her own mother's funeral.  The day after she buried her mother, she learned that her son had been shot and killed by the RPD.

56.     The loss of their son has caused Plaintiffs profound and lasting pain and sadness. They have suffered unimaginable anguish daily, and they miss every part of their son.  They will never be the same again.

### C.      Mental Health and Police Violence

57.     Approximately 52.9 million people in the United States experienced mental illness in 2020.[1]  About one in twenty American adults experienced what is classified as "serious" mental illness.[2]  The most prevalent of these illnesses include depression, schizophrenia, bipolar disorder, anxiety, PTSD, obsessive-compulsive disorder, and borderline

---

[1] *Mental Health by the Numbers*, NATIONAL ALLIANCE ON MENTAL ILLNESS (last updated Feb. 2022), https://www.nami.org/mhstats.

[2] *Id.*

personality disorder.[3]

58.     Rochester is home to thousands of people who receive mental-health services.  In Monroe County, where Rochester is located, the number of people who received mental health services increased by nine percent between 2015 and 2019.[4]  Today, there are more than 40,000 people in Monroe County who receive mental-health services.[5]

59.     As treatment models have shifted from long-term care in psychiatric hospitals to outpatient services, our nation has failed to provide the resources and funding necessary to adequately care for those suffering from mental disabilities.  Mental-health services are greatly underfunded and overtaxed, with need greatly outstripping available capacity—a problem compounded by the ongoing COVID-19 pandemic.  For instance, a report by the New York State Nurses Association found that "[b]etween 2015 and 2018, NYPD calls reporting emotionally disturbed persons increased about 23%" and "[s]ince the onset of the COVID crisis, calls to New York City's Mental Health Hotline and NAMI's suicide hotline have skyrocketed," but the number of certified inpatient psychiatric beds *declined* by 12% between 2000 and 2018.[6]  As a result, our country's mental health system is woefully unprepared to address the challenge.

---

[3] *Id.*

[4]*See Monroe County Behavioral Health Community Database 2019 Mental Health Summary Report*, OFFICE OF MENTAL HEALTH, MONROE COUNTY, at 3 (May 2020), https://www.monroecounty.gov/files/mh/BHCD%20Reports/2019%20Mental%20Health%20Summary%20Report.pdf.

[5] *Id.*

[6] *Closures Are Causing a Full-Blown Mental Health Emergency in New York*, New York State Nurses Association (Aug. 20, 2020), https://www.nysna.org/blog/2020/08/20/closures-are-causing-full-blown-mental-health-emergency-new-york#.Yp37JHbMKUk (last visited June 6, 2022); *A Crisis in Inpatient Psychiatric Serivces in New York State Hospitals*, New York State Nurses Association at 6, 28-29 (Aug. 2020), https://www.nysna.org/sites/default/files/attach/ajax/2020/08/Psych%20Whitepaper%20NYSNA.pdf (last visited June 6, 2022).

60.     Despite the prevalence of mental illness, in 2020, less than half of all adults in the United States suffering from a mental illness received treatment.  According to Mental Health America, a leading community-based nonprofit dedicated in part to addressing the needs of those living with mental illness, nearly 25% of adults suffering from such an illness sought treatment but were ultimately unable to secure it.[7]  The ratio of mentally ill individuals to available mental health providers across states is estimated to be 504 to 1.[8]

61.     Thus, it is no surprise that encounters between individuals with mental illness and law enforcement have become a pervasive feature of police work.  People with serious mental illnesses are processed into jails 2 million times each year, and approximately 37% of incarcerated adults in the state and federal prison system have a diagnosed mental illness.[9]  At least one in ten calls for police services involve individuals suffering from severe mental illness, and an estimated one in three individuals transported to hospital emergency rooms in psychiatric crisis are taken there by police."[10]

62.     Interactions between the mentally ill and police have become not only more common, but also injurious and even deadlier.  According to a study by BMC Psychiatry,[11] published in October 2021, "[p]ersons with serious mental illness constitute[d] 17.0% of use of

---

[7] *Quick Facts and Statistics about Mental Health*, MENTAL HEALTH AMERICA, https://mhanational.org/mentalhealthfacts (last accessed May 20, 2022, at 12:24PM).

[8] *Id.*

[9] NATIONAL ALLIANCE ON MENTAL ILLNESS, *supra* note 1.

[10] Doris Fuller et al., *Overlooked in the Undercounted The Role of Mental Illness in Fatal Law Enforcement Encounters*, TREATMENT ADVOCACY CENTER (Dec. 2015), https://www.treatmentadvocacycenter.org/storage/documents/overlooked-in-the-undercounted.pdf.

[11] BMC Psychiatry is a "peer-reviewed journal that considers articles on all aspects of the prevention, diagnosis and management of psychiatric disorders."  *See* https://bmcpsychiatry.biomedcentral.com.

force cases … and 20.2% of suspects injured in police interaction."[12]  The risk that persons with

serious mental illness will experience police use of force is 11.6 times higher, and the risk of

experiencing injury is 10.7 times higher, relative to persons without serious mental illness.[13]

Another study by the Treatment Advocacy Center[14] noted that "the risk of being killed during a

police incident is 16 times greater for individuals with untreated mental illness than for other

civilians approached or stopped by officers."[15]  The study estimated that a "*minimum*" of one in

four fatal police interactions involved someone with severe mental illness, and "that mental

health disorders are a factor in as many as 1 in 2 fatal law enforcement encounters."[16]  Between

2015 and 2020, nearly one in four people shot and killed by police officers had a mental health

condition.[17]

63.     Many tragic deaths and injuries of people with disabilities in police encounters are

avoidable.  There are in fact safe and effective ways for police officers to do their jobs *and* take

disability into account.  Over the last few years, the prevalence of these deadly encounters has

underscored the need to train police officers on how to interact with civilians suffering from

mental health episodes.  Traditional police tactics, such as verbal commands, displays of

authority, and threats of physical force, can escalate already-sensitive encounters, which, in turn,

can cause the individual to present a more threatening demeaner that may elicit yet more forceful

---

[12] Ayobami Laniyonu & Phillip A. Goff, *Measuring disparities in police use of force and injury among persons with serious mental illness*, BMC PSYCHIATRY (Oct. 21, 2021), https://bmcpsychiatry.biomedcentral.com/articles/10.1186/s12888-021-03510-w#citeas.

[13] *Id.*

[14] The Treatment Advocacy Center is a "a national 501(c)3 nonprofit organization dedicated to eliminating legal and other barriers to the timely and effective treatment of severe mental illness."  *See* https://www.treatmentadvocacycenter.org/.

[15] Fuller, *supra* note 10.

[16] *Id.*

[17] *Id.*

police responses.[18]  For example, pointing a gun at a potentially suicidal person will trigger that person's anxiety, which tends to escalate the encounter.

64.     To lower the tension in these situations, over the last several years, mental-health professionals and policy makers have developed several frameworks and training programs designed to improve police interaction with individuals with mental-health issues.  For instance, police training programs recommend refraining from pointing a weapon at the individual, and recommend that only one officer communicate with the civilian while other officers establish perimeter and provide cover.[19]  Moreover, when an individual has a knife, it is recommended that officers maintain a safe distance and use available cover, like a police cruiser, a fence, or other objects.[20]  And having a supervisor on the scene is critical to ensuring the scene remains stabilized and may reduce the likelihood of the use of deadly force.[21]

65.     Crisis intervention and de-escalation practices are not only widely accepted, but have been shown to be safer for both police officers and persons with disabilities.[22]

66.     Despite the ubiquity of individuals utilizing and needing mental-health services,

---

[18] Kelli E. Canada et al., *Intervening at the Entry Point: Differences in How CIT Trained and Non-CIT Trained Officers Describe Responding to Mental Health-Related Calls*, 48 Community Mental Health J. 746 (2012); Robin Shepard Engel et al., *Further Exploration of the Demeanor Hypothesis: The Interaction of Suspects' Characteristics and Demeanor on Police Behavior*, 17 Justice Q. 235 (2000).

[19] *See*, *e.g.*, *Suicide by Cop: Protocol and Training Guide*, POLICE EXECUTIVE RESEARCH FORUM, at 3, 5, https://www.policeforum.org/assets/SBCTrainingGuide.pdf (last visited June 2, 2022).

[20] *Id*. at 3, 4.

[21] *Id*. at 4.

[22] *See, e.g.*, Katharine Ball, Public safety digest; Salinas police, THE CALIFORNIAN, at A3 (June 3, 2014); Melissa Reuland & Jason Cheney, *Enhancing Success of Police-Based Diversion Programs for People with Mental Illness*, POLICE EXECUTIVE RESEARCH FORUM, at 7 (2005), https://evawintl.org/wp-content/uploads/PERF_enhancing.pdf  (finding that for several agencies, CIT implementation has decreased police shootings, assaults and batteries, and "problematic use of force issues").

upon information and belief, the RPD has failed to meaningfully train its officers on how to

serve these members of its community, especially in situations where they are experiencing

episodes of emotional or mental distress.  This deliberate indifference to the obvious need for

appropriate training has had severe, and often fatal, implications for Rochester's communities of

color.

       **D.**    **RPD's Policy and Practice of Engaging in Excessive Force, Particularly Against Black People and People with Mental Illness**

      67.    At the time of Tyshon's death, Rochester also had a policy and custom of

allowing the RPD and its officers to use excessive force during police encounters, particularly

against people who are Black and people with mental illness.  The following is a brief catalogue

of the incidents demonstrating RPD's custom of resorting to excessive force during police

encounters against these populations:

- In 1975, Denise Hawkins, an 18-year-old Black woman, was shot and killed by Michael Leach, an RPD officer, who was responding to a domestic dispute between Ms. Hawkins and her husband.  The RPD claimed the shooting was justified and cleared Officer Leach of any wrongdoing.[23]  Thereafter, Officer Leach was promoted up the ranks all the way to captain, until he retired in 2001.  In 2013, Leach was charged with second-degree murder for shooting and killing his own son.[24]

- Public outrage about Ms. Hawkins' killing led to demands for reform, which resulted in

---

[23] *See* Gino Fanelli, *Fifty years of Rochester police reform yielded few returns*, ROCHESTER CITY NEWSPAPER (Sept. 2, 2020), https://www.rochestercitynewspaper.com/rochester/fifty-years-of-rochester-police-reform-yielded-few-returns/Content?oid=12192039.

[24] *See* Rocco LaDuca, *Prosecutors want police personnel files for man who killed son*, UTICA OBSERVER-DISPATCH (last updated April 29, 2013 at 8:00PM), https://www.uticaod.com/story/news/environment/2013/04/29/prosecutors-want-police-personnel-files/44843045007/.

the City creating the Citizens Committee on Police Affairs (known as the "Crimi

Committee") to examine how policing in Rochester could be improved.  The Crimi

Committee found that police brutality was widespread in the City and recommended

numerous changes.  Although the City claimed to have adopted many of those

recommendations, the City's policy and practice of using excessive force continued

unabated. [25]  Many of the Crimi Committee's recommendations, such as diversifying the

RPD and increasing funding for social workers to respond to situations involving mental

health episodes, were never implemented.[26]

- In 1983, Alecia McCuller, a 21-year-old Black woman, by coincidence the daughter of

  one of the members of the Crimi Committee, was shot and killed by RPD Officer Thomas

  Whitmore, again in the midst of a domestic dispute.  Officer Whitmore, who shot Ms.

  McCuller twice in the chest, was cleared of any wrongdoing.[27]

- In 1984, RPD Officer Ceferino Gonzalez shot and killed Kenneth Jackson, a 25-year old

  Black man who was a diagnosed schizophrenic and was under psychological treatment at

  the time, during an altercation involving a knife.[28]

---

[25] *See* Will Cleveland, *Rochester police lawsuit plaintiffs, lawyers speak out; Say external pressure needed to change RPD*, DEMOCRAT AND CHRONICLE (April 7, 2021), https://www.democratandchronicle.com/story/news/2021/04/07/rochester-ny-police-reform-history-half-century-attempts-civil-lawsuit-daniel-prude/7063360002/.

[26] Fanelli, *supra* note 23.

[27] *Id.*

[28] *See Estate of Jackson v. City of Rochester*, CASETEXT (Jan. 31, 1989), https://casetext.com/case/estate-of-jackson-v-city-of-rochester; DEMOCRAT AND CHRONICLE, at 7 (Dec. 5, 1984), https://www.newspapers.com/image/?clipping_id=58635338&fcfToken=eyJhbGciOiJIUzI1NiIsI nR5cCI6IkpXVCJ9.eyJmcmVlLXZpZXctaWQiOjEzNzM2MDE3MSwiaWF0IjoxNjUzMDY0N

- Just a few years later, in 1988, RPD Officer Gary Smith shot and killed Calvin Greene, a 30-year-old Black man.  Mr. Greene was shot five times at close range, even though he was unarmed and was in the crawlspace of his own apartment at the time he was shot and killed.[29]

- In 1992, Gordon Urlacher—RPD's former Police Chief—was convicted of embezzlement after being indicted for "wide-ranging brutality and corruption" committed by RPD's Highway Interdiction Team, which was known as the "HIT squad."  Five other officers under his command were also indicted.  The RPD formed the HIT Squad in 1988 to combat street-level drug activity, but disbanded it in 1990.  The HIT Squad was alleged to have engaged in a number of racially motivated incidents, including cutting a dreadlock from the head of a man, referring to a wooden stick as their "n----- stick," and writing "illegal alien" in pen on the forehead of a young man.[30]

- Despite these events, the City did not take any meaningful action to address the RPD's deeply embedded culture and custom of using excessive force.  Although, in 1992, the City created a Civilian Review Board ("CRB"), the CRB was only "advisory."  It had no disciplinary powers.  The City permitted the RPD to continue to conduct its own investigations in which the Chief of Police would have the final say over any disciplinary

---

Dg1LCJleHAiOjE2NTMxNTA4ODV9.wX9knXBHFevDr76-eZPjbpZH-7oSADHVYrSB33dBQZo.

[29] *See Rochester Police Killing of a Black Stirs an Outcry*, N.Y. Times (May 29, 1988), https://www.nytimes.com/1988/05/29/nyregion/rochester-police-killing-of-a-black-stirs-an-outcry.html.

[30] *See* T. Forsyth, *Dredging Up the Past on Police Union President Mike Mazzeo*, Indymedia (May 23, 2013), http://rochester.indymedia.org/node/6979.

action following use-of-force incidents.  A 2017 review of the CRB concluded that it

"seemingly had no effect on reducing incidents of police misconduct and excessive

force."  This lack of effectiveness is primarily due to the fact that the CRB is not

independent of the RPD; thus, it cannot conduct its own investigations, it cannot issue

subpoenas to compel testimony or evidence, it cannot discipline officers, and it relies

solely upon the investigative materials and recommendations provided by the [RPD]."[31]

- In 2001, RPD Officer Eliud Rodriguez used excessive force against Edward S. Richards, who suffered from a chronic and/or acute mental illness.  Officer Rodriguez pepper-sprayed Mr. Richards while he was handcuffed, and failed to intervene when another officer struck Mr. Richards multiple times while he was handcuffed.  Officer Rodriguez was never reprimanded, suspended or retrained following this incident.

- In 2002, RPD officers killed Lawrence Rogers, an unarmed Black man who was having a mental health episode in the parking lot of a grocery store, wearing only his underwear. Employees of the grocery store called the police to notify them of Mr. Rogers' behavior.[32] Once RPD officers arrived, they tackled Mr. Rogers to the ground and beat him with nightsticks, punched and pepper-sprayed him.   A video of the arrest showed an RPD officer with his knee on Mr. Rogers' neck.  Mr. Rogers complained to the officers that he

[31] *See* Barbara Lacker-Ware & Theodore Forsyth, *The Case for an Independent Police Accountability System: Transforming the Civilian Review Process in Rochester, New York*, REUTERS (2017), https://www.reuters.com/investigates/special-report/assets/usa-police-rochester-union/cpr-report.pdf.

[32] *See* Tyler Brown, *In the wake of Daniel Prude's death, some push to reopen Lawrence Rogers' case*, 13WHAM (Sept. 11, 2020), https://13wham.com/news/local/in-the-wake-of-daniel-prudes-death-petition-calls-for-reopening-of-lawrence-rogers-case.

couldn't breathe during his arrest.[33]  Following this interaction, Mr. Rogers suffered

twenty-seven lacerations, contusions, respiratory trauma, and asphyxiation, and died from

his injuries later that evening.  Each of the four officers involved in the arrest and killing

of Mr. Rogers were cleared of any wrongdoing.  All four continued to be employed by

the RPD.  One had been promoted to Sergeant, and another had been assigned as an

Investigator.[34]

- In 2005, RPD Officer Mark Simmons shot an unarmed 13-year-old Black girl, Lashedica

  Mason.  Ms. Mason's mother had called the police out of concern that the child was

  going to hurt herself with a kitchen knife.  Officer Simmons claimed that Lashedica had

  "rushed" him with a knife, but witnesses reported that she had dropped the knife out of a

  bathroom window prior to being confronted by Officer Simmons, and police photographs

  showed a knife in the driveway and the bathroom window screen askew.  Officer

  Simmons shot Lashedica three times.  The RPD cleared Officer Simmons of any

  wrongdoing, named him "officer of the month" for his conduct in relation to this incident,

  and praised his conduct in RPD internal documents.  Former Police Chief David Moore

  stated that Officer Simmons "displayed a compassionate concern for the girl" during the

  incident.  Simmons was later promoted to interim Police Chief, and then later Deputy

  Chief.  Lashedica suffered years of surgeries, had her right finger amputated, and still has

---

[33] *See* Lowell Rose, *The Death of Lawrence Rogers in Rochester Compared to George Floyd*, SPECTRUM LOCAL NEWS (last updated June 5, 2020 at 8:24AM), https://spectrumlocalnews.com/nys/rochester/public-safety/2020/06/05/the-case-of-lawrence-rogers-in-rochester.

[34] *See* Lacker-Ware, *supra* note 31.

a bullet fragment in her right kidney.[35]

- In 2006, RPD Officer Jeffrey LaFave shot and killed Patricia Thompson, a mentally distraught 54-year-old Black woman, in her own home while she was having a mental health episode.[36]  Her husband had called the police, hoping for help.  Officer LaFave received an "Excellent Police Service" award that same year, and was later promoted to Lieutenant.[37]

- In 2009, Kerry Coleman, a 47-year-old Black man, called the RPD because his wife was experiencing a mental-health crisis.  Although Mr. Coleman had called for the Mobile Crisis Team, RPD officers came instead.[38]  Officer Cala then pepper-sprayed Mr. Coleman's wife and punched her in the face several times.  When Mr. Coleman tried to help her, another officer pepper-sprayed him as well.  When other family members asked who had assaulted Mr. Coleman's wife, Officer Cala responded, "I fucking did it."[39] Officer Cala was cleared of any wrongdoing in connection with this incident.[40]

---

[35]Will Cleveland, *RPD has had troubles with mental health calls; Can department learn from experience?*, DEMOCRAT AND CHRONICLE (Nov. 1, 2020), https://www.democratandchronicle.com/story/news/2020/10/29/rpd-and-mental-health-calls-before-daniel-prude-lashedica-mason/5872749002/.

[36]*See* DEMOCRAT AND CHRONICLE, at 9 (March 9, 2006), https://www.newspapers.com/image/?clipping_id=78570688&fcfToken=eyJhbGciOiJIUzI1NiIsI nR5cCI6IkpXVCJ9.eyJmcmVlLXZpZXctWQiOjEzNjc1OTI4MCwiaWF0IjoxNjUzMDY3MD M1LCJleHAiOjE2NTMxNTM0MzV9.PmWUPKns58RAu4aWFlYooIdLa6dG7XneNd6QW9N 5lwk.

[37] *See* David T. Moore, *2006 Annual Report Rochester, New York Police Department*, CITY OF ROCHESTER, https://www.cityofrochester.gov/WorkArea/DownloadAsset.aspx?id=8589934861 (last visited June 6, 2022).

[38] *See* Lacker-Ware, *supra* note 31.

[39] *Id*. at 20.

[40] *Id*.

- In 2010, RPD Officer Joseph Ferrigno used excessive force against a Black woman named Robin Turner.  Ms. Turner had called the RPD to report that she had been assaulted by a teenager in her neighborhood.  Instead of assisting Ms. Turner, Officer Ferrigno forced her to the ground, dragged her approximately 10 feet, and slammed his knee into her back.  The City later reached a settlement with Ms. Turner.[41]  Officer Ferrigno has been the subject of at least 23 civilian complaints, many of which involved allegations of excessive force, yet Officer Ferrigno has never been reprimanded, suspended, or retrained on the use of force.[42]

- In 2010, Miriam McKnight called the RPD to report a stabbing that occurred in the building next to her house.  When Officer Gregory Vasile began putting crime scene tape in her yard, Ms. McKnight informed Officer Vasile that he had the wrong property.  Officer Vasile then ordered Ms. McKnight to "put [her] hands behind [her] back" and stated, "I've had enough of this shit."  He then pepper-sprayed Ms. McKnight, resulting in scarring and breathing difficulties.  Although Ms. McKnight later prevailed in a civil action arising from this incident, Officer Vasile remained employed by the RPD.[43]

- In 2011, City Councilmember Adam McFadden wrote a letter to the Mayor, Police Chief, and Council President charging that the City had "lost control of its police force."  He

---

[41] *Id*. at 12.

[42] *See* Lisa Girion & Reade Levinson, *Special Report: A cop shoots a Black man, and a police union flexes its muscle*, REUTERS (Nov. 17, 2020), https://www.reuters.com/article/uk-usa-police-rochester-shooting-special-idINKBN27X1EJ.

[43] *See* Gary Craig, *Judge: Rochester cop illegally arrested woman who called police*, DEMOCRAT AND CHRONICLE (last updated April 5, 2017 at 6:37AM), https://www.democratandchronicle.com/story/news/2017/04/04/judge-rochester-police-illegally-arrested-woman-who-called-police-miriam-mcknight-gregory-vasile/100027296/.

detailed how, for eight years, the overwhelming majority of calls to his offices were complaints from citizens of color about their treatment by officers—with hundreds of complaints by Black and Latino residents about being racially profiled, arbitrarily stopped, and falsely arrested without cause. His letter concluded: "Of the hundreds and hundreds of phone calls I have received regarding police complaints, I have never been informed by the RPD of any disciplinary procedure brought against a police officer for any of these complaints."[44]

- In 2011, RPD Officer Randy Book shot and killed Hayden Blackman, a 43-year-old Black man, at his house after Mr. Blackman's family members had called the RPD following a dispute between Mr. Blackman and his son.[45] Mr. Blackman was shot four times.[46] According to a neighbor, less than two seconds passed between the time Office Book entered Mr. Blackman's apartment and the shots being fired.[47]

- In 2012, RPD officers shot and killed Israel "Izzy" Andino, a 20-year-old resident of

---

[44] *See* Letter from City Councilmember Adam McFadden, Public Safety Chair, to Mayor, Police Chief and Council
President of The City of Rochester, INDYMEDIA (June 29, 2011),
http://rochester.indymedia.org/sites/default/files/McFadden%20Letter.pdf.

[45] *See* Rachel Barnhart, *Rochester Settled High-Profile Cases Involving Alleged Police Misconduct*, ROCHESTER FOR ALL (Nov. 21, 2018), http://www.rochesterforall.com/city-checkbook-rochester-settled-high-profile-cases-involving-police-misconduct/; Davy V., *Remembering Hayden Blackman, Family Man Shot and Killed by Trigger-Happy, Rochester, NY Police officer Randy Book*, THE DAVY V. BLOG (Oct. 9, 2012),
http://davyv.blogspot.com/2012/10/remembering-hayden-blackman-family-man_9.html.

[46] *See* Hayden Blackman Complaint and Notice of Removal, ROCHESTER FOR ALL (Nov. 2018),
http://www.rochesterforall.com/wp-content/uploads/2018/11/HAYDEN-BLACKMAN-COMPLAINT.pdf.

[47] *See* Victoria Freile et al., *From the Democrat & Chronicle: "Ex-wife: Suspect a nonviolent man"*, INDYMEDIA (Nov. 26, 2015), http://rochester.indymedia.org/node/147136.

Rochester with well-known mental-health issues, including bipolar disorder.  Although
Mr. Andino was armed with a knife at the time, witnesses said that it did not appear that
officers had to shoot him to de-escalate the situation, and that there were ample
opportunities to subdue Mr. Andino instead of shooting him.[48]  Instead, seven officers
opened fire on Mr. Andino.  As one witness explained, Mr. Andino "died by … firing
squad."[49]  One of those officers was RPD Officer Brian Cala, who had earlier used
excessive force during the incident involving Kerry Coleman and his wife.[50]

- In 2013, Benny Warr, a 52-year-old Black man, was waiting for a bus in his motorized
  wheelchair.  RPD Officers Joseph Ferrigno (who had previously used excessive force
  against Robin Turner) and Anthony Liberatore ordered Mr. Warr to get off the street.
  When Mr. Warr responded that he was waiting for the bus, these officers pepper-sprayed
  him and tipped his wheelchair over, throwing him to the ground.  The officers punched
  and kicked Warr on his body and his head.  When a third officer named Mitchell Stewart
  arrived, he also kicked and struck Mr. Warr, who suffered three broken ribs as a result of
  the incident.[51]  These officers' use of excessive force was corroborated by multiple videos
  taken of the incident.[52]  All officers involved in the incident were cleared of any

---

[48] *See* Jon Hand, *Mother of man shot by police sues city*, DEMOCRAT AND CHRONICLE (last
updated Dec. 14, 2013 at 8:19PM),
https://www.democratandchronicle.com/story/news/local/2013/12/14/mother-of-man-shot-by-
police-sues-city/4025915/; Annette Jimenez, *Neighbors, activists decry police shooting*, EL
MENSAJERO ROCHESTER (July 12, 2020), https://en.elmensajerorochester.com/news/neighbors-
activists-decry-police-shooting/.

[49] Jimenez, *supra* note 48.

[50] Lacker-Ware, *supra* note 31.

[51] *See id.*

[52]  *See* Rochester Indymedia, *edited footage from cop cam on May 1st of Benny Warr attack*,
YouTube (June 25, 2013), https://www.youtube.com/watch?v=47vo2WVcWY0 (last visited

wrongdoing following an investigation.[53]

- In 2013, RPD Officers Daryl Hogg and Jason Prinzi used excessive force against Tina Cabisca after another RPD officer, Nolan Wengert, fatally shot Ms. Cabisca's dog. Following a bench trial in 2019, the court concluded that Officer Hoff had "lost his temper," used a "straight arm bar technique" to force Ms. Cabisca to the ground, and then placed his full bodyweight on her back.[54]  The court also found that Officer Prinzi had used excessive force in similar manner.  Ms. Cabisco was awarded $50,000.  Both Officer Hogg and Officer Prinzi continued to be employed the RPD; Officer Hogg was promoted to Sergeant in 2020.[55]

- In 2013, RPD Officer Alexander Baldauf assaulted Dwayne Ivery.  During this assault, Officer Baldauf punched Mr. Ivery, a Black man, in the head numerous times, slammed his body to the ground, further punched Mr. Ivery in the head and body, and stomped on Mr. Ivery's head with his foot.  This incident was recorded on video.[56]

- In 2013, RPD Officer Lucas Krull and other RPD officers were captured on video

---

June 2, 2022); Rochester Indymedia, *Corrected Higher Resolution Video of Benny Warr Being Attacked*, YouTube (June 25, 2013), https://www.youtube.com/watch?v=47vo2WVcWY0 (last visited June 2, 2022).

[53] Lacker-Ware, *supra* note 31.

[54] *Cabisca v. Hogg*, 14-CV-6485-MJP (W.D.N.Y. Jul. 31, 2020), https://casetext.com/case/cabisca-v-hogg.

[55] *See* Officer Detail: Daryl L. Hogg, OPENOVERSIGHT, https://openoversight.com/officer/32967 (last visited June 6, 2022).

[56] *See* Jon Hand, *Lawsuit: Police beat man without cause*, DEMOCRAT AND CHRONICLE (last updated Feb. 5, 2014 at 11:22AM), https://www.democratandchronicle.com/story/news/local/2014/02/04/lawsuit-police-beat-man-without-cause/5205185/.

assaulting a 21-year-old Black pregnant woman, Brenda Hardaway. They punched her in the head and violently threw her to the ground.[57] None of the officers involved were ever disciplined. The RPD's internal investigation found that Officer Krull's actions were "lawful, justified, and proper."[58] James Sheppard, Rochester's Police Chief at the time, stated that the officers involved in this incident used "tremendous restraint."[59]

- In 2013, Officer Drake (who later shot and killed Tyshon) drove his marked police car into a crowd, which, upon information and belief, included Black people, in what then-RPD Police Chief James Sheppard described as an "unsafe manner." Officer Drake struck an individual with his vehicle and that person sustained injuries that required medical attention. Apart from a letter "reprimand[ing]" Officer Drake for this conduct, he received no disciplinary action or retraining following this incident.[60]

- In 2014, RPD Officers Michael Feldman and Evan Henry stopped Dudley Scott, a 33-year-old Black man, while he was driving home. These officers then handcuffed Mr. Scott and repeatedly punched and kicked him, even though Mr. Scott was restrained and was not resisting. Mr. Scott had to undergo surgery and was permanently blinded in his

---

[57] *See* Christine Carrie Fien, *Arrest video provokes outrage; chief responds*, ROCHESTER CITY NEWSPAPER (Aug. 28, 2013), https://www.rochestercitynewspaper.com/rochester/arrest-video-provokes-outragechief-responds/Content?oid=2265099.

[58] *See* Jon Hand, *Brenda Hardway gets six months in jail*, DEMOCRAT AND CHRONICLE (last updated March 18, 2014 at 7:09PM), https://www.democratandchronicle.com/story/news/2014/03/18/brenda-hardaway-sentenced-today/6555259/.

[59] Fien, *supra* note 57.

[60] *See* Class Action Complaint, ROCHESTER BEACON (Apr. 2021), https://rochesterbeacon.com/wp-content/uploads/2021/04/Suit-against-RPD-et-al-hall-v-warren-21-cv-6296-filed-complaint4119.pdf.

right eye and now has permanently diminished vision in his left eye.  The City paid Mr.

Scott $750,000 to settle his claims.    Upon information and belief, all of the officers

involved continued to be employed by the RPD.[61]

- In 2014, Officer Mario "Cowboy" Masic used excessive force against Quintin Keene.  At

  the time, Mr. Keene had been talking on the phone while doing his laundry in a

  laundromat.  Officer Masic entered with his gun drawn, slammed Mr. Keene into a wall,

  pepper-sprayed him in the face and eyes, and struck his head and body several times.[62]

- In 2015, Officer Jeffrey Kester—the same officer involved in the incident with David

  Vann that had occurred just a few months prior—used excessive force against Septimus

  Scott, who had been diagnosed with PTSD and was suffering from a panic attack as he

  was brutalized by Officer Kester.  During a sobriety test following a vehicle stop, Mr.

  Scott explained that he was crying because he was having a panic attack and that he was

  an army veteran that had been diagnosed with PTSD.  Officer Kester slammed Mr.

  Scott's face into the side of the police vehicle, slammed him to the ground, punched him

  in the back of the head and torso multiple times, and then pepper-sprayed him from an

  extremely short distance.  At no point did Mr. Scott accost Officer Kester or otherwise

---

[61] *See id*.

[61] *See* Dudley Scott Complaint, ROCHESTER FOR ALL (Nov. 2018),
http://www.rochesterforall.com/wp-content/uploads/2018/11/DUDLEY-SCOTT-LAWSUIT.pdf;
Will Cleveland, *Excessive force lawsuit asks federal police oversight, reform for Rochester
Police Department*, DEMOCRAT AND CHRONICLE (last updated Jan. 18, 2021 at 5:51PM),
https://www.democratandchronicle.com/story/news/2021/01/16/rochester-ny-police-excessive-
force-officer-michael-stephens-dudley-scott-craig-puritt/4174736001/.

[62] *See* Justin Murphy, *Man files excessive force suit against RPD officer*, DEMOCRAT AND
CHRONICLE (last updated Sept. 18, 2017),
https://www.democratandchronicle.com/story/news/2017/09/18/rochester-mario-masic-quintin-
keene-emily-good/678935001/.

resist arrest.[63]

- The next year, in 2015, Officer Masic again used excessive force, this time against Rasheed Griner, a Black man, who was listening to music with his family and friends at a beach.  Officer Masic asked Mr. Griner to leave the area.  When Mr. Griner asked for Officer Masic's badge number, Officer Masic responded, "I've had enough of your mouth," and struck Mr. Griner in his face with his baton, an injury that required several stitches.[64]

- In 2015, RPD Officer Alexander Baldauf—the same officer who was involved in an earlier incident involving Dwayne Ivery—used excessive force against Delmar Lipford, a Black man, including by punching Mr. Lipford in the face and back.  The City later paid Mr. Lipford $7,500 to settle his claims.[65]

- In 2015, RPD Officers Jeffrey Kester, Matthew Drake (the officer who later shot and killed Tyshon), and Steven Mitchell brutally beat David Vann, a 23-year-old unarmed Black man.  These officers beat Mr. Vann for more than two minutes while he was handcuffed and lying on the ground.[66]  Although their beating of Mr. Vann was captured

---

[63] *Scott v. City of Rochester et al, No. 6:2017cv06359 – Document 46 (W.D.N.Y. 2018)*, JUSTIA, https://law.justia.com/cases/federal/district-courts/new-york/nywdce/6:2017cv06359/112277/46/ (last visited June 6, 2020).

[64] Lacker-Ware, *supra* note 31.

[65] *See* Bennett Loudon, *Police brutality case settled for $7,500*, NY DAILY RECORD (Feb. 27, 2018), https://nydailyrecord.com/2018/02/27/police-brutality-case-settled-for-7500/.

[66] *See* Will Cleveland, *Officer in Open Door Mission shooting tied to 'brutal' 2015 beating in lawsuit*, DEMOCRAT AND CHRONICLE (last updated Feb 1, 2022 at 6:57AM), https://www.democratandchronicle.com/story/news/2021/03/26/officer-matthew-drake-open-door-mission-shooting-tyshon-jones-tied-2015-beating-suspect/6972519002/.

on multiple videos, these officers pursued false criminal charges against Mr. Vann, of which he was later acquitted.  None of the officers involved in this incident—including Officer Drake—were disciplined in connection with this incident.  To the contrary, Officer Kester was later promoted to Investigator.[67]

- In 2016, six RPD officers brutally beat, tasered, and pepper-sprayed Rickey Bryant, a 17-year-old Black teenager.  Mr. Bryant suffered serious physical injuries, including a fractured orbital socket.  One of the officers involved was Officer Thomas Rodriguez, who was also involved in the earlier incident with Lawrence Rogers.  The RPD's investigation into this incident concluded that Mr. Bryant's allegations were "unprovable," and cleared the officers involved of any wrongdoing.[68]  Michael Ciminelli, RPD's Police Chief at the time, stated that the RPD's investigation concluded that the officers involved "acted in accordance with department policy, procedures, and guidelines."[69]  The City later settled a lawsuit with Mr. Bryant for $360,000.[70]

- In 2016, RPD Officer Jonathan Marsh used excessive force against Lentorya Parker, a Black woman, after she asked Officer Marsh why he had detained her boyfriend.

---

[67] *See* Chief Michael Ciminelli, *RPD Update*, CITY OF ROCHESTER (June 2017), https://www.cityofrochester.gov/WorkArea/DownloadAsset.aspx?id=8589972285.

[68] *See* Sean Lahman, *17 RPD officers named in lawsuit alleging assault of city teen*, DEMOCRAT AND CHRONICLE (last updated Aug. 7, 2017), https://www.democratandchronicle.com/story/news/2017/08/07/17-rpd-officers-named-lawsuit/543910001/.

[69] *See* James Goodman, *Rochester police chief covered up alleged beating, lawyer says*, DEMOCRAT AND CHRONICLE (last updated Apr. 12, 2017), https://www.democratandchronicle.com/story/news/2017/04/12/lawyer-teen-alleging-abuse-calls-ciminellis-letter-coverup/100364152/.

[70] *See* Rachel Barnhart, *City Paid Rickey Bryant $360,000*, ROCHESTER FOR ALL (Nov. 16, 2018), http://www.rochesterforall.com/city-paid-rickey-bryant-360000/.

Although Ms. Parker was turning away from Officer Marsh and returning to her yard, Officer Marsh said, "Oh, too late," and then ran and tackled Ms. Parker to the ground and drove his knee into her back.  Other officers at the scene then pepper-sprayed Ms. Parker. Another officer then told Ms. Parker's six-year old daughter that her mother was an "animal."  Officer Marsh continued to be employed by the RPD.[71]

- In 2016, RPD Officer Joseph Ferrigno—the same officer involved in earlier incidents with Benny Warr and Robin Turner—shot Silvon Simmons, a 34-year-old Black man, three times, as Mr. Simmons ran towards his own home to get away from Officer Ferrigno, who had not yet identified himself as a police officer.[72]

- In 2017, RPD Officer Thomas Rodriguez—the same officer involved in earlier incidents with Lawrence Rogers, Ann Marie Sanders, and Rickey Bryant—used an improper chokehold against a Black man named DKuan Webb in an incident that was recorded on Officer Rodriguez's body camera.  Mr. Bryant can be seen having difficulty breathing in the video of the incident.  The City later settled a lawsuit with Mr. Webb for $125,000. This incident prompted an investigation by the Federal Bureau of Investigation.[73]

- In 2017, RPD Officer Timothy Pancoe used racist language during an interaction with Rakim Yancey, a Black man.  When Mr. Yancey asked why he used that language,

[71] *See* Lacker-Ware, *supra* note 31; Amy Hudak, *Woman sues RPD, claiming excessive force in viral video*, 13WHAM (Sept. 6, 2017), https://13wham.com/news/local/woman-sues-rpd-claiming-excessive-force-in-viral-video.

[72] Girion, *supra* note 42.

[73] *See* Gary Craig, *City pays $125,000 to man allegedly choked by Rochester police officer*, DEMOCRAT AND CHRONICLE (last updated Sept. 5, 2017), https://www.democratandchronicle.com/story/news/2017/09/05/city-rochester-police-choking-fbi-settlement-dkuan-webb-thomas-rodriguez-john-parrinello/632147001/.

Officer Pancoe pepper-sprayed and assaulted Mr. Yancey, who required hospital treatment for wrist fractures, a chipped tooth, and multiple contusions and abrasions.[74] Officer Pancoe was never disciplined for this incident, and was promoted to Lieutenant in 2019.[75]

- In 2017, several RPD officers attended a training seminar led by Bill Lewinsky, a self-described "police psychologist," who is notorious for advocating on behalf of police officers who have shot people under suspicious circumstances. The seminar was intended to prepare the RPD "for the firestorm from a controversial use of force," and covered topics such as "[w]hether shots to the back really reflect what an officer saw when he pulled the trigger." Michael Mazzeo, the President of the RPD's police union, referred to this seminar as "premier training."[76]

- In 2017, RPD officer Patrick Giancursio was caught on surveillance video using excessive force against Alexander Grassies.[77] Although Officer Giancursio was briefly suspended for the incident and purportedly underwent "remedial training," he was cleared of any wrongdoing in relation to this incident, and was shortly thereafter awarded an

---

[74] *See Yancey v. Pancoe*, 6:20-CV-06149 EAW (W.D.N.Y. Mar. 8, 2021), https://casetext.com/case/yancey-v-pancoe.

[75] *See* Timothy Pancoe Linkedin Profile, LINKEDIN, https://www.linkedin.com/in/timothy-pancoe-72515b119/ (last visited June 6, 2022).

[76] *See* David Andreatta, *Rochester Police Department backpedals on controversial training*, DEMOCRAT AND CHRONICLE (last updated Sept. 7, 2017 at 3:04PM), https://www.democratandchronicle.com/story/news/local/columnists/andreatta/2017/09/06/rochester-backpedals-controversial-police-training/639216001/.

[77] *See* Justin Carter, *Two RPD officers suspended after video shows man riding motorbike taken down*, 13WHAM (Apr. 20, 2017), https://13wham.com/news/local/two-rpd-officers-suspended-after-video-shows-man-riding-motorbike-taken-down.

"Officer of the Year" award by the RPD.[78]

68.     The callous disregard by the RPD is perhaps best reflected by its interaction in 2020 with Daniel Prude, a 41-year-old Black man suffering from an acute mental-health crisis. In March 2020, Mr. Prude's family called the RPD hoping for assistance, but when the RPD arrived, they abused him, mocked him, and ultimately killed him.  Specifically, Mr. Prude's brother had told the 911 dispatcher that Mr. Prude had been released from Strong Memorial Hospital just two to three hours earlier, that he had been suicidal, and that he was concerned Mr. Prude could be a danger to himself.  At that time, Mr. Prude was in severe mental and emotional distress, and was running through the street in his underwear.

69.     Once RPD officers located Mr. Prude, they ordered him to lie down on the cold street naked, and handcuffed him.  Even though the six to seven officers on the scene were fully aware that Mr. Prude was experiencing a mental-health crisis, they did not permit medical personnel to assist him, and instead left him lying face down on the ground while mocking his behavior and laughing at him.  When Mr. Prude sat up and spat (away from the officers), Officer Mark Vaughn snuck up behind Mr. Prude and pulled a "spit hood" over his head, which impaired Mr. Prude's breathing and further disoriented him.  Instead of assisting him, the officers forced Mr. Prude back down, and further pinned him to the ground.  Mr. Prude began very clearly gasping for air, and his breathing was obviously obstructed.  But the officers continued to place their bodyweight on top of Mr. Prude.[79]

70.     When the officers finally permitted medical personnel to approach the scene,

---

[78] *See* Carlet Cleare, *Suspended RPD officer named "Officer of the Year"*, 13WHAM (May 4, 2017), https://13wham.com/news/top-stories/rpd-officer-honored-in-midst-of-controversy.

[79] *See generally*, Complaint, *Prude v. City of Rochester et al.*, No. 6:20-cv-06675-FPG (W.D.N.Y. June 8, 2021).

approximately five minutes after they arrived, it was too late. Mr. Prude had already gone limp.

Officer Vaughn and the other officers delayed in bringing this development to the EMT's

attention, and instead complained that they were going to have to wash their clothing because

they had touched Mr. Prude. The EMT asked the officers to uncuff Mr. Prude so that they he

could administer CPR. Officer Vaughn refused. The EMT attempted to administer CRP while

Mr. Prude was still handcuffed, but it was ineffective. Several additional attempts were made to

resuscitate Mr. Prude, but they were also ineffective. Mr. Prude was taken off of life support and

died on March 30, one week after his encounter with the RPD.[80]

71.    Mr. Prude's death sparked widespread protests in Rochester, which resulted in

RPD officers deploying further extreme and unnecessary force in a number of well-documented

instances against protesters. This included the widespread and indiscriminate use of tear gas and

pepper-spray, blunt-impact projectiles, pepper balls, and flash-bang grenades. Numerous

protesters suffered serious injuries from being shot with a pepper ball at close range, including

permanent blindness.[81]

72.    As demonstrated above, Officer Drake—who shot and killed Tyshon—has been

an active contributor to Rochester's brutality against the Black community. In 2013, he drove

his marked police car into a crowd—that upon information and belief included Black people—in

---

[80] *See* Brett Dahlberg, *Rochester Hospital Released Daniel Prude Hours Before Fatal Encounter with Police*, NPR (Sept. 29, 2020), https://www.npr.org/sections/health-shots/2020/09/29/917317141/rochester-hospital-released-daniel-prude-hours-before-fatal-encounter-with-police.

[81] *See, e.g.*, Complaint at ¶¶ 98-105, *Hall v. Warren*, No. 6:21-cv-06296-FPG (W.D.N.Y. Apr. 5, 2021) (alleging that the City of Rochester through the RPD "in keeping with its long history, responded [to peaceful protests] with the use of extreme violence and militarized police tactics—including deploying batons, tear gas, flash-bang grenades, armored vehicles, and police dogs" (¶ 6).

what RPD has admitted was an "unsafe manner," striking and injuring at least one individual.[82]
The RPD gave him a letter of reprimand—a slap on the wrist.  Just two years later, he and other
officers brutally beat an unarmed Black man while he was handcuffed and lying on the ground.[83]
This time around, he did not even get a slap on the wrist.

73.     Thus, rather than a series of isolated events, these incidents reflect a systemic and
pervasive problem with excessive force, particularly with respect to Rochester's residents of
color and people experiencing mental illness, and Rochester's deliberate indifference to the
brutality.

74.     A study published in 2021 by Chris LaFaso, a former RPD Investigator, analyzed
over 3,000 use-of-force reports by RPD officers from 2011 to 2016 (the "LaFaso Report").  The
LaFaso Report concluded that the "frequency and severity of force" are higher in areas with
"larger percentages of Black and Hispanic residents," and that this is true despite controlling for
other factors like crime rate.  Of the incidents analyzed by the LaFaso Report involving Black
and Latinx residents, nearly a quarter of them were classified as "high force" incidents, which
meant that the use-of-force incident involved a TASER, baton, canine, bean bag gun, or a gun.
Incidents involving tactics such as nerve pressure points, punches and jabs, kicks and knee
strikes, takedowns or pepper-spray were classified only as a "low force."  The LaFaso Report
concluded that "as the percentage of Black and Hispanic residents [in a neighborhood] increases,
uses of force significantly increase," and that officers use force more often and at more severe

---

[82] *See* Class Action Complaint, ROCHESTER BEACON (Apr. 2021),
https://rochesterbeacon.com/wp-content/uploads/2021/04/Suit-against-RPD-et-al-hall-v-warren-
21-cv-6296-filed-complaint4119.pdf.
[83] *See* Will Cleveland, *Officer in Open Door Mission shooting tied to 'brutal' 2015 beating in
lawsuit*, DEMOCRAT AND CHRONICLE (last updated Feb 1, 2022 at 6:57AM),
https://www.democratandchronicle.com/story/news/2021/03/26/officer-matthew-drake-open-
door-mission-shooting-tyshon-jones-tied-2015-beating-suspect/6972519002/.

levels when interacting with citizens in neighborhoods with higher percentages of Black and Latinx residents.  Importantly, the analysis, revealing the disproportionate use of excessive force against people of color, was based on the RPD's own self-reported data.

75.    Rochester understands that RPD officers must interact with people of color in the normal course of their work.  In fact, people of color make up more than 63% of the Rochester population.[84]  City policymakers are also well aware of the frequency with which excessive force is applied towards Black and Latinx populations.  The previous Mayor of Rochester, Lovely Warren, publicly acknowledged that "institutional racism" was to blame for the death of Daniel Prude,[85] and that there is "a pervasive problem in the Rochester Police Department."[86]  Despite that awareness, the City has failed to provide adequate training and supervision to address the pervasive racism that has resulted in the use of excessive force, at disproportionately high rates against Rochester's Black and Latinx residents.

76.    Likewise, RPD's history of encounters with individuals experiencing mental-health crisis underscores the dire need for policies and training to guide these interactions.  These incidents have been the source of public outcry, protest, and litigation against the City placing policy makers on notice of the obvious need to address this pressing issue time and time again.

---

[84] *See* U.S. Census Bureau, 2020 Decennial Census, Redistricting Data, Table P1 | Race (2021) *available at* https://data.census.gov/cedsci/table?q=rochester&tid=DECENNIALPL2020.P1 (last visited June 2, 2022). "People of color" means those self-identifying in the United States Census as other than "White alone." Of the 90.6% of Rochester residents self-identifying as being of "one race," a plurality self-identified as "Black or African American alone."

[85] Sean Lahman & Will Cleveland, Rochester mayor: 'Daniel Prude was failed by our police…our society, and by me', USA TODAY (last updated Sept. 4, 2020 at 5:08PM), https://www.usatoday.com/story/news/nation/2020/09/04/daniel-prude-rochester-death-by-police-mayor-lovely-warren-apologizes/5717698002/.

[86] Associated Press, Rochester Police Chief Out in Fallout Over Prude Death, USNEWS (Sept. 14, 2020), https://www.usnews.com/news/politics/articles/2020-09-14/rochester-police-chief-out-in-fallout-over-prude-death?context=amp.

77.     Nevertheless, despite awareness of the need for training around de-escalation methods, and the likelihood that this lack of training would result in the unnecessary use of excessive force – especially if they also happened to be people of color or experiencing mental illness – the City has failed to appropriately train the RPD to engage with these individuals.

78.     The City has also failed to adequately equip responding officers with either the physical or tactical tools that could reasonably accommodate the needs of persons experiencing mental health crisis while avoiding subjecting them to excessive force by police at disproportionately higher rates.  Responding officers do not generally have non-lethal weapons available to them to disable potentially dangerous subjects at reduced risk to themselves.

**E.      Rochester Acknowledges the Need to Address RPD's Brutality Against People Experiencing Mental-health Crises, But Fails to Make Substantive Changes**

79.     In 2021, following the death of Daniel Prude and the others that came before him, in January 2021 the City launched a "Person in Crisis" (PIC) team.  According to the Pilot Plan, the PIC Team, which is comprised of emergency response social workers, was commissioned to create a "24/7, law enforcement alternative response of trained professionals to address behavioral health and related crises occurring in the City of Rochester."  The Pilot Plan described the purpose of the team as a means to "[i]ncrease efficiency for identifying and connecting individuals with the appropriate level of care during crisis situations . . . [e]ngage individuals with solutions that influence behaviors by providing information needed to make informed decisions, better understand their mental health status, and know when to seek which level of care."[87]

---

[87] *See* Dr. Daniele Lyman-Torres, *Person In Crisis Team Pilot Plan*, CITY OF ROCHESTER, at 4 (Jan. 4, 2021),

80.     Rochester described the goals of the PIC team as a means to: "[i]ncrease connection to community crisis services that meet the need," by de-escalating crisis calls; "[d]ivert crisis calls coming in to 911 to the most appropriate response option, activating law only when needed;" and "[s]trengthen supports post crisis to address full range of needs to stabilize and prevent future crises."[88]

81.     PIC teams are one way for police departments to intercept people having mental-health episodes and deal with them in a manner that does not require the use of force.  In order for PIC teams to be successful, they need to be adequately trained, and their services actually need to be utilized when there is a police encounter with an individual evincing a mental health episode.  There is significant evidence that the RPD did not properly employ the PIC teams in encounters with people suffering mental disabilities.[89]

82.     For example, in February 2021, RPD Officers pepper-sprayed a nine-year-old girl after responding to a family disturbance call and learning that the child might be suicidal.  The child was detained, handcuffed and placed in the back of the patrol call.  When she pleaded with the officer, stating "please don't do this to me," the officer responded "you did it to yourself, hon."  According to news reports, as officers tried to restrain the young girl, her mother repeatedly told an officer that her daughter was experiencing a mental-health breakdown, and asked them to call a specialist rather than trying to detain her.  They ignored these requests.  A video clip of the encounter reflects the child sobbing, and screaming that her eyes are "bleeding"

---

https://www.cityofrochester.gov/uploadedFiles/Departments/Drys/21%20DRHS%20Person%20in%20Crisis%20ERA%20format%20Plan%20FINAL%20020321.pdf.

[88] *Id*. at 3.

[89] *See* Derek Hawkins, *New video shows Rochester police scolding 9-year-old after they pepper sprayed her*, WASH. POST (Feb. 12, 2021), https://www.washingtonpost.com/nation/2021/02/12/rochester-police-9-year-old/.

and "burning."  An officer in the car with her responded "that's the point of pepper spray."[90]

83.    In a public statement, Mayor Warren stated that she was "outraged" by the incident.  She added that the family had been connected to the PIC team following their encounter with the RPD officers, but failed to explain why the PIC team was not deployed in order to prevent or de-escalate these events while the RPD was interacting with the young person.  Former New York State Governor Andrew Cuomo described the footage of the child's encounter with the police as "even more shocking and disturbing than the last" and described it as "part of a systemic problem with law enforcement."[91]

84.    As described more fully above, on March 10, 2021, Tyshon encountered the RPD. Although it was clear that he was in emotional distress and experiencing a mental-health crisis, neither the PIC team nor other de-escalation techniques were sufficiently utilized.  This disregard and failure had fatal implications for Tyshon, and resulted in the unnecessary and untimely loss of his life in violation of his rights under the Fourteenth Amendment, the ADA, the Rehabilitation Act, and New York law.

85.    As a result of the RPD's actions, on information and belief, Tyshon experienced conscious physical and mental pain and suffering prior to his death.  Tyshon's Estate incurred funeral expenses.  Most important, the life that Tyshon lived—and that he lost—had intrinsic value to himself, his family, and his community.

### CAUSES OF ACTION

### Count I

### Title II of the ADA – 42 U.S.C. § 12131 *et seq.*

---

[90] *Id.*

[91] *Id.*

86.     Plaintiffs repeat and reallege all the preceding paragraphs.

87.     At the relevant time, Tyshon was a qualified individual with a disability within the meaning of 42 U.S.C. § 12312.

88.     The City and the RPD are public entities that operative services, programs, and/or activities, including law enforcement.

89.     Acting through the RPD, the City denied Tyshon the benefits of such services, programs, and/or activities and subjected Tyshon to unlawful discrimination by, among other things, failing to provide reasonable accommodations for his disabilities.

90.     The City was aware that the RPD's existing policies and practices made it substantially likely that disabled individuals would be denied their federally protected rights under the ADA in use-of-force interactions with the RPD and acted with deliberate indifference in failing to prevent or mitigate the denial of those rights.

91.     The fatal shooting of Tyshon was a direct and proximate result of the City's violations of Title II of the ADA.

92.     The City is liable for the damages hereinbefore alleged in an amount to be determined at trial.

## Count II

### Rehabilitation Act – 29 U.S.C. § 794 *et seq.*

93.     Plaintiffs repeat and reallege all the preceding paragraphs.

94.     On information and belief, the City and/or the RPD receive federal funding, including for police services, and are subject to the Rehabilitation Act.

95.     Tyshon was, at the relevant time, a qualified individual with a disability.

96.     Acting with deliberate indifference to Tyshon's federal rights, the City failed to

reasonably accommodate his disability; denied him access to the services, programs, or activities of the RPD on the basis of his disability; and/or otherwise discriminated against him on the basis of his disability.

97.     The fatal shooting of Tyshon was a direct and proximate result of the City's violations of the Rehabilitation Act.

98.     The City is liable for the damages hereinbefore alleged in an amount to be determined at trial.

## Count III

### 42 U.S.C. § 1983 – Fourth/Fourteenth Amendments – Excessive Force – Municipal Liability

99.     Plaintiffs repeat and reallege all the preceding paragraphs.

100.     On or about March 10, 2021, one or more members of the RPD used objectively unreasonable force against Tyshon.

101.     At the relevant time, the City had an unlawful municipal policy or custom of its police using objectively unreasonable force, particularly against Black residents and residents with mental illness.

102.     In addition or in the alternative, City policymakers ratified its officers' repeated unlawful uses of force, particularly against Black residents and residents with mental illness, by failing to take corrective action despite their subjective awareness of a pattern of such constitutional violation.

103.     In addition or in the alternative, City policymakers knew to a moral certainty that City police officers would confront the difficult situation of responding to requests for police services involving persons experiencing mental-health crises, in which a lack of appropriate training and/or supervision (including training in de-escalation techniques and access to

nonlethal force) would frequently result in its officers using objectively unreasonable and disproportionate force against persons experiencing mental health crises, and was deliberately indifferent to the constitutional rights of those interacting with its police in failing to provide such training and supervision.

104.    In addition or in the alternative, City policymakers knew to a moral certainty that its heavily white police force, infected by generations of racism and pernicious stereotyping, would regularly encounter situations requiring its officers to evaluate the alleged danger posed by people of color, in which inadequate training and/or supervision would frequently result in its officers using objectively unreasonable and disproportionate force against people of color, and was deliberately indifferent to the constitutional rights of those interacting with its police in failing to provide such training and supervision.

105.    One or more of the foregoing municipal policies, customs, and/or usages proximately caused the use of objectively unreasonable force against Tyshon on or about March 10, 2021.

106.    The City is liable for the damages hereinbefore alleged in an amount to be determined at trial.

## Count VI

### Common-Law Battery

107.    Plaintiffs repeat and reallege all the preceding paragraphs.

108.    On March 10, 2021, one or more employees, servants, and/or agents of the City made harmful and/or offensive contact with Tyshon, proximately causing injury to Tyshon.

109.    Such contact was without lawful privilege.

110.    The City is liable for the damages hereinbefore alleged in an amount to be

determined at trial.

## Count V

### Common-Law Assault

111.    Plaintiffs repeat and reallege all the preceding paragraphs.

112.    On March 10, 2021, one or more employees, servants, and/or agents of the City placed Tyshon in fear of imminent harmful or offensive contact, proximately causing injury to Tyshon.

113.    Such contact was without lawful privilege.

114.    The City is liable for the damages hereinbefore alleged in an amount to be determined at trial.

## Count VI

### Wrongful Death – EPTL § 5-4.1

115.    Plaintiffs repeat and reallege all the preceding paragraphs.

116.    As a result of the foregoing, the statutory distributees of Tyshon's estate sustained pecuniary loss, including funeral expenses, and non-economic loss resulting from the loss of love, comfort, companionship, society, support, and services provided by Tyshon.

117.    Plaintiffs suffered emotional distress.

118.    The City is liable for the damages hereinbefore alleged in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

A.    Compensatory damages in an amount to be determined at trial;

B.    Reasonable costs and attorneys' fees under 42 U.S.C. §§ 1988 and 12205,

or other applicable law:

C.      Pre- and post-judgment interest to the fullest extent permitted by law; and

D.      Any additional relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.


Dated:  June 8, 2022

Respectfully submitted,

*Attorneys for Plaintiffs*
*Kennetha Short and Pernell Jones, Sr., in their*
*capacity as administrators of the Estate of Tyshon*
*Jones*

By:   ___/s/ Henry J. Ricardo___

Alanna Kaufman
Douglas E. Lieb

KAUFMAN LIEB LEBOWITZ
& FRICK LLP
18 E. 48th Street, Suite 802
New York, New York 10017
(212) 660-2332
dlieb@kllf-law.com
akaufman@kllf-law.com

Muhammad U. Faridi
David S. Kleban
Christina M. Seda-Acosta
Kevin Opoku-Gyamfi
Maggie O'Neill
David Erroll
PATTERSON BELKNAP
 WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Tel: (212) 336-2000
mfaridi@pbwt.com
hjricardo@pbwt.com
dkleban@pbwt.com
cseda@pbwt.com
kopokugyamfi@pbwt.com
moneil@pbwt.com
derroll@pbwt.com