UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KENNETHA SHORT and PERNELL JONES,
SR., *in their capacity as administrators of the estate of Tyshon Jones*,

           Plaintiffs,

      v.

CITY OF ROCHESTER,

           Defendant.
_____

**DECISION AND ORDER**

6:22-CV-06263 EAW

# INTRODUCTION

      Plaintiffs Kennetha Short and Pernell Jones, Sr. ("Plaintiffs") are the administrators of the estate of Tyshon Jones ("Jones"), who was shot and killed by officers of the Rochester Police Department ("RPD") in 2021. Plaintiffs assert claims against defendant City of Rochester (the "City") pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131, *et seq.*, the Rehabilitation Act ("RA"), 29 U.S.C §§ 794 *et seq.*, and 42 U.S.C. § 1983, as well as state law claims for battery, assault, and wrongful death. (Dkt. 1). Presently before the Court is Defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. 8). For the reasons that follow, Defendant's motion is denied.[1]

---

[1]     Defendant has also filed a motion to stay discovery pending resolution of its motion to dismiss. (Dkt. 20). In light of the Court's issuance of the instant Decision and Order, that request is denied as moot. Upon Defendant's filing of an answer, the Court will refer the matter to a magistrate judge for supervision of discovery, including issuance of a scheduling order.

- 1 -

## FACTUAL BACKGROUND

The following facts are taken from the allegations in Plaintiffs' complaint. (Dkt. 1). As is required at this stage of the proceedings, Plaintiffs' allegations are treated as true.

Jones was "a young Black man with mental illness." (*Id*. at ¶ 1). He had been diagnosed with post-traumatic stress disorder, anxiety, and borderline personality disorder, and his mother "also believes he exhibited signs of schizophrenia." (*Id*. at ¶ 29).

At approximately 4:00 p.m. on March 9, 2021, Jones was observed walking around the Town of Gates, just outside the City, without any shoes. (*Id*. at ¶ 35). A security guard at a residential building, seeing that Jones was visibly distressed, called the police. (*Id*.). Gates police brought Jones to a homeless shelter on Hobart Street in the City. (*Id*. at ¶ 36). Jones was provided with shoes and granted entry. (*Id*.). He spent the rest of that afternoon and most of the evening at the Hobart Street shelter. (*Id*.).

Jones began experiencing acute mental distress and voluntarily left the Hobart Street shelter around midnight on March 10, 2021. (*Id*. at ¶ 37). By 2:00 a.m., he had arrived at the Open Door Mission (the "Mission"), a shelter located at 210 West Main Street in the City. (*Id*. at ¶ 38). The Mission is a not-for-profit organization that provides emergency food and services to the City's homeless community. (*Id*.). Many of the individuals whom the Mission serves suffer from mental illness, and the RPD is aware of this fact. (*Id*. at ¶¶ 38-39).

When Jones arrived at the Mission, he was greeted by employee Allen Woodruff ("Woodruff"). (*Id*. at ¶ 40). Woodruff opened the door and Jones walked inside to the kitchen, where he grabbed "a bucket of ordinary kitchen knives used for food preparation

at the shelter[.]" (*Id*.). Jones then left, without encountering any other guests or attempting to harm anyone. (*Id*.). Woodruff called the police and reported that Jones had taken knives from the Mission. (*Id*.).

Several nearby RPD officers, "including Officers Drake, Audrey Jackson, Sir Glynn, and Jared Carello," were dispatched to the scene and arrived shortly before 3:00 a.m. (*Id*. at ¶ 42). Officer Drake located Jones, who was in severe mental distress, at approximately 3:03 a.m. (*Id*. at ¶ 44). Officer Drake reported to dispatch that Jones was at the intersection of Cascade Drive and Industrial Street and was "actively cutting himself." (*Id*. at ¶ 44). At this time, no civilians other than Jones were on the street, and Officer Drake was aware of that fact. (*Id*. at ¶ 45).

The responding RPD officers lacked the appropriate equipment to engage with Jones in light of his mental state. (*Id*. at ¶ 46). "Acknowledging this, a fellow officer said to Officer Drake, 'just get in your car, Drake, and let's back off.'" (*Id*.). However, Officer Drake, flanked by Officers Glynn and Jackson, surrounded Jones and shone bright lights in his eyes while pointing their guns at him. (*Id*.).

Jones was in clear distress and experiencing a severe mental health episode. (*Id*. at ¶ 47). Jones stated that he was dangerous and begged the officers to shoot him, telling them that if they did not kill him, he would have to kill them "for Jesus." (*Id*.). Officers Drake, Glynn, and Jackson shouted commands at Jones, including telling him to drop the knife he had in his hand, which he was using to cut himself. (*Id*. at ¶ 49). Jones did not acknowledge their requests, but instead began to walk towards Officer Drake. (*Id*.). As Jones continued walking towards Officer Drake, who was on the sidewalk at the time,

Officer Drake fired five fatal shots, striking Jones once in the chest, twice in the abdomen, once in the groin, and once in the arm. (*Id.* at ¶ 50). Jones was transported to the University of Rochester Medical Center, where he was pronounced dead by 4:30 a.m. (*Id.* at ¶ 54).

## PROCEDURAL BACKGROUND

Plaintiffs filed the complaint on June 8, 2022. (Dkt. 1). Defendant filed the instant motion to dismiss on June 26, 2022. (Dkt. 4). Defendant subsequently filed two corrected memoranda of law in support of its motion. (Dkt. 6; Dkt. 7). Plaintiffs filed their response on July 18, 2022. (Dkt. 8). Defendant filed its reply on July 25, 2022. (Dkt. 9). With the Court's permission (Dkt. 11), Plaintiffs filed a sur-reply on August 3, 2022 (Dkt. 12).

## DISCUSSION

### I. Legal Standard

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). A court should consider the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2279 (2017). To withstand dismissal, a claimant must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

**II.     Request to Submit Video Evidence to the Court**

In connection with its motion to dismiss, the City submitted to the Court a letter from counsel stating:

> We believe that the Court can decide the motion based solely on the Complaint and the stipulations of fact therein. However, we believe that the video footage, which is in the possession of Plaintiffs and has been widely viewed, is dispositive evidence in this case. Therefore, Defendants [sic] request permission to submit same to the Court in support of its motion to dismiss.
>
> Should the Court not be inclined to view the video at this juncture, Defendant respectfully requests that the Court convert the current motion into a motion for summary judgment and permit the City to provide the relevant videos as exhibits under separate cover.

(Dkt. 4-2). In its memorandum of law, Defendant argues that the Court can consider video footage of the RPD's encounter with Jones on March 10, 2021, in connection with the instant motion to dismiss "[b]ecause extrinsic video evidence is repeatedly referenced in

- 5 -

Case 6:22-cv-06263-EAW   Document 23   Filed 12/29/22   Page 6 of 15

the Complaint" and because "the Complaint does not challenge the veracity/authenticity of any [of] the video evidence concerning the subject incident." (Dkt. 7 at 3).

The Court disagrees. Defendant has cited to no portion of the complaint where extrinsic video evidence of the incident at issue is referenced, nor has the Court found any such reference in its own review of the complaint. While the complaint references video footage of other incidents involving the RPD (*see, e.g.,* Dkt. 1 at ¶¶ 67, 82), Defendant has cited no authority for the proposition that a reference to *any* video in a complaint means that a court may consider a completely different, unreferenced video on a motion to dismiss. Similarly, the Court is unaware of any authority for the proposition that Plaintiffs were required to preemptively challenge the authenticity of video footage they did not refer to in their complaint, and Defendant has cited to none.

The Court is further unpersuaded by Defendant's contention that it can consider the video evidence on a motion to dismiss because "the Complaint's description of the relevant interaction is essentially a play by play narration of the subject video[.]" (Dkt. 7 at 3). As Plaintiffs correctly point out in their response, there are apparently multiple videos of the incident. (*See id*. at 3 (referencing "both . . . surveillance and body worn camera footage in this matter")). Defendant has failed to identify with any level of specificity the particular video or videos it is claiming Plaintiffs gave a "play by play narration" of, and Plaintiffs do not concede that that they viewed any particular video when drafting the complaint. On these facts, the Court cannot find that the video evidence referenced by Defendant is integral to the complaint. *See Holmes v. City of New York*, No. 14 CV 5253-LTS, 2016 WL 915332, at *3 (S.D.N.Y. Mar. 4, 2016) ("Plaintiff concedes that she used various

videos as sources for a number of the allegations that were made in the Amended Complaint. Plaintiff does not, however, state that she drafted her pleading using the specific videos proffered by Defendants as source material. Defendants have not proffered any other evidence that would establish that the video evidence is integral to the Amended Complaint, and therefore the video evidence is not properly considered in the context of this motion to dismiss." (citation and quotation omitted)).

*Moran v. Town of Greenwich*, No. 3:19-CV-722, 2021 WL 3604349 (D. Conn. Aug. 13, 2021), the sole case cited by Defendant on this point, is inapposite. In that case, the video in question was "repeatedly referenced throughout" and "linked in the body of" the operative pleading. *Id.* at *2 n.1. No comparable facts are present here.

Finally, the Court declines Defendant's invitation to convert the instant motion into one for summary judgment. As noted above, it appears that there are multiple recordings of the incident at the center of this lawsuit. It would be premature for the Court to consider a motion for summary judgment before affording Plaintiffs the opportunity, through discovery, to ensure that they have been provided with all relevant videos. Indeed, Defendant is not able to provide any assurances that this is the case, stating only that "[u]pon information and belief, Plaintiffs are in possession of all salient extrinsic materials to be proffered in support of this motion." (Dkt. 9 at 8). However, the purpose of the discovery process is to ensure that Plaintiffs have the opportunity to assure themselves of that fact, rather than being required to rely on vague, equivocal representations by an opposing party.

For these reasons, the Court has limited its review to the facts set forth in the complaint.

### III.   ADA and Rehabilitation Act Claims

"The purpose of [Title II of the ADA] is to 'eliminate discrimination on the basis of disability and to ensure evenhanded treatment between the disabled and able-bodied.'" *Maccharulo v. New York State Dep't of Corr. Servs.*, No. 08 Civ. 301, 2010 WL 2899751, *2 (S.D.N.Y. July 21, 2010) (quoting *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998)). As such, a defendant engages in discrimination under Title II of the ADA "when it fails to make a reasonable accommodation that would permit a qualified disabled individual 'to have access to and take a meaningful part in public services.'" *Durr v. Slator*, 558 F. Supp. 3d 1, 27 (N.D.N.Y. 2021) (quoting *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir. 2004)). "To prove a violation of Title II, a party must therefore establish: (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability." *Hargrave v. Vermont*, 340 F.3d 27, 34-35 (2d Cir. 2003) (internal quotation marks omitted). The same standard applies to a claim under the RA. *Fulton v. Goord*, 591 F.3d 37, 42 n.1 (2d Cir. 2009).

"A number of courts have considered whether interactions between law enforcement and disabled individuals—whether initiated by the disabled individual or the police and whether the interaction culminates in an arrest—are 'services, programs, or activities' subject to the requirement of accommodation under Title II of the ADA."

*Williams v. City of New York*, 121 F. Supp. 3d 354, 365 (S.D.N.Y. 2015) (citations omitted).  "Those courts have generally found that Title II applies, but the reasonableness of the accommodation required must be assessed in light of the totality of the circumstances of the particular case." *Id.*

In its moving papers, Defendant made three narrow arguments as to why Plaintiffs had not stated a claim under the RA or the ADA: (1) Plaintiffs have not "credibly alleged that police knew [Jones] had a mental disability," because "Mr. Jones' behavior could have been caused by a number of factors"; (2) Plaintiffs have not articulated a reasonable accommodation that could have been made; and (3) the force used by Officer Drake was objectively reasonable under the circumstances. (Dkt. 7 at 4-5).  The Court is unpersuaded by these arguments for the reasons that follow.

First, as to the contention that the responding RPD officers did not know Jones had a mental disability, Defendant has misapprehended the standard applicable on a Rule 12(b)(6) motion.  The Court is required, at this stage of the proceedings, to draw all inferences in favor of Plaintiffs.  Here, Plaintiffs have alleged that Jones was in visible mental distress, that he was actively engaging in self-harm, that he was begging the responding officers to shoot him, and that he had come from the Mission, which was known to the RPD to serve individuals with mental illness.  On these facts, it is a reasonable inference that the responding officers were aware of Jones' mental disability. *See, e.g., Sage v. City of Winooski through Police Dep't*, No. 2:16-CV-116, 2017 WL 1100882, at *1, 3 (D. Vt. Mar. 22, 2017) (denying motion to dismiss where reference to residence for individuals with mental illnesses "should have alerted the police officers that [the plaintiff]

was mentally disabled" and explaining that accommodation is required when a disability is obvious).

Second, Plaintiffs have identified several proposed reasonable accommodations: (1) waiting to engage with Jones; (2) equipping the responding officers with non-lethal weapons; (3) using alternative means to remove the knife from Jones' possession; and (4) utilizing the City's Person in Crisis ("PIC") team.  (Dkt. 8 at 12; *see* Dkt. 1 at ¶¶ 46, 52-53, 78, 84).  *See Sage*, 2017 WL 1100882, at *4 (the plaintiff's allegations "that the police could have accommodated [the plaintiff] by avoiding physical contact and calling a nearby mental health counselor" were "sufficient to overcome the City's motion to dismiss under Rule 12(b)(6)").  While Defendant argues that "the suggestion that Officers should have merely remained in their vehicle and attempted to block the street is unreasonable and fraught with danger to individuals [Jones] may have encountered" (Dkt. 7 at 4), that type of factual dispute is not amenable to resolution by the Court on a motion to dismiss.  *See, e.g., Morales v. City of New York,* No. 13-CV-7667 (RJS), 2016 WL 4718189, at *8 (S.D.N.Y. Sept. 7, 2016) (finding issue of fact as to reasonableness of proposed accommodation notwithstanding "the possibility that, given criminal activity and safety concerns surrounding Plaintiff's arrest, such an accommodation might have unduly burdened law enforcement" (citation and quotation omitted)).

Third, Defendant's argument that the force used by Officer Drake was objectively reasonable misses the point.  Plaintiffs' ADA and RA claims address actions taken, and decisions made, before Officer Drake ever fired a shot.  In other words, if the City failed to reasonably accommodate Jones by not, for example, deploying the PIC team, that

- 10 -

conclusion would not be undermined by a holding that Officer Drake was ultimately justified in using deadly force. Further, the City's attempt to import Fourth Amendment case law regarding the use of force into the ADA and RA context fails, because that case law does not address the standard for asserting a viable disability discrimination claim.

In its reply papers, the City largely abandons its more narrow arguments, and instead argues broadly that "the applicability of the ADA to life threatening situations is not settled." (Dkt. 9 at 1). Relying on out-of-Circuit case law, Defendant argues that "there is no binding precedent and no persuasive argument that police officers responding to a 911 call wherein an individual is not only harming themselves, but also attacking officers, must be afforded 'reasonable accommodation' before the threats are addressed." (Dkt. 9 at 3). As an initial matter, the City failed to make this argument in its opening papers, and the Court would be justified in refusing to consider it on this basis alone. *See, e.g., In re Various Grand Jury Subpoenas*, 235 F. Supp. 3d 472, 485 (S.D.N.Y. 2017) ("Generally, a court does not consider issues raised in a reply brief for the first time[.]" (citation omitted)).

Moreover, as noted above, numerous courts within this Circuit have concluded that "the ADA requires police departments to make reasonable accommodations for disabled suspects." *Felix v. City of New York*, No. 16-CV-5845 (AJN), 2020 WL 6048153, at *4 (S.D.N.Y. Oct. 13, 2020) (collecting cases); *see also Williams*, 121 F. Supp. 3d at 368 ("The only reasonable interpretation of Title II is that law enforcement officers who are acting in an investigative or custodial capacity are performing 'services, programs, or activities' within the scope of Title II. Whether a disabled individual succeeds in proving discrimination under Title II of the ADA will depend on whether the officers'

accommodations were reasonable under the circumstances. . . . The City's argument that exigent circumstances may excuse law enforcement officers from providing accommodations fits within this standard; its argument that on-the-street interactions are categorically excluded from Title II coverage does not."). The Court does not find the out-of-Circuit case law relied upon by Defendant persuasive in this regard.

Defendant's argument based on *City & County of San Francisco v. Sheehan*, 575 U.S. 600 (2015), a case dealing with qualified immunity and the reasonableness of force, also lacks merit. There are no individual defendants in this case. The only defendant is the City, and "[q]ualified immunity is a defense available only to individuals sued in their individual capacity." *Askins v. Doe No. 1*, 727 F.3d 248, 254 (2d Cir. 2013) (further explaining that "the entitlement of the individual municipal actors to qualified immunity because at the time of their actions there was no clear law or precedent warning them that their conduct would violate federal law is . . . irrelevant to the liability of the municipality"); *see also Gonzalez v. Cnty. of Suffolk*, No. 09-CV-1023 (ST), 2022 WL 4648492, at *4 (E.D.N.Y. Sept. 30, 2022) ("The entitlement of the individual municipal actors to qualified immunity is irrelevant to the liability of the municipality."). Defendant has articulated no basis on which the *Sheehan* case could justify dismissal of Plaintiffs' RA and ADA claims.

For all these reasons, the Court denies Defendant's motion to dismiss Plaintiffs' claims under the RA and the ADA.

### IV.   Section 1983 Claim

In its moving papers, Defendant made no arguments specifically addressed to Plaintiffs' § 1983 claim. Instead, a general argument is asserted that "[t]he imminent threat

posed by Mr. Jones" was "a complete defense" to all claims apart from his ADA and RA claims. (Dkt. 7 at 5). However, whether or not a particular use of lethal force was reasonable is a fact-intensive inquiry, *see Cowan ex rel. Est. of Cooper v. Breen*, 352 F.3d 756, 762 (2d Cir. 2003), and Defendant's contention that Jones posed an imminent threat requires that the Court rely on Defendant's own characterization of Plaintiffs' factual allegations. The Court cannot do so at this stage of the proceedings, where it is required to read the allegations in the light most favorable to Plaintiffs and draw every inference in their favor. Accordingly, the Court disagrees that dismissal is warranted on this basis.

Defendant again raises a new argument in reply, arguing that Plaintiffs "have not set forth sufficient facts showing the City knew that Officers regularly and unjustifiably killed mentally ill African Americans, and that such a result was caused by the City's deliberate indifference to known training deficits." (Dkt. 9 at 9). Again, the Court need not consider this argument raised for the first time in Defendant's reply. Further, Plaintiffs' complaint is replete with factual allegations regarding an alleged policy and practice by the RPD of using unconstitutional force against "people who are Black and people with mental illness." (Dkt. 1 at ¶¶ 67-77). Defendant has made no effort to articulate why these specific factual allegations are insufficient to survive a motion to dismiss, and accordingly has not met its burden under Rule 12(b)(6).

## V. State Law Claims

The Court turns finally to Plaintiffs' state law claims. In its moving papers, Defendant argued only that the "imminent threat" posed by Jones constituted a defense to these claims. (Dkt. 7 at 5). However, as discussed above, this argument turns on accepting

Defendant's factual characterizations, and is accordingly not a basis for dismissal under Rule 12(b)(6).

Defendant has raised yet another new argument in reply, contending that it is entitled to "governmental immunity" on the state law claims. (Dkt. 9 at 10-12). Defendant argues that "the Court may and should consider immunity due to the lack of prejudice to the Plaintiff [sic] and the importance of the issues presented by this litigation." (*Id*. at 12). Without objection from Defendant, Plaintiffs were permitted to file a sur-reply addressing this specific issue. (Dkt. 12).

In addition to having been improperly raised for the first time in reply, Defendant's immunity argument fails on the merits. As the Second Circuit recently explained, New York law allows for a municipality to be held vicariously liable for the wrongdoing of its employees, even if the employees themselves enjoy immunity. *Triolo v. Nassau Cnty.*, 24 F.4th 98, 109 (2d Cir. 2022). Accordingly, Defendant's reliance on New York's qualified immunity law as a basis for dismissal is misplaced. *See id*. Further, the cases cited by Defendant involving negligence simply do not apply to in the context of intentional torts such as those at issue here. *See id*. at 111 (collecting cases holding that, under New York law, municipalities may be held vicariously liable for tortious conduct by their police officers). Defendant has not identified any viable basis for dismissal of Plaintiffs' state law claims.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss (Dkt. 4) is denied. Defendant's motion to stay discovery (Dkt. 20) is denied as moot.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: December 29, 2022
       Rochester, New York