**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

KENNETHA SHORT and PERNELL JONES, SR.,
in their capacity as administrators of the ESTATE
OF TYSHON JONES,

                                        Plaintiffs,

            – against –

CITY OF ROCHESTER,

                                      Defendant.

6:22-cv-06263

---

**PLAINTIFFS' MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND .................................................................................................................1

ARGUMENT ......................................................................................................................6

I.     DRAWING ALL REASONABLE INFERENCES IN PLAINTIFFS' FAVOR, A
JURY COULD FIND FOR PLAINTIFFS ON THE ADA AND RA CLAIMS ................6

     A.     The City has Failed to Establish that Tyshon was Not a Qualified
Individual with a Disability for the Purposes of the ADA as a Matter of
Law ...................................................................................................................7

          i.     A Reasonable Jury Could Conclude that the Police Officers Knew
or Reasonably Should Have Known That Tyshon was a Qualified
Individual under the ADA ..........................................................................7

          ii.     The City Has Not Established That Tyshon Posed a "Direct Threat
to the Health and Safety of Others" Within the Meaning of
Applicable Law .........................................................................................8

     B.     The Fourth Amendment's Standard of Reasonableness Is Not Relevant to
the ADA Claim ...............................................................................................10

     C.     There Is a Genuine Dispute of Fact Material Fact as to Whether the RPD
Could Have Accommodated Tyshon During Their Interaction ..........................11

II.     MATERIAL FACTS ARE IN DISPUTE WITH RESPECT TO PLAINTIFFS'
EXCESSIVE FORCE CLAIM ..........................................................................................14

     A.     A Reasonable Jury Could Conclude That Tyshon Did Not Pose an
Immediate Threat to the Police Officers' Safety When Officers Initiated
The Encounter ................................................................................................16

     B.     A Reasonable Jury Could Conclude That Officer Drake Used Excessive
Force By Firing Additional Shots at Tyshon After Tyshon Fell to the
Ground Severely Injured .................................................................................18

     C.     Body Worn Camera Footage Does Not Preclude Factual Disputes ....................19

III.     PLAINTIFFS ARE ENTITLED TO ADDITIONAL DISCOVERY ...............................20

i

A.  The City's Motion for Summary Judgment Is Premature......................................21

B.  Plaintiffs Are Entitled to Discovery on the City's Policies and Officers' Training on De-escalation and Mental Illness .......................................21

C.  The City Cannot Obtain Summary Judgment With Self-Serving Police Officers' Accounts, Particularly in Light of Some Officers' Credibility Issues................................................................................................22

IV.  THE COURT SHOUL DENY THE MOTION ON THE STATE LAW CLAIMS..........24

CONCLUSION....................................................................................................................25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abdu-Brisson v. Delta Air Lines, Inc.*,
239 F.3d 456 (2d Cir. 2001) ........................................................................6

*Alvarez v. City of New York*,
2015 WL 1499161 (S.D.N.Y. Mar. 30, 2015) ...........................................15

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .....................................................................................6

*Anniskiewicz v. City of Rochester*,
2021 WL 1699731 (W.D.N.Y. Apr. 29, 2021) ..........................................20

*Bah v. City of New York*,
319 F. Supp. 3d 698 (S.D.N.Y. 2018) ..................................................17, 19

*Berger v. United States*,
87 F.3d 60 (2d Cir. 1996) ...........................................................................20

*Brady v. Wal-Mart Stores, Inc.*,
531 F.3d 127 (2d Cir. 2008) ..........................................................................7

*Bragdon v. Abbott*,
524 U.S. 624 (1998) .....................................................................................9

*Brunette v. City of Burlington*,
2018 WL 4146598 (D. Vt. Aug. 30, 2018) .............................................9, 10

*Butchino v. City of Plattsburg*,
2022 WL 137721 (N.D.N.Y. Jan. 14, 2022) ...............................................8

*Cabisca v. City of Rochester*,
2019 WL 5691897 (W.D.N.Y. Nov. 4, 2019) ............................................21

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ...................................................................................11

*Cornell v. Village of Clayton*,
691 F. Supp. 3d 608 (N.D.N.Y. 2023) .......................................................19

*Cowan ex rel. Est. of Cooper v. Breen*,
352 F.3d 756 (2d Cir. 2003) .......................................................................15

*Dasrath v. City of New York*,
    2018 WL 10501877 (E.D.N.Y. Sept. 25, 2018) ...............................................17, 18

*Durr v. Slator*,
    2021 WL 3930704 (N.D.N.Y. Sept. 2, 2021) ..........................................................13

*Durr v. Slator*,
    2023 WL 8277960 (N.D.N.Y. Nov. 30, 2023) .................................12, 13, 14, 25

*Elliott v. Cartagena*,
    84 F.4th 481 (2d Cir. 2023) ...........................................................................20

*Estate of Jaquez v. City of New York*,
    104 F. Supp. 3d 414 (S.D.N.Y. 2015), *aff'd*, 706 F. App'x 709 (2d Cir. 2017)..........15, 18, 19

*Felix v. City of New York*,
    2020 WL 6048153 (S.D.N.Y. Oct. 13, 2020) .........................................................8

*Felix v. City of New York*,
    344 F. Supp. 3d 644 (S.D.N.Y. 2018)...................................................................14

*Fisher v. Kanas*,
    487 F. Supp. 2d 270 (E.D.N.Y. 2007), *aff'd*, 288 F. App'x 721 (2d Cir. 2008)....................14

*G-I Holdings, Inc. v. Baron & Budd*,
    2002 WL 31251702 (S.D.N.Y. Oct. 8, 2002) .........................................................24

*Graham v. Connor*,
    490 U.S. 386 (1989).......................................................................................16

*Green v. Morse*,
    2009 WL 1401642 (W.D.N.Y. May 18, 2009).....................................................22

*Harris v. Coweta County, Georgia*,
    2003 WL 25419527 (N.D. Ga. Sept. 25, 2003), *overruled by Scott v. Harris*,
    550 U.S. 372 (2007).......................................................................................22

*Hellstrom v. U.S. Dep't of Veterans Affairs*,
    201 F.3d 94 (2d Cir. 2000)..............................................................................20

*Holcomb v. State Univ. of New York at Fedonia*,
    2014 WL 4421713 (W.D.N.Y. Sept. 8, 2014) .....................................................20

*Hulett v. City of Syracuse*,
    253 F. Supp. 3d 462 (N.D.N.Y. 2017)..............................................................9, 10

iv

*Jamison v. Metz*,
    541 F. App'x 15 (2d Cir. 2013) ...........................................24

*Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co.*,
    2018 WL 3364388 (S.D.N.Y. July 9, 2018) ...........................................9

*Lockett v. Catalina Channel Exp., Inc.*,
    496 F.3d 1061 (9th Cir. 2007) ...........................................9

*Manganiello v. City of New York*,
    612 F.3d 149 (2d Cir. 2010)...........................................23

*McClendon v. Cnty. Of Nassau*,
    2012 WL 4849144 (E.D.N.Y. Oct. 11, 2012) ...........................................15

*McDonald v. City of Troy*,
    542 F. Supp. 3d 161 (N.D.N.Y. 2021) ...........................................15

*Meloff v. New York Life Ins. Co.*,
    51 F.3d 372 (2d Cir. 1995)...........................................24

*Monell v. Dep't of Social Services of City of New York*,
    436 U.S. 658 (1978)...........................................24

*Morales v. City of ew York*,
    2016 WL 4718189 (S.D.N.Y. Sept. 7, 2016) ...........................................12

*Nunez v. Superintendent of Elmira Corr. Facility*,
    2024 WL 3278530 (W.D.N.Y. May 29, 2024) ...........................................11

*O'Bert ex rel. Estate of O'Bert v. Vargo*,
    331 F.3d 29 (2d Cir. 2003)...........................................15

*O'Brien v. City of Syracuse*,
    2023 WL 6066036 (N.D.N.Y. Sept. 18, 2023) ........................... *passim*

*Reyes v. Town of Thomaston*,
    2020 WL 5849529 (D. Conn. Sept. 30, 2020) ...........................................9, 13

*Ridge v. Davis*,
    639 F. Supp. 3d 465 (S.D.N.Y. 2022)...........................................23

*Sage v. City of Winooski through Police Dep't*,
    2017 WL 1100882 (D. Vt. Mar. 22, 2017) ...........................................7

*Short v. City of Rochester*,
    2022 WL 17990106 (W.D.N.Y. Dec. 29, 2022)...........................................7, 11, 20

*Strong v. Perrone*,
    2020 WL 1445877 (W.D.N.Y. Mar. 25, 2020)....................................................23

*Tardif v. City of N.Y.*,
    2017 WL 3634612 (S.D.N.Y. Aug. 23, 2017) .....................................................21

*Tardif v. City of New York*,
    991 F.3d 394 (2d Cir. 2021)..........................................................................24, 25

*Taylor v. Schaffer*,
    2015 WL 541058 (D. Vt. Feb. 10, 2015) ...........................................................14

*Tracy v. Freshwater*,
    623 F.3d 90 (2d Cir. 2010)................................................................................16

*Tripathy v. Schneider*,
    2023 WL 3124723 (W.D.N.Y. Apr. 27, 2023) ...................................................22

*Weixel v. Board of Educ. Of City of New York*,
    287 F.3d 138 (2d Cir. 2002)................................................................................6

*Williams v. City of New York*,
    121 F. Supp. 3d 354 (S.D.N.Y. 2015)...............................................6, 7, 11, 12, 13

*V.W. ex rel. Williams v. Conway*,
    236 F. Supp. 3d 554 (N.D.N.Y. 2017)..............................................................24

*Williams v. D'Youville College*,
    2024 WL 69846 (W.D.N.Y. Jan. 5, 2024) ...........................................................6

*Wynne v. Town of E. Hartford*,
    2023 WL 7339543 (D. Conn. Nov. 7, 2023) ......................................................12

**Statutes**

42 U.S.C.A. § 12101(a)(7) (2008) ..............................................................................11

42 U.S.C. § 1983...........................................................................................................22

42 U.S.C. § 12182(b)(3) .........................................................................................9, 10

Americans with Disabilities Act ...................................................................... *passim*

New York Estates, Powers and Trusts Law § 5-4.1 ....................................................25

New York Penal Law § 35.30.......................................................................................25

Rehabilitation Act ........................................................................................... *passim*

**Other Authorities**

28 C.F.R. § 35.139(a)..................................................................................................9

Fed. R. Civ. P. 12....................................................................................................10

Fed. R. Civ. P. 56(a) .................................................................................................6

Fed. R. Civ. P. 56(d) ........................................................................................ *passim*

**PRELIMINARY STATEMENT**

On March 10, 2021, Rochester Police Officers shot and killed Tyshon Jones, a young Black man suffering from a mental health crisis. Plaintiffs, who are Tyshon's parents and the administrators of Tyshon's estate, assert claims against the City of Rochester (the "City") under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act ("RA"), the United States Constitution, and New York state law. After the Court denied the City's motion to dismiss Plaintiffs' complaint, the parties began engaging in discovery. Fact discovery had been ongoing until the City abruptly filed this premature and unsupported motion for summary judgment.[1] Even on its own cherry-picked record, before Plaintiffs have taken a single deposition, the City has failed to establish that there exist no material facts in dispute and that Plaintiffs' claims fail as a matter of law. Its motion for summary judgment should therefore be denied on the merits. In addition or in the alternative, the Court should deny or defer the City's motion until the completion of discovery under Federal Rule of Civil Procedure 56(d).

**BACKGROUND**

Tyshon Jones was a young Black man and one of millions of Americans who suffer from mental health problems—in Tyshon's case, post-traumatic stress disorder ("PTSD") and personality disorder. Plaintiffs' Statement of Material Facts ("SMF") ¶¶ 18, 21. Tyshon was not violent, *id.* ¶ 20, and was receiving mental health counseling to help treat his condition, *id.* ¶ 19.

In the early morning hours of March 10, 2021, in the midst of an acute mental health crisis, Tyshon wandered around downtown Rochester. He attempted to enter a high-rise building,

---

[1] Before filing this motion, the City filed a motion for a stay of discovery. Dkt. 96. Judge Pedersen explained that "discovery is not stayed in this case until [the court] issues a decision on the motion for [a] stay." Dkt. 103. But the City has nonetheless helped itself to its requested stay, halting all document productions and failing to timely respond to discovery requests.

resulting in a call to the police. *Id.* ¶ 13. Rochester Police Department ("RPD") Officer Matthew Drake responded to this call, and Tyshon left peacefully upon seeing Drake's vehicle. *Id.* ¶¶ 13–15. Later, Tyshon went to the Open Door Mission ("ODM"), *id.* ¶ 23, a homeless shelter known to the City as a location frequented by persons with mental disabilities, *id.* ¶ 27, and where RPD officers direct such individuals, *id.* ¶ 28.

ODM staff allowed Tyshon to enter ODM, after which he walked to the kitchen, took a bucket of cooking knives, and walked out. *Id.* ¶ 24. Tyshon did not harm or threaten anyone at ODM, *id.* ¶ 25, but an ODM worker called 911 (the Office of Emergency Communications or "OEC") to report the theft, *id.* ¶ 26. In response, OEC dispatched Officer Sir Glynn, an officer not equipped with a Taser or beanbag gun, to the ODM. *Id.* ¶ 29. The OEC did not refer the call to Rochester's Crisis Intervention Team, *id.*, a special unit for responding to calls involving emotionally disturbed individuals. *Id.* ¶ 22. Officers Jared Carello, Drake and Audrey Wicher also responded to the call. *Id.* ¶ 30. Drake spoke to someone who told him that a person matching Tyshon's description was cutting himself and screaming nearby. *Id.* ¶ 31. Drake, now aware that Tyshon had exhibited symptoms of a mental health crisis, *id.* ¶ 32, found Tyshon alone at the end of a deserted dead-end road, *id.* ¶ 36, and observed first-hand that Tyshon was indeed engaged in self-harm, "cutting himself," *id.* ¶ 33, which he broadcast to other RPD officers, *id.* ¶ 34.

Drake exited his car at a distance of 150 feet away, *id.* ¶ 46, well beyond the distance at which Tyshon could pose a threat, *id.* ¶ 47. Drake directed his car's spotlight into Tyshon's face and yelled at Tyshon to drop the knife he held, but Tyshon did not comply. *Id.* ¶ 37. As he had done earlier, Tyshon attempted to walk away from Drake's car along the sidewalk, which was the only exit from the dead-end street. *Id.* ¶ 38. No other civilians were present, and RPD officers had no indication that Tyshon had harmed or threatened anyone other than himself. *Id.* ¶¶ 40, 44.

2

Drake drew his service weapon, even though: (1) Tyshon was too far away to pose an imminent threat to anyone besides himself; (2) Drake had observed Tyshon exhibiting obvious signs of a mental health crisis; and (3) Drake was carrying a Taser.[2] *Id.* ¶¶ 41, 65.

Shortly thereafter, Wicher arrived with a beanbag gun in her patrol car. *Id.* ¶ 70. Wicher was farther from Tyshon than Drake was from Tyshon, and upon her arrival Tyshon was still too far to pose a threat to Drake or anyone else. *Id.* ¶ 68. Wicher exited her car and drew her service weapon, despite the fact that: (1) she was equipped with a beanbag gun; (2) Tyshon did not pose an imminent threat to anyone besides himself; (3) Wicher saw and heard Tyshon exhibiting obvious signs of a mental health crisis; and (4) Wicher knew that Drake was already providing lethal cover, *i.e.*, had a gun aimed at Tyshon. *Id.* ¶ 78.

At approximately the same time, Carello arrived on the scene with a beanbag gun in his car. *Id.* ¶ 71. Like Wicher, Carello was farther from Tyshon than Drake was from Tyshon, and upon Carello's arrival Tyshon was still too far to pose a threat to Drake or anyone else. *Id.* ¶ 68. Carello exited his car and drew his service weapon, even though: (1) he was equipped with a beanbag gun; (2) Tyshon did not pose an imminent threat; (3) Carello saw and heard Tyshon exhibiting obvious signs of a mental health crisis; and (4) Carello knew that both Drake and Wicher were already providing lethal cover. *Id.* ¶ 79. Officer Trevor Jones, who also had a beanbag gun in his car, was signaled to stop traffic rather than proceed to the scene. *Id.* ¶ 10.

Once Drake confronted Tyshon, Tyshon began to walk towards Drake. Carello, Drake, and Glynn did not employ de-escalation techniques. *Id.* ¶ 90. Wicher did not employ de-

---

[2] Plaintiffs initially alleged that Carello, Drake, Glynn and Wicher had no less-lethal weapons during their encounter with Tyshon, Dkt. 1 ¶ 52, based in part on the public statements of City officials that Tyshon was shot before less-lethal resources such as a Taser or beanbag gun arrived on the scene. The City's statements are now known to have been false.

escalation techniques, other than to ask Tyshon his name. *Id.* ¶ 91. That perfunctory effort was ineffective, since Tyshon was "fixated on Drake" and never acknowledged or looked at Wicher. *Id.* Despite being the focus of Tyshon's attention, Drake made no effort to continue Wicher's abortive effort at de-escalation. *Id.* ¶ 90. Rather than employ effective de-escalation techniques or deploy any of the multiple less-lethal weapons at their disposal, Carello, Drake and Wicher repeatedly shouted at Tyshon and brandished guns, while Glynn shined a spotlight in Tyshon's eyes. *Id.* ¶¶ 88–89. Drake walked backwards, leading Tyshon out of the dead-end street and back toward the ODM, but failed to maintain the distance between himself and Tyshon. *Id.* ¶ 87.

When Tyshon was still more than 13 feet from Drake, Drake shot Tyshon the first time. *Id.* ¶ 96. From that distance, Tyshon could not reach Drake or any other person. Tyshon never reached the four- to six-foot "reactionary gap" of Drake or anyone else. *Id.* ¶¶ 95, 97. Tyshon was more than twice that far when Drake chose to shoot him.

When Drake's first shot struck Tyshon, Tyshon was standing and facing Drake, with his right side angled slightly toward Drake. *Id.* ¶ 104. When Drake fired his second shot, Tyshon had already started falling and was no longer facing Drake, having twisted to his left with his legs buckling. *Id.* ¶ 108. When Drake fired his third shot, Tyshon had fallen nearly to the ground, and was facing away from Drake. *Id.* ¶ 110. Before Drake fired his fourth shot, Tyshon was already lying on the ground, *id.* ¶ 123, and no reasonable officer could believe he posed a threat to Drake or any other person, *id.* ¶ 124.

Before Drake's fourth shot, Tyshon lay debilitated on the sidewalk on his back with his left side facing Drake. *Id.* ¶ 135. As Tyshon lay on the ground, Drake, while walking backwards along the sidewalk and unconstrained by any wall or other impediment, continued to aim his gun downward at Tyshon and continued to fire, shooting Tyshon a fourth time. *Id.* ¶ 136. After

4

Drake's fourth shot struck Tyshon, Tyshon still lay on the sidewalk, debilitated. *Id*. ¶ 139. Drake, still walking backwards along the sidewalk unimpeded, maintained his aim at Tyshon and continued to fire, shooting Tyshon a fifth time. *Id*. ¶ 140.

The wounds to Tyshon were documented by the Monroe County Medical Examiner's Office. *Id*. ¶ 105. The order in which these wounds occurred, and the extent to which each wound contributed to Tyshon's injuries and ultimate death are unknown and subjects for further discovery. *Id*. ¶¶ 106–07, 109, 111, 138, 142.

During his interview with the RPD Professional Standards Section ("PSS"), Drake claimed to have fired three shots and then observed that Tyshon was still approaching him. *Id*. ¶¶ 127, 130.[3] That claim was false. In reality, the video footage and statements from other officers show that Drake fired five shots in rapid succession. *Id*. ¶¶ 115, 121. It is unknown and the subject of further discovery whether the RPD directs its officers, when using the service pistol for deadly force, to fire a certain number of shots and then reassess whether a threat still exists, as Drake characterized his own conduct. *Id*. ¶¶ 112, 126–27. The purpose of such a policy is presumably to ensure that officers do not needlessly kill someone who no longer poses an imminent threat. *Id*. ¶ 113. Evidence yet to be adduced, including expert opinion testimony, may demonstrate that if Drake had complied with RPD policy, Tyshon would have been disabled by Drake's initial shots but survived. *Id*. ¶ 114.

Prior to Drake's encounter with Tyshon, the City knew that RPD officers would be called upon to use force, including deadly force, in connection with their duties, and that RPD officers will confront situations in which, after a justified initial use of force, the use of force is no longer

---

[3] Drake has claimed on different occasions to having fired twice (SMF ¶ 126) or three times (*id*. ¶¶ 125, 127) before reassessing whether Tyshon continued to pose a threat.

justified, and that there is a history of officers mishandling situations in which the use of force must be halted after a justified initial use. *Id.* ¶ 116–17. Halting the use of deadly force after a justified initial use is precisely the type of situation that presents RPD officers with a difficult choice of the sort that training or supervision will make less difficult. *Id*.

## ARGUMENT

A court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "has the burden of showing that there is no genuine issue of fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The court must deny the motion if "a rational trier of fact could find for the non-moving party on the record taken as a whole." *Williams v. D'Youville College*, 2024 WL 69846, at *2 (W.D.N.Y. Jan. 5, 2024) (internal quotation marks and citation omitted). When deciding a motion for summary judgment, "the court must view the evidence in the record in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

## I.    DRAWING ALL REASONABLE INFERENCES IN PLAINTIFFS' FAVOR, A JURY COULD FIND FOR PLAINTIFFS ON THE ADA AND RA CLAIMS

Claims under the ADA and the RA are so similar that they are analyzed together. *Weixel v. Board of Educ. Of City of New York*, 287 F.3d 138, 146 n.6 (2d Cir. 2002). To establish a violation of the ADA, a plaintiff "must demonstrate (1) that [he] is a 'qualified individual' with a disability; (2) that the defendants are subject to the ADA; and (3) that [he] was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant by reason of [his] disability." *Williams v.*

*City of New York*, 121 F. Supp. 3d 354, 364 (S.D.N.Y. 2015). It is established within the Second Circuit that Title II of the ADA applies to the activities of law enforcement officers in their "on-the-street" interactions. *Id.* at 368; *see also O'Brien v. City of Syracuse*, 2023 WL 6066036, at *9–11 (N.D.N.Y. Sept. 18, 2023) (discussing authorities). The City's protestations notwithstanding, this Court has already held that the RPD was required to comply with Title II during its on-the-street interaction with Tyshon. *See Short v. City of Rochester*, 2022 WL 17990106, at *6 (W.D.N.Y. Dec. 29, 2022) (Dkt. 23 at 11–12).[4]

### A. The City has Failed to Establish that Tyshon was Not a Qualified Individual with a Disability for the Purposes of the ADA as a Matter of Law

Tyshon was a qualified individual under the ADA if the officers "knew or reasonably should have known" that Tyshon was disabled. *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008); *see also Sage v. City of Winooski through Police Dep't*, 2017 WL 1100882, at *4 (D. Vt. Mar. 22, 2017). A reasonable jury could easily find that to be the case here.

#### i. *A Reasonable Jury Could Conclude that the Police Officers Knew or Reasonably Should Have Known That Tyshon was a Qualified Individual under the ADA*

Tyshon suffered from PTSD and personality disorder. SMF ¶ 18. Each of these conditions individually and/or collectively impaired one or more of Tyshon's major life activities. *Id.* ¶ 21. Tyshon did in fact have a disability, and the City does not argue otherwise. Rather, it asserts without support that "[t]here is no evidence whatsoever that RPD knew or had an opportunity to determine that Mr. Jones was a person with a disability." Mot. at 12. But even the incomplete record contains plenty of evidence to the contrary. Several hours prior to the shooting, Drake encountered Tyshon on Broad Street. As Drake later recounted, a brief

---

[4] The City's repeated citations to out-of-circuit caselaw should be given little weight. *See* Dkt. 117-1, ("Mot.") at 8–10 (citing cases from the Fourth and Fifth Circuits).

encounter with Tyshon was sufficient to show him that Tyshon was mentally "off":

> Working Downtown, I deal with homeless, I deal with mental health issues a lot. [Tyshon] was not somebody that I had interacted with before, but definitely somebody that I had made a mental note at the time that, you know, be aware of this guy. . . . [H]is behavior was definitely off.

*Id.* ¶ 17. Viewing this statement in the light most favorable to Plaintiffs and drawing all reasonable inferences in Plaintiffs' favor, Drake regarded Tyshon's "behavior" as consistent with someone suffering from mental illness based on his experience.[5]

Later, when Drake arrived at Cascade Drive and Industrial Street, an individual told Drake he had observed a person matching Tyshon's description "cutting himself and screaming." *Id.* ¶ 31. Then, around 3:03 AM, Drake himself saw that Tyshon was "cutting himself." *Id.* ¶ 33. Once the RPD arrived, Tyshon repeatedly requested to the officers that "they shoot him." *Id.* ¶ 43. A factual dispute exists regarding Tyshon's other words to the RPD, but he also invoked religious references and made incoherent statements. *Id.* Drawing inferences in Plaintiffs' favor, a reasonable jury could easily conclude from Tyshon's "off" demeanor, his reported and visible acts of self-harm, and his requests to be shot in conjunction with religious references that Tyshon was experiencing a mental health crisis, and that the responding officers knew or should have known as much. *See, e.g.*, *Felix v. City of New York*, 2020 WL 6048153, at *5 (S.D.N.Y. Oct. 13, 2020); *Butchino v. City of Plattsburg*, 2022 WL 137721, at *11–12 (N.D.N.Y. Jan. 14, 2022).

    ii.   *The City Has Not Established That Tyshon Posed a "Direct Threat to the Health and Safety of Others" Within the Meaning of Applicable Law*

The City argues that Tyshon was excluded under 28 C.F.R. § 35.139(a) from receiving

---

[5] Of course, because of the City's premature motion, Plaintiffs have not yet had the opportunity to question Drake about his statement, about his observations of Tyshon more generally, or about any other subject. *See infra* Section III; More Rule 56(d) Decl. ¶¶ 8, 11.

Title II benefits because he posed "a direct threat to the health or safety of others." Mot. at 9. Under this doctrine, an "individual poses a 'direct threat' when he presents 'a significant risk to the health or safety of others *that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services*.'" *Brunette v. City of Burlington*, 2018 WL 4146598, at *32 (D. Vt. Aug. 30, 2018) (emphasis added) (quoting 42 U.S.C. § 12182(b)(3)). This doctrine operates as an affirmative defense to an ADA claim, *see Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 487 (N.D.N.Y. 2017), and a defendant asserting it "bears a heavy burden," *Lockett v. Catalina Channel Exp., Inc.*, 496 F.3d 1061, 1066 (9th Cir. 2007) (cleaned up). This assessment—whether Tyshon posed a significant risk that could not be eliminated with a proper accommodation—"must be based on medical or other objective evidence." *Bragdon v. Abbott*, 524 U.S. 624, 649 (1998). On this motion, the City must establish that no reasonable trier of fact could fail to find that it has proved this affirmative defense beyond genuine dispute. *See Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co.*, 2018 WL 3364388, at *4 (S.D.N.Y. July 9, 2018). The City fails to meet this burden for three reasons.

*First*, the "direct threat" defense does not apply to Plaintiffs' theories of liability premised upon the City's failure to train its officers to respond appropriately to persons experiencing mental health crises. Conduct giving rise to liability on such a theory—a deficient training program, developed by policymakers in an office—"precedes the untrained on-the-scene encounter" in which any threat may have arisen. *Reyes v. Town of Thomaston*, 2020 WL 5849529, at *5 n.5 (D. Conn. Sept. 30, 2020).

*Second*, even on this partial record, a rational jury could find that Tyshon did not pose "a direct threat to the health or safety of others" *at the time RPD first encountered him and could have extended him an accommodation*. Mot. at 9. There is no evidence that there was anyone in

9

Tyshon's vicinity at Cascade Drive and Industrial Street at 3:00 AM on March 10, 2021. SMF ¶¶ 36, 40–44. There is thus no evidence that any person other than Tyshon himself would have been in danger had the officers simply remained in their vehicles and coordinated a tactical response properly tailored to the situation. Indeed, Drake ignored Glynn's recommendation to get back into his patrol car, as Glynn himself did. *Id.* ¶¶ 81–82. The facts are akin to those in *Brunette*, where police officers fatally shot someone who allegedly attempted to attack them with a shovel. *See Brunette*, 2018 WL 4146598, at *33. The court refused to grant summary judgment on the "direct threat" doctrine, holding that the defendant had not established as a matter of law that the decedent posed an immediate threat to anyone and there was no indication that he had "physically injured another person." *Id.*; *see also Hulett*, 253 F. Supp. 3d at 488 (denying the defense and noting that "a direct threat is not lightly found" (quotation marks and citation omitted)). So too here. The City has failed to establish that Tyshon posed a direct threat that could not be eliminated by reasonable accommodations from the City.

*Third*, the City ignores that the "direct threat" defense fails where the purported threat could have been eliminated by a "modification of [the RPD's] policies, practices, or procedures or by the provision of auxiliary aids or services" and does not even try to prove beyond genuine dispute that no such modification could have succeeded here. 42 U.S.C. § 12182(b)(3). For example, the City of Rochester had established a Crisis Intervention Team (CIT) to deal with "emotionally disturbed individuals" in Rochester. SMF ¶ 22. The City has produced no evidence to explain why the CIT was not dispatched to respond to the call regarding Tyshon.

**B.    The Fourth Amendment's Standard of Reasonableness Is Not Relevant to the ADA Claim**

The City reprises the same unsuccessful argument from its Rule 12 motion to dismiss by

10

arguing that Drake's use of force against Tyshon was reasonable under the Fourth Amendment and thus Plaintiffs' ADA and RA claims fail. Mot. at 7, 8, 9, 11, 12. But this Court has already squarely rejected that argument, holding that "Defendant's argument that the force used by Drake was objectively reasonable misses the point. Plaintiffs' ADA and RA claims address actions taken, and decisions made, before Drake ever fired a shot . . . [Defendant's] attempt to import Fourth Amendment case law regarding the use of force into the ADA and RA context fails." *Short*, 2022 WL 17990106, at *5. The Court's decision that the ADA and RA analyses are distinct from the Fourth Amendment reasonableness analysis is the binding law of this case and applies with equal force on this motion. *See Nunez v. Superintendent of Elmira Corr. Facility*, 2024 WL 3278530, at *11 (W.D.N.Y. May 29, 2024). The Court's decision is also correct. *See*, *e.g.*, *Williams*, 121 F. Supp. 3d at 368 (noting the two claims involve "distinct" reasonableness analyses (quotation marks omitted)).[6]

### C.     There Is a Genuine Dispute of Material Fact as to Whether the RPD Could Have Accommodated Tyshon During Their Interaction

"The ADA mandates reasonable accommodation of people with disabilities in order to put them on an even playing field with the non-disabled." *O'Brien*, 2023 WL 6066036, at *12 (cleaned up). The determinative question is whether Plaintiffs have identified a "plausible accommodation" that officers could reasonably have provided Tyshon when they found him

---

[6] The City asserts that "[i]t would be completely contradictory" for the ADA to provide protections that the Fourth Amendment does not. Mot. at 8. There is no contradiction to speak of. In matters involving civil rights, the Constitution prescribes a floor, not a ceiling. Indeed, the ADA was enacted after Congress found that disabled persons constitute a "discrete and insular minority" who had been "subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society" and therefore required greater statutory protection, 42 U.S.C.A. § 12101(a)(7) (2008), even though discrimination against disabled persons is subject only to rational basis review as a matter of constitutional law, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441–2 (1985).

alone on a deserted street in the middle of the night in the throes of a severe mental health crisis.

A disabled individual's claim for Title II of the ADA will turn on "whether the officers' accommodations were reasonable under the circumstances." *Williams*, 121 F. Supp. 3d at 368. This is "a highly fact-specific inquiry." *Morales v. City of New York*, 2016 WL 4718189, at *8 (S.D.N.Y. Sept. 7, 2016) (quotation marks omitted). Courts therefore deny defendants summary judgment when plaintiffs have "met [their] burden of suggesting the existence of a plausible accommodation." *Durr v. Slator*, 2023 WL 8277960, at *12 (N.D.N.Y. Nov. 30, 2023).

Even on the City's self-selected record, a rational jury could find that Tyshon's mental health disability could have reasonably been accommodated. For example, summary judgment on ADA claims is inappropriate in police shooting cases where the officers failed to use "de-escalation techniques" or failed to "wait[] for a [Crisis Intervention Team]-trained officer." *Wynne v. Town of E. Hartford*, 2023 WL 7339543, at *11 (D. Conn. Nov. 7, 2023). Similarly, in *O'Brien*, the court noted that plausible reasonable accommodations by police officers include (among other things) dispatching mental health professionals; providing a cooling-off period to the disabled person; not escalating or exacerbating the situation; and using de-escalating techniques. *See* 2023 WL 6066036, at *12.

Plaintiffs are aware at this point—even though fact discovery has not been completed, see *infra* Section III—of the following relevant facts:

- A new General Order (G.O.) 575 was implemented a few weeks *after* Tyshon was shot, under which RPD officers are mandated to "use de-escalation techniques and tactics, when it is safe and feasible to do so, to prevent and minimize the need to use force in response to resistance and to increase the likelihood of securing a subject's voluntary compliance with police instructions." G.O. 575 requires RPD officers to attempt de-escalation techniques, "especially . . . [when] confronting subjects who are combative and/or appears to be suffering an emotional/mental health crisis." SMF ¶ 86. It is not clear on the existing record why the RPD did not have a similar policy in place during the time of Tyshon's death nor why

12

responding officers in this case so thoroughly failed to use de-escalation techniques.

- The City of Rochester has also established a Crisis Intervention Team pursuant to G.O. 561 (May 2017) to deal with "emotionally disturbed individuals" in Rochester. Any person presenting as suffering from a mental health crisis, including substance abuse and "situational stress" is considered an emotionally disturbed individual within the meaning of the General Order. *Id.* ¶ 22. Tyshon was clearly an "emotionally disturbed individual" within the meaning of G.O. 561. It is not clear on the existing record why the CIT was not dispatched here.

- RPD officers could have used less than lethal force in apprehending Tyshon. The RPD has in place a Taser Standard Operating Procedure that explicitly authorizes RPD members to deploy the taser "in situations in which an officer reasonably believes its use could mitigate an imminent danger to the officer or others." *Id.* ¶ 56. A report issued by the RPD in 2012 describes several situations in 2011 in which subjects holding knives were disarmed by RPD officers simply by presenting their tasers. *Id.* ¶ 64. Drake was carrying a Taser during the entire encounter. *Id.* ¶ 65. Wicher and Carello's patrol cars were equipped with beanbag guns. *Id.* ¶¶ 70–71. Any of these officers could have resorted to the use of less lethal force to avoid a fatal shooting.

These facts establish that the City could have provided a reasonable accommodation for Tyshon.

The City's repeated invocation of "exigent circumstances," Mot. at 9, 10, 11, does not alter the result. "[T]here is no categorical exception for police responding to exigent circumstances under Title II of the ADA." *Reyes*, 2020 WL 5849529, at *5 n.5. Rather, courts consider exigent circumstances among the relevant *factors* that determine whether a particular accommodation was reasonable. *Williams*, 121 F. Supp. 3d at 367; *Durr v. Slator*, 2021 WL 3930704, *17 (N.D.N.Y. Sept. 2, 2021). Here, a reasonable jury could conclude that the circumstances were not exigent when the RPD first encountered Tyshon, given that no one else was on the street, most of the RPD officers were in their vehicles, and Drake was 150 feet away and easily could have stayed in his car (or gotten back into it). SMF ¶¶ 36, 37, 46, 80.

A reasonable jury could also find that an accommodation was feasible despite any exigency. In *Durr*, police officers used force in apprehending the plaintiff who was having a

13

psychotic episode at a busy intersection in the middle of the day. Defendants, like the City, sought summary judgment on the ADA claim by invoking "exigent circumstances." *Durr*, 2023 WL 8277960, at \*11. The court denied the motion based on the plaintiff's assertion that the officers "should have used de-escalation techniques" rather than using force. *Id.*; *see also Taylor v. Schaffer*, 2015 WL 541058, at \*2, 6–8 (D. Vt. Feb. 10, 2015) (plaintiff stated ADA claim by alleging that officers used force against mentally distressed man who walked toward an officer asking them to "just go ahead and shoot"). Similar considerations apply here.

Even on the scant record that exists to date, a reasonable jury could conclude that the RPD officers could have used de-escalation techniques, remained in their vehicles, waited for the CIT response, and/or used less-than-lethal force to disarm Tyshon when he was in the midst of a mental health episode, expressing suicidal intentions, and exhibiting physical self-harm. Thus, there is a genuine factual dispute as to whether the RPD could have accommodated Tyshon.[7]

## II.   MATERIAL FACTS ARE IN DISPUTE WITH RESPECT TO PLAINTIFFS' EXCESSIVE FORCE CLAIM

The City has failed to demonstrate that there are no disputed facts material to Plaintiffs'

---

[7] The City does not seek summary judgment on the basis that it was not "deliberately indifferent to a risk of discrimination against persons with disabilities in policing." *Felix v. City of New York*, 344 F. Supp. 3d 644, 665 (S.D.N.Y. 2018). *See* Mot. at 7–13. The Court therefore need not consider this issue and should not entertain any new argument about it on reply. *See Fisher v. Kanas*, 487 F. Supp. 2d 270, 278 (E.D.N.Y. 2007), *aff'd*, 288 F. App'x 721 (2d Cir. 2008). In any event, the existing record contains sufficient evidence from which a reasonable jury could infer that municipal policymakers failed to act in response to a known risk that the RPD would violate the statutory rights of people experiencing mental health crises. The City was aware that RPD officers frequently encountered individuals with mental health disabilities, particularly in downtown Rochester. SMF ¶¶ 17, 27–28. And the record is still incomplete as to whether RPD officers received training or guidance establishing standards for how officers should deal with such persons. *See* More 56(d) Declaration. There is thus a genuine dispute as to whether the City's training was deficient.

excessive force claim.[8] At a minimum, the City's motion is radically premature without a single deposition having taken place.

"Law enforcement officers may use only such force as is objectively reasonable under the circumstances." *Estate of Jaquez v. City of New York*, 104 F. Supp. 3d 414, 433 (S.D.N.Y. 2015), *aff'd*, 706 F. App'x 709 (2d Cir. 2017). The degree of force used constitutes a constitutional violation if the "actions of the arresting officer were objectively unreasonable in light of the facts and circumstances confronting [them]." *McClendon v. Cnty. Of Nassau*, 2012 WL 4849144, at *7 (E.D.N.Y. Oct. 11, 2012) (quotation marks and citation omitted). "The use of deadly force, in particular, is objectively reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Alvarez v. City of New York*, 2015 WL 1499161, at *6 (S.D.N.Y. Mar. 30, 2015) (quoting *Cowan ex rel. Est. of Cooper v. Breen*, 352 F.3d 756, 762 (2d Cir. 2003)). "The officer's mindset is measured by the officer's knowledge of circumstances immediately prior to and at the moment" that he made the decision to employ deadly force. *McDonald v. City of Troy*, 542 F. Supp. 3d 161, 169 (N.D.N.Y. 2021) (internal quotation marks and citation omitted).

In addition, "given the difficult problem posed by a suit for the use of deadly force, in which the witness most likely to contradict the police officer's story—the person shot dead—is unable to testify, the court may not simply accept what may be a self-serving account by the police officer. Rather, the court must also consider circumstantial evidence that, if believed, would tend to discredit the police officer's story . . . ." *O'Bert ex rel. Estate of O'Bert v. Vargo*,

---

[8] Plaintiffs allege that RPD officers used excessive force against Tyshon by shooting and killing him, violating his constitutional rights, and that the City had an unlawful policy or custom of using excessive force against Black residents and people with mental illness. Dkt. 1 ¶¶ 99–106.

331 F.3d 29, 37 (2d Cir. 2003) (alterations, quotation marks, and citations omitted).

Even on the selective record that the City presents in support of its motion for summary judgment, the City has failed to carry its burden to prove that no material issues of fact exist—both as to the initial use of deadly force and as to Drake's *continued* shooting of Tyshon after Tyshon was already debilitated and on the ground. The reasonableness of a police officer's use of force is "necessarily case and fact specific." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). In determining whether the force used is reasonable, a court must examine "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The City does not address the first and third *Graham* factors, both of which weigh in favor of Plaintiffs. Assuming that the crime for which the officers were sent to Tyshon's location was petit larceny of ODM kitchen supplies, SMF ¶ 26—which, since Plaintiffs have been unable to depose the officers, is not clear from the record—the use of deadly force was unreasonable. In addition, the City does not argue that Tyshon was actively resisting arrest, or that its officers were even attempting to effect an arrest. With respect to the safety of the officers or others—the only factor the City relies on—there is a genuine factual dispute as to whether the use of deadly force was reasonable. *Id.* ¶¶ 95–97, 102–03, 123–24, 136–37, 140-41.

### A.    A Reasonable Jury Could Conclude That Tyshon Did Not Pose an Immediate Threat to the Police Officers' Safety When Officers Initiated The Encounter

The City makes a number of self-serving characterizations in its interpretation of the body-worn camera footage that Plaintiffs disagree with and that evidence does not support. For example, there is no evidence that Tyshon harmed or even threatened anyone at ODM, nor any

evidence that there were any civilians present on the street at the time officers arrived on the scene. *Id.* ¶¶ 25, 36, 40, 44. There is thus no evidence that any person would have been in danger had the officers remained in their vehicles. In addition, Drake ignored Glynn's recommendation to get back into his patrol car. *Id.* ¶¶ 81–82. A reasonable jury could thus conclude that Drake did not reasonably feel threatened by Tyshon since he chose to exit his vehicle. Plaintiffs also dispute that Tyshon was ever "running" towards Drake, *id.* ¶¶ 8, 11, or was ever close enough to cause harm with the knife that he held, *id.* ¶ 11; when Drake first shot Tyshon, Tyshon was still more than 13 feet away from Drake, and the officers' training indicated that an officer's "reactionary gap" with a weapon drawn is between four and six feet. *Id.* ¶¶ 95–96. A reasonable jury could conclude that Drake knew that he was far enough away from Tyshon to avoid injury.

In *Dasrath v. City of New York*, 2018 WL 10501877 (E.D.N.Y. Sept. 25, 2018), the court denied summary judgment on the plaintiff's excessive force claim because there existed a genuine issue of material fact as to whether the officer acted reasonably in shooting an "emotionally disturbed man" who was wielding a knife. *Id.* at *6–7. As here, the defendants based their summary judgment argument on the following facts: "that the decedent had a knife in his hand, . . . that the decedent refused to comply with multiple commands to drop the knife when [officers] approached him, and that the decedent ran at Officer Guzman with the knife in his raised hand." *Id.* at *5. The court denied the motion, holding that a reasonable jury could find that the decedent did not pose an immediate threat to anyone's safety, in part due to the fact that there were no civilians in the immediate vicinity, the officer was wearing a vest, and the officer had his pepper spray and an expandable baton. *Id.* at *6; *see also Bah v. City of New York*, 319 F. Supp. 3d 698, 711 (S.D.N.Y. 2018). Based on the similar circumstances presented here (where the interaction between Tyshon and RPD occurred on a desolate street and Drake had a Taser

17

readily available), the Court should deny the City's motion.

**B.    A Reasonable Jury Could Conclude That Officer Drake Used Excessive Force By Firing Additional Shots at Tyshon After Tyshon Fell to the Ground Severely Injured**

The record is in even starker dispute as it relates to whether Tyshon posed an immediate threat to the safety of any individuals *after* Drake shot Tyshon and he was lying on the ground. In *Dasrath*, the court held that the plaintiff raised a triable issue of fact as to whether the officer was justified in firing as many shots as he did. 2018 WL 10501877, at *6. The court noted that even if the decedent posed an immediate threat at the moment of the officer's first shot, the decedent was severely wounded and falling to the ground and was no longer a threat, thus the officer's decision to continue shooting at the decedent could constitute excessive force. *Id.* Similarly, there is a genuine dispute here as to whether the shots fired by Drake when Tyshon was already on the ground constituted excessive force. Drake has given inconsistent accounts of his shooting pattern. On one occasion, he said that he fired three times and then reassessed his need to continue firing; on another, he claimed that he fired two times and then reassessed. SMF ¶¶ 125–26. But the other officers have all testified that Drake fired five shots without any break, and the video footage itself provides no support for Drake's version of events. *Id.* ¶¶ 115, 121. Moreover, RPD investigator Thomas Cassidy appears not to have credited Drake's assertion that he paused and reassessed the threat, Naylon Decl., Ex. K at 3 ("Officer Drake . . . fired shots at the subject"), despite being aware of Drake's claim, *id.* at 11 (recounting Drake's testimony to PSS). One way or another, the evidence is clear that Tyshon began falling to the ground as Drake fired his second shot and had fallen to the ground after Drake's third shot. SMF ¶¶ 108–09.

These facts preclude summary judgment on the excessive force claim. In *Estate of Jaquez*, the court denied the City's motion for summary judgment on an excessive force claim as

18

to a final, fatal gunshot. 104 F. Supp. 3d at 438. The decedent, who had a knife, "was on the ground after being hit at least four times with live ammunition." The court concluded that "[a] rationale [*sic*] juror could draw factual inferences to determine that [the police officer's] use of lethal force was unreasonable where [decedent] had already been severely wounded, was on the ground, and was surrounded by a team of officers protected by ballistics gear," and that "[r]easonable jurors could determine that as of that moment, the officers could have merely backed off or taken some form of alternative action." *Id.* at 438, 435; *see also Bah*, 319 F. Supp. 3d at 710 ("The fact that the person may have engaged in some form of threatening conduct in the moments before the shooting would not justify shooting him after he ceased posing a threat."). Here, Tyshon did not pose any threat when he was already shot and lying on the ground. SMF ¶¶ 123-24, 135-35, 139-41. Accordingly, regardless of whether Tyshon initially posed a threat, a reasonable jury could conclude that Drake's additional shots at Tyshon constituted excessive force. *Id*. ¶¶ 135-36, 140. This is a sufficient reason to deny the City's motion.

### C.    Body Worn Camera Footage Does Not Preclude Factual Disputes

The City's arguments rest on the fact that there is body-worn camera footage of some of the officers' interactions with Tyshon. *See* Mot. at 4. But even if such footage were complete—and it is not, SMF ¶ 12—"the mere existence of a videotape in the record depicting some or all of the events in dispute will not always be dispositive at the summary judgment stage. Instead, the appropriate course of action is to permit the jury an opportunity to resolve the parties' competing versions of the events, in conjunction with the video, through the ordinary fact-finding processes in which juries engage." *Cornell v. Village of Clayton*, 691 F. Supp. 3d 608, 618 (N.D.N.Y. 2023) (denying a motion for summary judgment on an excessive force claim even though the

subject incident was on camera and noting that the "interpretation of the events is most likely appropriately reserved for the triers of facts"); *see also Anniskiewicz v. City of Rochester*, 2021 WL 1699731, at *5 (W.D.N.Y. Apr. 29, 2021). Indeed, this Court already held, when declining to convert the City's motion to dismiss into a motion for summary judgment based on video footage, that making the case-specific determination of the reasonableness of an officer's use of force requires complete development of all relevant facts. *See Short*, 2022 WL 17990106, at *3–4. The video does not capture many of the other facts and circumstances known to Drake at the time he used deadly force, which remain in dispute. SMF ¶¶ 12, 15, 17, 31. These include the relative positioning of other officers, *id*. ¶¶ 36–37, 68–69, the relative positioning of police vehicles, *id*. ¶¶ 81–82, and the location of potential backup, *id*. ¶¶ 9-10.

Because genuine issues of material fact are in dispute related to Plaintiffs' excessive force claim, the Court should deny the City's motion for summary judgment on Count III.

## III.    PLAINTIFFS ARE ENTITLED TO ADDITIONAL DISCOVERY

"Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000). Instead, "[t]he nonmoving party must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment." *Berger v. United States*, 87 F.3d 60, 65 (2d Cir. 1996) (internal quotation marks and citation omitted); *see also Elliott v. Cartagena*, 84 F.4th 481, 493 (2d Cir. 2023). Thus, a court must "deny" or "defer considering" a summary judgment motion "[i]f [the] nonmovant shows by affidavit or declaration" that the motion is premature. *See* Fed. R. Civ. P. 56(d). Rule 56(d) is "a safeguard against premature grants of summary judgment and should be applied with a spirit of liberality." *Holcomb v. State Univ. of New York at Fedonia*, 2014 WL 4421713, at *2 (W.D.N.Y.

20

Sept. 8, 2014) (quotation marks and citation omitted).

### A.    The City's Motion for Summary Judgment Is Premature

The City filed its motion in the midst of fact discovery and before any expert discovery. *See* Dkt. 87. While some documents have been exchanged between the parties, the City has refused to provide Plaintiffs with a number of categories of relevant documents. Meanwhile, *no depositions*—including of the officers who interacted with and shot Tyshon—have been conducted. To the extent the existing record fails to establish genuine issues of fact, this discovery is critical for Plaintiffs to rebut the City's motion. Plaintiffs respectfully refer the Court to the Rule 56(d) Declaration of Madeline J. More filed in conjunction with this memorandum for a full description of the material facts that Plaintiffs have been unable to obtain based on discovery that is still outstanding in this case. Plaintiffs delineate a few below.

### B.    Plaintiffs Are Entitled to Discovery on the City's Policies and Officers' Training on De-escalation and Mental Illness

Plaintiffs are entitled to discovery regarding the officers' knowledge of the City's policies and training as it concerns a person holding a knife, as well as how to deploy less lethal weapons such as a taser and a beanbag gun. It is undisputed that Drake had a taser on the night of Tyshon's death and that he did not use it. *See* SMF ¶ 65. In addition, there are material facts that are either not established or are in dispute as to why the beanbag guns present at the scene were not used by the officers. *Id.* ¶¶ 70–71, 75-77. Plaintiffs are also entitled to probe the officers' knowledge of the concept of "suicide by cop," *id.* ¶ 42, and de-escalation techniques, *id.* ¶¶ 90–92, and to receive RPD policies and training materials on these topics, as well as others. An officer's training and police force policy is relevant to evaluate the reasonableness of an officer's actions in excessive force claims. *See Cabisca v. City of Rochester*, 2019 WL 5691897, at *13–14 (W.D.N.Y. Nov. 4, 2019) (considering the training an officer would have received regarding

use of force techniques and de-escalation when determining an excessive force claim); *Tardif v. City of N.Y.*, 2017 WL 3634612, at *6 (S.D.N.Y. Aug. 23, 2017) (observing that "[w]hether the officers violated the NYPD Patrol Guide remains a significant factor to be considered in ultimately determining whether the officers' actions that day were reasonable"). The City has stymied discovery into any in-service training and policy materials. *See* Hearing Tr. at 15:15–23. It is manifestly unfair to prevent Plaintiffs from taking this discovery and then seek summary judgment on a claim to which it is material.

Cases cited by the City support the proposition that summary judgment is premature. In a number of those cases, the non-movant had taken precisely the kind of discovery that the City is trying to avoid here. For example, in *Green v. Morse*, 2009 WL 1401642 (W.D.N.Y. May 18, 2009), depositions had been conducted when the court evaluated the defendant's summary judgment motion. *Id.* at *2. The plaintiff in *Scott* similarly had the opportunity to depose the defendant's witnesses before summary judgment briefing, and had received documents related to officer training and the police department's policies. *See Harris v. Coweta County, Georgia*, 2003 WL 25419527, at *9 (N.D. Ga. Sept. 25, 2003), *overruled by Scott v. Harris*, 550 U.S. 372 (2007). Here, the City is seeking to prevent Plaintiffs from taking any of this discovery. This case is therefore more akin to *Tripathy v. Schneider*, 2023 WL 3124723 (W.D.N.Y. Apr. 27, 2023), which concerned claims under 42 U.S.C. § 1983, the ADA, and the RA. *Id.* at *1. There, while fact discovery was underway and before expert discovery had been completed, the defendants moved for summary judgment, which the court denied under Rule 56(d). *Id.* at *1–2. The Court should do the same here (if it does not simply deny the City's motion on the merits).

**C.    The City Cannot Obtain Summary Judgment With Self-Serving Police Officers' Accounts, Particularly in Light of Some Officers' Credibility Issues**

In support of its motion, the City relies on the officers' own reports describing the incidents and on declarations submitted by the officers. *See* Naylon Decl., Exs. I–J; Dkts. 117-2–4 (Declarations of Officers Wicher, Drake, and Carello). Plaintiffs must be given the opportunity to test the credibility and veracity of those witnesses' assertions.

The record already supports a finding that officers have made false statements. *See* SMF ¶¶ 115, 121, 125-33, 147. The officers' credibility is important here, and "[c]ourts may not make credibility determinations in ruling on a motion for summary judgment." *Strong v. Perrone*, 2020 WL 1445877, at *4 (W.D.N.Y. Mar. 25, 2020) (citing *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010)). But Plaintiffs have been unable to depose the officers, and so have been unable to test the veracity of these officers' statements or claims.[9] Thus, Plaintiffs have no ability to dispute Drake's statement that he "discharged [his] service pistol . . . as [he] believed [he] was in imminent danger of being stabbed with a knife" and that the use of deadly force was "necessary to meet and stop the use of deadly physical force against [him]." Dkt. 117-3 ¶ 4. Plaintiffs have not had the opportunity to probe the reliability of officers' self-serving statements.

Plaintiffs are also entitled to know what the officers believed the purpose of their dispatch was when they headed to the location of Tyshon: Were they responding to a report of petit larceny? A distress call? A mental health wellness check? Whether Drake was intending to effect an arrest—and, if so, for what—is relevant to the reasonableness of the force he used. *See Ridge v. Davis*, 639 F. Supp. 3d 465, 471–72 (S.D.N.Y. 2022) (noting that "any information that the officers had at the time of the arrest about the nature and severity of Plaintiff's alleged crime" is

---

[9] As explained more fully in the Rule 56(d) declaration, Plaintiffs have not been able to depose the involved officers because the City has not produced important documents regarding those officers' in-service training, supervision, and prior statements regarding the incident.

relevant to an excessive force claim). Plaintiffs have also had no opportunity to test Drake's own assessment of whether Tyshon had already been disabled after the firing of one or two shots before he chose to fire more. Such information is highly relevant to the reasonableness of Drake's decision to *continue* shooting Tyshon because it is part of Drake's "knowledge of circumstances immediately prior to and at the moment" he decided to keep shooting Tyshon. *Jamison v. Metz*, 541 F. App'x 15, 19 (2d Cir. 2013) (summary order).

In *V.W. ex rel. Williams v. Conway*, 236 F. Supp. 3d 554 (N.D.N.Y. 2017), the court denied a summary judgment motion for this precise reason. *Id.* at 580–1. While the defendant pointed to three declarations to support its summary judgment motion, the court noted that "plaintiffs have not yet been given an opportunity to test the veracity of the 'undisputed' facts set forth in these declarations—among other things, they have not yet had an opportunity to depose any of these individuals," and commented "[t]hat is not how the truth-testing feature of our adversary system of litigation is generally thought to work best." *Id.*; *see also G-I Holdings, Inc. v. Baron & Budd*, 2002 WL 31251702, at *5 (S.D.N.Y. Oct. 8, 2002) (collecting decisions denying summary judgment where the non-movants had been unable to depose witnesses whose declarations were submitted in support of motions for summary judgment); *Meloff v. New York Life Ins. Co.*, 51 F.3d 372, 375–76 (2d Cir. 1995).[10]

## IV.    THE COURT SHOULD DENY THE MOTION ON THE STATE LAW CLAIMS

Civil battery "is an intentional wrongful physical contact with another person without consent." *Tardif v. City of New York*, 991 F.3d 394, 410 (2d Cir. 2021). "[B]attery claims under

---

[10] The City has not challenged the remaining elements of Plaintiffs' Count III: namely, that the City is liable under *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658 (1978). *See* Mot. at 4–6. Plaintiffs have thus not addressed the additional discovery to which they are entitled on the remaining elements of their claim, but note that such discovery is outstanding.

24

New York law and Fourth Amendment excessive force claims are evaluated pursuant to the same standard." *O'Brien*, WL 6066036, at *24. For the reasons discussed in Section II *supra*, a genuine issue of fact exists as to whether the use of deadly physical force against Tyshon was objectively reasonable under the Fourth Amendment. The affirmative defense of justification under New York Penal Law § 35.30 does not change the result. *See Durr*, 2023 WL 8277960, at *14 (holding that "§ 35.30(1) requires the jury to conduct precisely the same analysis as does the reasonableness standard under the Fourth Amendment" (quotation marks and citation omitted)). Thus, summary judgment on Plaintiffs' battery claim should be denied.

Civil assault "is an intentional placing of another person in fear of imminent harmful or offensive contact." *Tardif*, 991 F.3d at 410. Drawing all reasonable inferences in Plaintiffs' favor, the record demonstrates that the officers intentionally placed Tyshon in fear of harmful contact by pointing their firearms at Tyshon, yelling at him and flashing their lights at him, and ultimately shooting Tyshon when he was obviously in the throes of a mental health crisis. SMF ¶¶ 88–89. Thus, the City's motion on the assault claim should also be denied.

Under § 5-4.1 of the New York Estates, Powers and Trusts Law ("EPTL"), the estate of a decedent is permitted to maintain an action to recover damages for wrongful death. The liability standard of such a claim does not differ from that which governs the underlying tort. *See O'Brien*, 2023 WL 6066036, at *25. As discussed above, the City's motion for summary judgment on Plaintiffs' battery claim should be denied. Therefore, the City's motion for summary judgment on Plaintiffs' wrongful death claim should also be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny the City's motion for summary judgment.

Dated:  July 26, 2024

Respectfully submitted,

*Attorneys for Plaintiffs*
*Kennetha Short and Pernell Jones, Sr., in their*
*capacity as administrators of the Estate of Tyshon*
*Jones*

By:    /s/ David S. Kleban

| | |
|---|---|
| Alanna Kaufman | Henry J. Ricardo |
| Douglas E. Lieb | Muhammad U. Faridi |
| | David S. Kleban |
| KAUFMAN LIEB LEBOWITZ | David Erroll |
| & FRICK LLP | Ian Eppler |
| 18 E. 48th Street, Suite 802 | Madeline More |
| New York, New York 10017 | Andrew Bloomfield |
| (212) 660-2332 | Bharath Palle |
| dlieb@kllf-law.com | Jabari Matthew |
| akaufman@kllf-law.com | PATTERSON BELKNAP |
| |  WEBB & TYLER LLP |
| | 1133 Avenue of the Americas |
| | New York, New York 10036 |
| | Tel: (212) 336-2000 |
| | hjricardo@pbwt.com |
| | mfaridi@pbwt.com |
| | dkleban@pbwt.com |
| | ieppler@pbwt.com |
| | derroll@pbwt.com |
| | mmore@pbwt.com |
| | abloomfield@pbwt.com |
| | bpalle@pbwt.com |
| | jmatthew@pbwt.com |

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 26, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all counsel of record.

/s/ David S. Kleban_____
David S. Kleban