**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

KENNETHA SHORT and PERNELL JONES, SR.,
in their capacity as administrators of the ESTATE
OF TYSHON JONES,

Plaintiffs,

6:22-cv-06263

– against –

CITY OF ROCHESTER,

Defendant.

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SANCTIONS AGAINST DEFENDANT CITY OF ROCHESTER**

15883677

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................................1

FACTUAL BACKGROUND...........................................................................................3

1.   The City Failed to Collect or Produce Electronically Stored Information ("ESI")............4

2.   The City Refused to Produce In-Service Training Materials...............................................7

3.   The City Has Withheld Qualifications and Certifications for Service Weapon and
     Less-Lethal Weapons Trainings ........................................................................................9

4.   The City Has Failed to Produce PDS Files and Evaluations for the Involved
     Officers ..........................................................................................................................10

5.   The City has Failed to Respond to Interrogatories .........................................................11

LEGAL STANDARD....................................................................................................13

ARGUMENT.................................................................................................................14

     I.    AN ORDER IMPOSING NON-MONETARY SANCTIONS IS
           WARRANTED AND NECESSARY ....................................................................14

           A.   The City Has Willfully Defied Its Discovery Obligations Here and
                in Other Civil Rights Cases Involving RPD Misconduct .........................14

           B.   All Other Factors for Imposing Non-Monetary Sanctions on the
                City Are Satisfied...................................................................................17

     II.   THE COURT SHOULD SANCTION THE CITY FOR ITS DISCOVERY
           MISCONDUCT BY ESTABLISHING CERTAIN FACTS AGAINST
           THE CITY .........................................................................................................19

           A.   PDS Files, Personnel Files, and Evaluations for the Involved
                Officers ................................................................................................20

           B.   In-Service Training Materials.................................................................20

           C.   Qualifications and Certifications for Service Weapons and Less-
                Lethal Weapons Trainings ......................................................................21

     III.  THE COURT SHOULD ORDER THE CITY TO PAY PLAINTIFFS'
           REASONABLE EXPENSES, INCLUDING ATTORNEYS' FEES, IN
           SEEKING THE CITY'S COMPLIANCE WITH ITS DISCOVERY
           OBLIGATIONS...................................................................................................22

CONCLUSION.............................................................................................................23

15883677

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Air Crash Near Clarence Ctr., N.Y.*,
  2013 WL 6073635 (W.D.N.Y. Nov. 18, 2013) ...................................................16

*Casaccia v. City of Rochester*,
  2020 WL 1042149 (W.D.N.Y. Mar. 4, 2020), *reconsideration denied*, 2020
  WL 2833008 (W.D.N.Y. June 1, 2020) ........................................................ *passim*

*Casaccia v. City of Rochester*,
  No. 6:17-cv-06323-FPG-MJP (W.D.N.Y. Aug. 26, 2019), Dkt. 45-2 .................................15

*Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine*,
  951 F.2d 1357 (2d Cir. 1991) .............................................................19

*Diegert v. Receivables Performance Mgmt., LLC*,
  2017 WL 370808 (W.D.N.Y. Jan. 26, 2017) ................................................19

*EEOC v. Green Lantern Inn, Inc.*,
  2021 WL 4086148 (W.D.N.Y. Aug. 19, 2021) ..............................................19

*Embuscado v. DC Comics*,
  347 F. App'x 700 (2d Cir. 2009) .....................................................18, 19

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
  314 F.R.D. 85 (S.D.N.Y. 2016) .........................................................16

*Houghtaling v. Downes*,
  2023 WL 7304954 (W.D.N.Y. Oct. 11, 2023) .............................................18

*Kandey Co. v. Barbera*,
  2012 WL 3838179 (W.D.N.Y. Sept. 4, 2012) .............................................13

*Karsch v. Blink Health Ltd.*,
  2019 WL 2708125 (S.D.N.Y. June 20, 2019) ...........................................19, 22

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  341 F.R.D. 474 (S.D.N.Y. 2022) .......................................................19

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  673 F. Supp. 3d 345 (S.D.N.Y. 2023) ..................................................13

*King v. Conde*,
  121 F.R.D. 180 (E.D.N.Y. 1988) .......................................................14

# TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

*Klipsch Grp., Inc. v. ePRO E-Com. Ltd.*,
880 F.3d 620 (2d Cir. 2018) .......................................................................................13

*Major League Baseball Props., Inc. v. Corporacion de Television y Microonda Rafa*,
2022 WL 3974409 (S.D.N.Y. Aug. 31, 2022) ............................................................13

*Monell v. Dep't of Soc. Servs.*,
436 U.S. 658 (1978) .............................................................................................. *passim*

*Richard v. Dignean*,
332 F.R.D. 450 (W.D.N.Y. 2019) ..............................................................................13

*Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*,
319 F.R.D. 122 (S.D.N.Y. Nov. 9, 2016) ..................................................................17

*S. New England Tel. Co. v. Global NAPs, Inc.*,
624 F.3d 123 (2d Cir. 2010) .................................................................................16, 17

*In re Sumitomo Copper Litig.*,
204 F.R.D. 58 (S.D.N.Y. 2001) .................................................................................13

*Travco Ins. Co. v. Gree U.S.A., Inc.*,
2022 WL 16945747 (W.D.N.Y. Nov. 15, 2022) ...................................................13, 22

*Wishart v. Welkley*,
2022 WL 737156 (W.D.N.Y. Mar. 11, 2022) ........................................................17, 22

**Other Authorities**

Fed. R. Civ. P. 16 ...........................................................................................................17

Fed. R. Civ. P. 34 ......................................................................................................6, 16

Fed. R. Civ. P. 37 ................................................................................................... *passim*

W.D.N.Y. Local Civ. R. 26(d) ........................................................................................6

15883677

## PRELIMINARY STATEMENT

On March 10, 2021, officers from the Rochester Police Department ("RPD") shot and killed Tyshon Jones, a young Black man suffering from a mental health crisis. Over *three years ago*, in June 2022, Tyshon's parents, the administrators of his estate ("Plaintiffs"), sued the City of Rochester (the "City") because, among other things it failed to accommodate Tyshon's mental illness and to adequately train and supervise its police officers to respond to mental health crises. These failures—fatal in Tyshon's case—violated the Americans with Disabilities Act ("ADA") and the municipal liability doctrine established in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). To develop their claims, Plaintiffs have sought evidence regarding the Rochester Police Department's ("RPD") policies and procedures for addressing mental health crises, including internal communications about how those policies were developed that may bear upon policymakers' indifference to the City's constitutional and statutory duties. Plaintiffs also seek evidence about the substance of how RPD trained and supervised its police officers on topics relevant to the Plaintiffs' claims, as well as evidence of how RPD supervised the officers involved in Tyshon's death (the "Involved Officers").[1]

Three years, two unsuccessful dispositive motions by the City, and one Court-ordered discovery deadline have passed since Plaintiffs brought this suit. But the City has still not produced these highly relevant documents, despite Plaintiffs' best efforts. The City has not produced relevant in-service training materials for RPD officers, even though Plaintiffs have worked in good faith to narrow their requests on this topic to minimize any burden. The City has also withheld *most* of the disciplinary records, evaluation reports, and personnel files for the Involved Officers over the past five years. Furthermore, the City has withheld *virtually all*

---

[1] "Involved Officers" here refers to Officers Drake, Carello, Glynn, Wicher (née Jackson), and Jones.

1

responsive electronically stored information ("ESI") pertinent to this litigation, such as emails between RPD officials regarding departmental policies and procedures. Several of the categories of documents that the City has refused to produce—including the ESI and disciplinary records of the Involved Officers—are responsive to Plaintiffs' First and Second set of Requests for the Production of Documents ("RFPs"), served nearly *three years ago* on October 31, 2022, and January 13, 2023.

Last year, the City sought a stay of discovery pending its motion for summary judgment, citing the burden of discovery associated with Plaintiffs' *Monell* claim. In granting the motion, the Court was crystal clear: If the motion for summary judgment were denied, the City would have to participate in discovery, burdens or not. On May 21, 2025, Chief Judge Wolford denied the City's motion for summary judgment and the Court lifted the stay of discovery the same day. Plaintiffs then resumed their assiduous efforts to move the case forward. By contrast, the City's discovery misconduct has only worsened. The City agreed to a document discovery deadline, which it then promptly violated. It has produced very few documents since the stay was lifted, and even those productions have been flagrantly deficient. And it has raised new and grievously belated objections to the Plaintiffs' discovery demands only *after* the production deadline passed. In sum, the City has acted in open defiance of the Court's repeated admonition to "to keep this case on track." Dkt. 138 at 14.

This discovery misconduct by the City is not unique to this case. Just as the City has exhibited a pattern and practice of subjecting Rochester's most vulnerable residents to the RPD's most violent conduct, it has flouted the authority of the federal court system to offer relief to the RPD's victims, earning itself recent sanctions orders in multiple other civil rights cases. A harsh sanction is necessary to mitigate the harm of the City's discovery misconduct in this case and to

deter similar conduct in future cases. In addition to monetary sanctions and pursuant to Rule 37(b)(2)(A)(i), Plaintiffs seek directions to establish the following facts for the purpose of this action:

     i. Directing that the City's failure to produce in-service training materials should be taken as establishing that RPD officers, including the Involved Officers, did not receive any training in any of the specific areas (identified in Plaintiffs' June 6, 2024 email to the City) for the relevant period of 2015 to 2023;

     ii. Directing that the City's failure to produce personnel files and evaluations for an Involved Officer should be taken as establishing that RPD did not evaluate the Involved Officer during any period(s) for which an evaluation was not produced; and

     iii. Directing that, to whatever extent the City has failed to produce training certifications for less-lethal weapons and service weapon qualifications for the Involved Officers, it is established that none of the Involved Officers were certified in the use of less-lethal weapons or service weapons between 2020 and 2023.

## **FACTUAL BACKGROUND**

The history of the City's failure to comply with its discovery obligations in this case extends over three years. For the sake of clarity, Plaintiffs narrate the relevant facts by category of outstanding document, rather than chronologically. Plaintiffs sent a detailed letter to the City on July 23, 2025 detailing these discovery deficiencies, after previously having reminded the City of the key categories of missing information on May 21, 2025. *See* Declaration of Ian D. Eppler ("Eppler Decl.") Exs. 1, 2. The City made no meaningful effort to address these deficiencies before the July 8, 2025 document-discovery deadline or since, necessitating this motion.

15883677

1.    **The City Failed to Collect or Produce Electronically Stored Information ("ESI")**

Plaintiffs have endeavored for years to develop a workable framework for the production of ESI but have been stonewalled at every turn.  For example, on February 15, 2023, the Plaintiffs proposed an ESI protocol and suggested that the parties confer and finalize the protocol by February 28, 2023.  *See* Eppler Decl. Ex. 3.  The City never responded.

The City has also refused to work with the Plaintiffs to establish parameters for identifying responsive ESI.  On May 8, 2023, this Court issued an order requiring the City to "produce a list of electronically stored information (ESI) repositories it intends to search for responsive ESI."  Dkt. 32; *see also* Dkt. 37 at 37.  The Court also directed Plaintiffs to revise and circulate a "proposed list of search terms" and to meet and confer with the City.  Dkt. 32.

On May 19, 2023, Plaintiffs complied with the Court's order by sending the City a list of proposed search terms.  *See* Eppler Decl. Ex. 4 at 1.  On September 8, 2023, the City claimed that these searches had resulted in 169,000 hits and that it would "create seemingly unimaginable havoc to review."  Eppler Decl. Ex. 5 at 1.  In an effort to compromise, Plaintiffs conferred with the City's counsel and Alex Koroleski, a member of the City's Information Technology ("IT") team, to learn about the City's systems and their purported limitations.  *See* Eppler Decl. Ex. 25. Plaintiffs then sent the City a revised list of search terms on June 3, 2024, to be applied to the e-mails of agreed-upon City custodians.  *See* Eppler Decl. Ex. 6 at 1.  Plaintiffs' revisions significantly narrowed the search parameters and custodians to address concerns voiced by the City.  The revised terms would target highly relevant documents, such as discussions about whether RPD policies and procedures adequately accommodate Rochester residents suffering

4

from mental health crisis.[2]  *See* Eppler Decl. Ex. 7.  The City offered no substantive response or objection to these proposed terms.

Once the stay was lifted, on July 22, 2025—two weeks after the deadline for completing document discovery passed and *over a year* after Plaintiffs circulated their revised search parameters—the City disclosed that it ran unspecified searches on seven custodians' documents, yielding 16,415 unique hits.  *See* Eppler Decl. Ex. 8 at 1-2.  The City did not identify the terms that were used to run this search.  The City speculated that running 18 other (also unidentified) searches over 19 other custodians' data would likely yield over 150,000 unique hits, concluding, "it seems we need to do something to reduce the number of hits."  *Id*. at 2.

Although Plaintiffs maintain that the City has waived any objection to Plaintiffs' proposed search terms through delay, they nevertheless responded the same day inviting the City to provide (1) term-by-term and custodian-by-custodian hit counts that would better illuminate which of Plaintiffs' terms were generating relatively large hit counts, and (2) a proposed set of alternative search terms, accompanied by term-by-term and custodian-by-custodian hit counts.  *Id*. at 1.  On July 29, 2025, the City claimed—without providing the requested term-by-term and custodian-by-custodian hit counts or any alternative proposal—that the Plaintiffs' proposed searches would result in "204,500 or so emails," a volume that would be "far too burdensome to review."  Eppler Decl. Ex. 9 at 1-2.

Thus, while the City has had Plaintiffs' revised search term proposal for over a year, it did not raise its burden objection—and, apparently, made no effort even to quantify the supposed

---

[2] Some examples include:
- "Use of force" AND (race OR racial OR mental OR minorit*) AND disparit*;
- ("PIC" OR "person in crisis") AND ("emotionally disturbed" OR "emotional distress" "mental illness" OR "mentally ill" OR "mentally disabled" OR "mentally impaired" "suicid*" OR "self ~2 harm" OR "mental disability" OR depress* OR schizophren* OR bipolar OR "mental health crisis" OR psycho* OR crazy).

15883677

burden—until *after* the Court-ordered production deadline.  Even today, despite multiple requests by Plaintiffs, the City has failed to provide the information (such as hit counts by search string) that would allow meaningful efforts to narrow the terms and has refused to provide alternative terms.  Notably, this Court already anticipated the City's protestations and delay tactics and rejected them.  In its stay order, the Court "warn[ed] the City that if it loses its motion for summary judgment—in whole or part—this Court cannot ease the burden of discovery. Discovery will proceed."  Dkt. 138 at 14.  The City, the Court went on, "will need to take steps—better staffing, an outside e-discovery vendor (something the Court might expect in a case of this size and complexity)—to keep this case on track."  *Id.*  The City has not heeded the Court's admonition.

Meanwhile, even the paltry production of ESI that the City *has* made is deficient.  The City produced 50 emails on June 6, 2025.[3]  *See* Eppler Decl. Ex. 10.  But, as Plaintiffs pointed out in an email to the City on June 10, 2025, this production is systemically deficient for at least two reasons.  *See id*. at 1.  *First*, the production is in the form of a single consolidated PDF file without any email metadata, violating Fed. R. Civ. P. 34(b)(2)(E)(ii).  *See id.  Second*, the production is inconsistent with the ESI protocol that Plaintiffs proposed on February 15, 2023, and contravenes Local Rule 26(d) because the production contains extensive and unwarranted redactions of non-privileged information (including email senders, recipients and subject lines) without a privilege log.  *See id.* (*citing* W.D.N.Y. Local Civ. R. 26(d)).  Plaintiffs stated that they were "willing to accept the production of redacted documents in lieu of a privilege log in this instance," so long as the City "reproduce[s] documents with meritless redactions removed."  *Id*. The City neither reproduced the documents nor provided a substantive response.

---

[3] Despite repeated requests, the City has not confirmed the search query to which these emails are responsive.

### 2.    The City Refused to Produce In-Service Training Materials

Plaintiffs have long sought documents about how the City trains its police officers—a central inquiry in any *Monell* case.  These documents are also relevant to Plaintiffs' ADA claim, which alleges that the City was deliberately indifferent to the likelihood that people experiencing mental health crises would be deprived of their federal rights.

In response to Plaintiffs' Requests, the City merely produced a set of "training orders"— documents instructing RPD officers to attend training on certain topics.  While the training orders indicated the general subject matter purportedly covered at those training sessions, they did not include documents—such as presentations or course syllabi—that would provide specific information on what RPD officers were taught about policies, tactics, and best practices.  On May 7, 2024, Plaintiffs asked the City to provide the underlying course materials for 52 training sessions on topics responsive to Plaintiffs' Requests.  *See* Eppler Decl. Ex. 11 at 1-2.  On June 4, 2024, the City said that this list was "extensive" and "significantly over burdensome."  Eppler Decl. Ex. 12 at 2-3.

In response to the City's professed concern, Plaintiffs voluntarily narrowed their requests. On June 6, 2024, Plaintiffs sent the City a more limited list of only 21 in-service trainings for which they sought the underlying training materials.  *See id.* at 1.  These training sessions are directly relevant to the issues in this case.  For example, Plaintiffs requested training materials for courses entitled "Aggressive Deadly Behavior In-Service Training," "Effectively Responding to Emotional Crisis Training," "Suicide Prevention, Intervention & Postvention," and "Close Quarter Tactics."  *Id*.

The City refused to produce underlying material for *any* of these trainings, and instead sought a stay of discovery.  By the City's own admission, Plaintiffs' request for training materials was a central motivation for the City's stay application:  On June 4, 2024, the City

7

wrote that "[a]s for the training materials, that extensive demand is among the requests that convinced me it was time to file an MSJ & seek a stay. . . The request for all that material is significantly over burdensome and seemingly not proportional to the needs of the case." *Id*. at 3. This explanation implied that the City had a large volume of responsive training materials; otherwise, it could not be overburdened by collecting and producing them.

The City's motion for summary judgment has been denied and the discovery stay has been lifted. But instead of producing the training documents, the City claimed in an email on July 28, 2025, that those "documents have been searched for but not found." Eppler Decl. Ex. 13 at 4. More concerningly, the City claimed that it did not have any protocol in place for preserving these documents. *See id*. Thus, the City has accomplished a classic bait-and-switch. When successfully seeking a stay of discovery, the City suggested that the production of the requested training materials would be so voluminous as to impose an undue burden. Now that the stay has been lifted and the time for production has come, the City claims that it has no responsive documents, potentially owing to their having been destroyed at some unspecified time.

This is the latest episode in the City's pattern of losing or destroying responsive material. In its first motion to stay discovery from October 2022, the City asserted without evidence or explanation that the materials Plaintiffs sought were "at no risk of becoming unavailable if required at a later date." Dkt 20-1 at 5. But in the same brief, the City also asserted that certain responsive documents may already "no longer exist." *Id*. at 4. Moreover, at the outset of this litigation, the City was obligated to ensure that its employees safeguarded against text messages, e-mails, and other responsive documents being discarded. But the City concededly did not issue a preservation notice to its employees to protect relevant documents until February 17, 2023, and

admitted on May 31, 2024, that its officers had caused pertinent text messages to be deleted. Eppler Decl. Ex. 14 at 1-2.

### 3. The City Has Withheld Qualifications and Certifications for Service Weapon and Less-Lethal Weapons Trainings

A core question in this case is whether RPD officers could have addressed any purported threat from Tyshon Jones by using a less-lethal weapon, such as a Taser or beanbag shotgun, rather than shooting him to death. Accordingly, on June 11, 2024, Plaintiffs sought less-lethal weapon certifications (including but not limited to Taser certifications), and documentation of all service weapon qualifications for the Involved Officers. Eppler Decl. Ex. 15 at 2. As Plaintiffs noted in the same email, the City's discovery obligation included producing any sign-in logs and staffing spreadsheets for such service weapons and less-lethal weapons trainings attended by the Involved Officers. *See id.* Plaintiffs also reminded the City by email that it was obligated to produce "less-lethal weapon certifications (including but not limited to Taser [])" pursuant to RFP #52, and # 53. *Id*. at 1. On the same day, the City responded that "not all trainings have certifications," while confirming that officers who opted to carry Tasers were required to complete certification. *Id*. at 2.

After the Court lifted the discovery stay, the Plaintiffs again reminded the City of their request for documents related to less-lethal weapon certification. *See* Eppler Decl. Ex. 2 at 2. Rather than producing responsive documents, on July 9, 2025, *see* Eppler Decl. Ex. 16, the City emailed Plaintiffs a table—the provenance of which it did not disclose—containing purported weapons "qualification scores" for the Involved Officers, including scores for "less-lethal" weapons for each of the Involved Officers in the 2020-23 period. Eppler Decl. Ex. 17 at 3-4. The City did not explain what underlying documents were used to prepare this table, nor did it explain why it had failed to produce those documents. The City did not even identify which

"less-lethal" weapons on its table the "qualification scores" pertained to (e.g., whether they related to Tasers, beanbag shotguns, or any other less-lethal weapons). *Id.* After Plaintiffs pointed out this deficiency and sought the underlying responsive documents, the City confoundingly asserted by email on July 28, 2025 that "[t]he only certification for less than lethal weapons was Officer Drake." Eppler Decl. Ex. 13 at 4. This assertion is contradicted by the City's own table, which appeared to reflect less-lethal weapons training for other officers.

### 4.    The City Has Failed to Produce PDS Files and Evaluations for the Involved Officers

Another important question is whether RPD was deliberately indifferent to its officers' practice of using excessive force, thus giving rise to municipal liability under *Monell*. To investigate this issue, Plaintiffs requested documents on how RPD supervised its officers. Since October 2022, Plaintiffs have sought documents from the files of the RPD's Professional Development Section ("PDS"), including evaluations for the Involved Officers. On June 14, 2023, the City agreed to produce the PDS files for all Involved Officers. *See* Eppler Decl. Ex. 19 at 2. But the City's production—when it finally arrived on September 13, 2023—was deficient and incomplete. Of the five Involved Officers, the City produced a complete PDS file only for Officer Carello. As Plaintiffs pointed out in an email on April 5, 2024, the City has failed to produce *any* of the full-year evaluations between 2020 and 2023 for Officer Drake, who fired the shots that killed Tyshon. *See* Eppler Decl. Ex. 20 at 1-2; *see also* Dkt. 97. For Officers Glynn, Wicher, and Jones, the full-year evaluations for 2021 and 2023 are missing. *In sum, the City has not produced the PDS files and evaluations for four of the five Involved Officers for the period that covers the 2021 incident where Tyshon was shot and killed.*

On May 2, 2024, the City acknowledged these deficiencies, explaining that they were due to certain personnel being out on leave. *See* Eppler Decl. Ex. 21 at 1. But on June 14, when

10

Plaintiffs asked the City to conduct a diligent search in the personnel files, where copies of evaluations are supposed to be maintained pursuant to RPD General Orders, *see* Eppler Decl. Ex. 22 at 3, counsel for the City refused, stating, "no, I am not going to go over to the Chief's Office over at RPD to do a personal search." *Id*. at 2.

When Plaintiffs reiterated their demand for these documents in the July 23, 2025, deficiency letter, *see* Eppler Decl. Ex. 1 at 4, the City changed its story on the status of the production and implied that it had (again) allowed responsive documents to be lost or destroyed. *See* Eppler Decl. Ex. 13 at 4.  Though it had previously acknowledged that its production was incomplete, the City now asserted that it had "provided what we actually have" and continued that these "were all literally 'paper' evaluations when they were actually in fact [sic] completed." *Id*.  The City later asserted that "locating and producing [these documents] is particularly onerous given the seemingly antiquated record keeping."  *Id*. at 5.

In sum, Plaintiffs have sought PDS files and evaluations for the Involved Officers for nearly three years, and still do not have a clear understanding of (1) whether required evaluations for the Involved Officers never happened, (2) whether the evaluations happened but their documentation has been lost or destroyed, or (3) whether this is simply another instance of the City's intransigence in discovery.

### 5.     The City has Failed to Respond to Interrogatories

On June 18, 2025, Plaintiffs served their second set of interrogatories on the City.  *See* Eppler Decl. Exs. 23, 24.  This set contained only one request: for the City to identify the manufacturer and model number of any less-lethal weapons that the Involved Officers possessed at the time of the Incident.  Although the deadline for responding to the Interrogatory was July 18, 2025, the City has not responded to the Interrogatory.  Nor did it respond once Plaintiffs raised this deficiency.  *See* Eppler Decl. Ex. 1.

15883677

***

On May 21, 2025, Chief Judge Wolford denied the City's motion for summary judgment. *See* Dkt. 147.  The same day, this Court lifted the discovery stay and directed the parties to confer regarding a revised case schedule. *See* Dkt. 148.  Plaintiffs proposed a document discovery deadline of June 23, 2025 and reminded the City of the categories of documents the City had yet to produce.  *See* Eppler Decl. Ex. 2 at 1-2.  On May 22, 2025, the City wrote, "I will thoroughly review the outstanding requests and issues forthwith" but asked to delay the proposed deadline for document discovery to July 8.  Eppler Decl. Ex. 26 at 1.  Plaintiffs agreed to the City's proposed deadline.  The Court so-ordered the proposed schedule on May 23.  Dkt. 150, 151.

On July 9, 2025—*after* the deadline for document discovery had passed—the City made a small production of documents.  *See* Eppler Decl. Ex. 16.  The production consisted of some documents responsive to Plaintiffs' Sixth and Seventh Requests.  *See* Eppler Decl. Exs. 17, 18. The City also sent long overdue responses and objections to the Plaintiffs' Sixth and Seventh Set of Requests.[4]  But the City failed to produce the vast majority of the outstanding document categories, including those that had prompted the City to seek a stay of discovery in the first place, such as email ESI and in-service training materials.  *See* Dkt. 138 at 11-13.

Plaintiffs pointed out the deficiencies in the City's production in a letter on July 23, 2025. *See* Eppler Decl. Ex. 1.  Rather than producing the missing documents, on July 28, 2025, the City objected to some of the Plaintiffs' requests on burden grounds (it did not purport to raise any relevance objections).  *See* Eppler Decl. Ex. 13 at 4.  The City did not explain what steps, if any, it had taken to collect and produce the materials not covered by its objections.  *See id*.  The

---

[4] The Sixth and Seventh Set of RFPs were served on May 16, 2024 and August 1, 2024, respectively.

City did not commit to produce remaining documents or provide a timeline for doing so.  *See id.*

And while the City paid lip service to wanting to meet and confer further, when Plaintiffs

promptly provided their availability to confer, the City never responded.  *See* Eppler Decl. Ex. 13

at 1.

## LEGAL STANDARD

"The law is clear in this Circuit that discovery orders are meant to be followed."  *In re*

*Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 673 F. Supp. 3d 345, 361 (S.D.N.Y.

2023) (cleaned up).  Rule 37 authorizes a court to impose sanctions for a party's non-compliance

with discovery obligations.  Generally, courts considering Rule 37 sanctions must be guided by

four factors: "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2)

the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether

the non-compliant party had been warned of the consequences of noncompliance."  *Richard v.*

*Dignean*, 332 F.R.D. 450, 464 (W.D.N.Y. 2019) (cleaned up); *see also In re Sumitomo Copper*

*Litig.*, 204 F.R.D. 58, 60 (S.D.N.Y. 2001).  A "court may consider the need to deter discovery

abuse and efficiently control dockets." *Travco Ins. Co. v. Gree U.S.A., Inc.*, 2022 WL 16945747,

at *4 (W.D.N.Y. Nov. 15, 2022).  Discovery sanctions are awarded to compensate the injured

party "for costs it should not have had to bear" and which the party "would never have been

incurred had the party complied with its obligations in the first instance."  *Klipsch Grp., Inc. v.*

*ePRO E-Com. Ltd.*, 880 F.3d 620, 634 (2d Cir. 2018).  Monetary sanctions under Rule

37(b)(2)(C) sanctions are "mandatory regardless of whatever other sanctions are imposed."

*Kandey Co. v. Barbera*, 2012 WL 3838179, at *2 (W.D.N.Y. Sept. 4, 2012); *see also Major*

*League Baseball Props., Inc. v. Corporacion de Television y Microonda Rafa*, 2022 WL

3974409, at *7 (S.D.N.Y. Aug. 31, 2022) (noting that "the Court 'must' award reasonable

expenses, including attorney's fees caused by the failure to comply with court orders under Rule 37(a)") (cleaned up).

## ARGUMENT

### I.   AN ORDER IMPOSING NON-MONETARY SANCTIONS IS WARRANTED AND NECESSARY

#### A.   The City Has Willfully Defied Its Discovery Obligations Here and in Other Civil Rights Cases Involving RPD Misconduct

The City has openly defied this Court's discovery orders and unjustifiably refused to produce documents responsive to Plaintiffs' requests.  The Court warned the City that if its motion for summary judgment was denied, then the stay of discovery would be lifted and the City would have to comply with its discovery obligations by taking concrete measures, such as "better staffing [and/or] an outside e-discovery vendor," commensurate with the needs of a "case of this size and complexity."  Dkt. 138 at 14.  The City has done none of this, treating court-mandated deadlines as optional and forcing Plaintiffs to engage in lengthy and fruitless correspondence imploring the City to meet its basic discovery obligations.  There is no excuse for this conduct.

There is also no question that the documents that Plaintiffs have sought in this litigation—such as in-service training materials for RPD officers and the disciplinary records, evaluation reports, and personnel files prepared during the relevant period for the Involved Officers—are routinely sought in police misconduct cases that involve *Monell* claims.  Indeed, this Court has already told the City that "records of discipline and training of the [police] officers involved in the allegedly unconstitutional conduct . . . are relevant and should be produced." *Casaccia v. City of Rochester*, 2020 WL 1042149, at *4 (W.D.N.Y. Mar. 4, 2020) (Pedersen, M.J.), *reconsideration denied,* 2020 WL 2833008 (W.D.N.Y. June 1, 2020); *see also King v. Conde*, 121 F.R.D. 180, 198 (E.D.N.Y. 1988) (holding that "plaintiffs in federal civil rights

14

15883677

actions are presumptively entitled to recollections as well as documents on prior complaints and police history").[5]  Such documents are relevant and proportional to the needs of this case, and the City cannot seriously contend otherwise.

The City's conduct here is part of its pattern of withholding relevant documents in police misconduct cases.  After trying—and failing—to have the *Casaccia* ruling set aside on reconsideration, the City still did not get the message.  In *Vann v. City of Rochester*, which involved claims against the City based on allegations of excessive force by Officer Matthew Drake—the same officer who shot and killed Tyshon Jones—the plaintiff was forced to move for sanctions on multiple occasions due to the City's failure to produce officer personnel files and misconduct records.  2023 WL 4976002 at *2 (W.D.N.Y. Aug. 3, 2023) (Pedersen, M.J.).  The Court held that the City's "failure is egregious and has consumed valuable judicial resources in an effort to get the City . . . to comply with basic discovery obligations."  *Id*. at *6.  The Court was "disturbed by the City Defendants' blatant disregard for court-ordered deadlines and their discovery responsibilities."  *Id*.

Many litigants would have been deterred from similar conduct after being subject to such an order from a federal district court.  Not the City.  Here, once again, the City has withheld the same categories of documents without any proper justification.  The City's utter disregard for the scheduling order and its extreme recalcitrance to produce documents regarding RPD operations, in this and similar cases, constitute a clear pattern of "intentional obstruction" of discovery in civil rights cases.  *Id*.  Considering this consistent pattern of thwarting discovery in civil rights

---

[5] The *Casaccia* plaintiff sought "disciplinary and personnel records of the Officer defendants; and incident reports, use of force reports, and investigative records from other incidents involving the Officer defendants; and records from other incidents where either the Professional Standards Section or Civilian Review Board substantiated unlawful use-of-force allegations."  *Casaccia v. City of Rochester,* No. 6:17-cv-06323-FPG-MJP (W.D.N.Y. Aug. 26, 2019), Dkt. 45-2 at 4 .  Other document requests included "the RPD's training [materials] and policies."  *Id*. at 9.

cases, the Court can draw a reasonable inference the City has been "act[ing] willfully and in bad faith." *S. New England Tel. Co. v. Global NAPs, Inc.*, 624 F.3d 123, 147 (2d Cir. 2010). Indeed, it would be hard to infer anything else.

The City's meager and conclusory allusions to burden are both too little and too late to overcome a conclusion that its discovery violations are willful. This Court has already warned that the City would have to produce materials responsive to the Plaintiffs' requests, notwithstanding the potentially significant burden of doing so, if the City's motion for summary judgment were denied. *See* Dkt. 138 at 14. The insufficiency of the City's objections is compounded by how it has raised them. It is the City that bears the burden of showing that Plaintiffs' discovery requests should be denied. *See Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 314 F.R.D. 85, 87 (S.D.N.Y. 2016). But the City has not asserted objections in a timely manner—often serving the Responses and Objections required by Fed. R. Civ. P. 34(b)(2) late or not at all—nor attempted to "clearly set forth the specifics of each objection and how that objection relates to the discovery being demanded." *In re Air Crash Near Clarence Ctr., N.Y.*, 2013 WL 6073635, at *2 (W.D.N.Y. Nov. 18, 2013). Apart from vague and cryptic remarks over email to Plaintiffs, the City has not explained "how each [of Plaintiffs'] request is overly broad, burdensome, or oppressive" by producing "affidavits or offering evidence revealing the nature of the burden." *Fin. Guar. Ins. Co.*, 314 F.R.D. at 88 (S.D.N.Y. 2016) (cleaned up). Likewise, the City's repeated bait-and-switch tactics also bespeak bad faith. The City, having sought a stay of discovery on the ground that producing in-service training materials would be "significantly burdensome," claimed, after the stay was lifted, that it no longer had any relevant documents to produce in response. At other moments, the City simply refused to undertake searches of documents responsive to Plaintiffs' requests. All of this confirms that the City's

16

recalcitrance is the product not of good-faith disagreements over the scope of discovery, but of a willful disregard for the discovery process.

### B.    All Other Factors for Imposing Non-Monetary Sanctions on the City Are Satisfied

In addition to the demonstrated willfulness of the City's misconduct, the other Rule 37 factors—the inefficacy of lesser sanctions; prior warnings to the non-compliant party; and the duration of the period of noncompliance—all support non-monetary sanctions.

"Sanctions under Rule 37" are designed "to specifically deter and secure compliance, as well as the purpose of general deterrence." *Wishart v. Welkley*, 2022 WL 737156, at *3 (W.D.N.Y. Mar. 11, 2022) (Pedersen, M.J.); *see also Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 319 F.R.D. 122, 126 (S.D.N.Y. Nov. 9, 2016). Monetary sanctions against the City have been ineffective in this regard. The Court assessed such sanctions against the City in both *Casaccia*, 2020 WL 1042149, at *10, and *Vann*, 2023 WL 4976002, at *6. But serial monetary sanctions have seemingly had no effect on the conduct of the City, which appears to treat them as a cost of doing business when attempting to stymie the progress of civil rights cases. This record is all the Court needs to be "justified in concluding that lesser sanctions would be ineffective to achieve compliance." *S. New England Tel. Co.*, 624 F.3d at 148.

Aside from the warnings it should have taken to heart in prior cases, the City has been admonished in this very case to abide by its discovery obligations or else face consequences. While granting the City's motion to stay discovery, this Court told the City "that if it loses its motion for summary judgment—in whole or part—this Court cannot ease the burden of discovery. Discovery will proceed." Dkt. 138 at 14. In its scheduling order, the Court once again warned that it would, "on motion or *sua sponte*, impose sanctions where parties willfully ignore or otherwise fail to adhere to this scheduling order under Fed. R. Civ. P. 16(f)." Dkt. 151

17

at 3.  The Court has issued similar warnings in other police misconduct cases referred to in the previous section.  *See Vann*, 2023 WL 4976002, at *6; *see also Casaccia*, 2020 WL 2833008 at *3-4.  Accordingly, the City was well aware of the consequences of discovery misconduct in this case, yet it chose not to conform its conduct accordingly.

The City has been non-compliant with its discovery obligations in this case for an extended period.[6]

    iv. It has been over 26 months since Plaintiffs first proposed search terms to the City for the ESI production in May 2023.  *See* Eppler Decl. Ex. 4.  Due to the City's unreasonable and conclusory objections, the parties are no closer to reaching agreement on production parameters than 26 months ago.

    v. It was in October 2022—more than 33 months ago—when the Plaintiffs first requested that the City produce qualifications and certifications for less-lethal and service weapons for the Involved Officers.  *See* Eppler Decl. Ex. 1 at 4.  The City has not produced these materials and only recently emailed a table, apparently generated by the City's counsel, purporting to summarize the information it has otherwise withheld.

    vi. It has been 25 months since Plaintiffs sought in-service training course materials from the City.  *See* Eppler Decl. Ex. 1 at 3.  The City refuses to provide such materials, claiming for the first time after the document-production deadline that these documents either were destroyed or perhaps never existed in the first place.

In cases involving similarly lengthy periods of non-compliance with litigation obligations, this Court has imposed non-monetary sanctions.  *See Houghtaling v. Downes*, 2023 WL 7304954 (W.D.N.Y. Oct. 11, 2023) (finding that the plaintiff's refusal to respond over a nine-month period was sufficient to impose the sanction of dismissal), *report and recommendation adopted*, 2023 WL 7301023 (W.D.N.Y. Nov. 6, 2023); *see also Embuscado v.*

---

[6] Even if the period of stay—which lasted from August 30, 2024 to May 21, 2025, or 8 months—were to be excluded from this period, the City's period of non-compliance remains to be calculated in years, not months or days.

15883677

*DC Comics*, 347 F. App'x 700, 701 (2d Cir. 2009) (dismissing a complaint because the plaintiff had violated court orders over a three-month period).

## II.     THE COURT SHOULD SANCTION THE CITY FOR ITS DISCOVERY MISCONDUCT BY ESTABLISHING CERTAIN FACTS AGAINST THE CITY

Rule 37 grants "significant" power to courts "to ensure that [the rule] is perceived as a credible deterrent rather than a 'paper tiger'." *EEOC v. Green Lantern Inn, Inc.*, 2021 WL 4086148, at *8 (W.D.N.Y. Aug. 19, 2021), *report and recommendation adopted*, 2021 WL 4081109 (W.D.N.Y. Sept. 8, 2021).  When a party or a witness fails to comply with a discovery order or permit discovery, Rule 37(b)(2)(A) "permits the court to . . . direct[] that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims."  *Karsch v. Blink Health Ltd.*, 2019 WL 2708125, at *12 (S.D.N.Y. June 20, 2019).  "Even in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs."  *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 493 (S.D.N.Y. 2022) (citation omitted).

Rule 37(b)(2) "expressly requires that the sanctions must be 'just'; and the sanction must relate to the particular claim to which the discovery order was addressed."  *Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357, 1366 (2d Cir. 1991); *see also Diegert v. Receivables Performance Mgmt., LLC*, 2017 WL 370808, at *4 (W.D.N.Y. Jan. 26, 2017) ("The choice of sanction should be guided by the concept of proportionality between offense and sanction.") (cleaned up). All the factors that courts consider before imposing non-monetary sanctions are satisfied here.  *See* Section I.  Accordingly, Plaintiffs seek the following sanctions that are specifically targeted at, and proportional to, the City's numerous discovery violations.

19

15883677

### A.    PDS Files, Personnel Files, and Evaluations for the Involved Officers

Over 33 months ago, Plaintiffs sought the PDS and personnel files for the Involved Officers.  *See* Eppler Decl. Ex. 1 at 4.  Since then, the City's production of these PDS files for the Involved Officers (apart from Officer Carello) contained disturbing gaps which Plaintiffs identified by email to the City on April 5, 2024.  *See* Eppler Decl. Ex. 20.  Despite Plaintiffs' repeated requests and entreaties, the City has not explained whether (i) the mandatory evaluations for the Involved Officers never took place; (ii) the Officers were evaluated but those files were subsequently spoliated; or (iii) the City conducted the evaluations and still possesses the files but simply refuses to produce them.

Plaintiffs should not be prejudiced by the dearth of evidence on the City's supervision of the Involved Officers, whether caused by the City's incompetence, its recalcitrance, or its spoliation.  Accordingly, the Court should direct that it is established for the purposes of this action that the City's failure to produce PDS files, personnel files, and evaluations for an Involved Officer should be taken as establishing that the Involved Officer received no evaluation during any period(s) for which an evaluation was not produced, and consequently that the City failed to supervise that officer's compliance with their constitutional and statutory obligations to the residents of Rochester.

### B.    In-Service Training Materials

Twenty-five months after Plaintiffs sought in-service training materials, the City still has not produced these documents.  Its explanation for this failure has evolved over time.  In June 2024, the City announced that the purported burden of complying with this discovery request was a precipitating factor in its decision to seek a stay of discovery.  *See* Eppler Decl. Ex. 12 at 2-3.  But the stay has been lifted, and the City still has not produced the materials.  Now, though, the City says that it looked for the documents (the ones that, a year ago, it said would be

15883677

burdensome to produce) and could not find them—explaining that this is perhaps due to "antiquated" recordkeeping practices.  *See* Eppler Decl. Ex. 13 at 4.

If the City of Rochester claims to have no record of the materials it used to train its officers during the time period relevant to this case, Plaintiffs and the factfinder are entitled to a sworn explanation of how that could be.  Accordingly, Plaintiffs respectfully seek an order compelling the City to cause a senior member of the RPD's Professional Development Section to undertake a diligent search and provide a declaration (i) explaining the efforts taken to locate and collect the in-service training materials identified in Plaintiffs' June 6, 2024 email to the City; (ii) identifying the document preservation protocol, if any, applicable to those materials; and (iii) to the extent the City contends those materials are no longer available, explaining when and how they were destroyed or discarded.  To whatever extent the City fails to produce such in-service training materials, the Court should establish for the purposes of this action that RPD officers, including the Involved Officers, did not receive any training in the subject areas identified in Plaintiffs' June 6, 2024 email to the City.[7]

### C. Qualifications and Certifications for Service Weapons and Less-Lethal Weapons Trainings

Over 33 months ago, the Plaintiffs requested that the City produce qualifications and certifications for less-lethal and service weapons for the Involved Officers.  *See* Eppler Decl. Ex. 1 at 4.  The City has withheld these materials to date.  In July 2025, the City provided a chart purporting to summarize the weapons qualifications of the Involved Offers without explaining when, or if, it intends to produce the underlying documents it used to prepare the chart.  *See* Eppler Decl. Ex. 17 at 3-4.  Moreover, the chart is also deficient because Plaintiffs had sought

---

[7] Plaintiffs will take additional steps to identify whether there has been spoilation and reserve their rights to bring further sanctions motions.

15883677

sign-in logs and staffing spreadsheets for such service weapons and less-lethal weapons trainings attended by the Involved Officers—none of which the City provided.

Accordingly, Plaintiffs seek an order compelling the City to produce the underlying documents it used to prepare the table of qualification scores along with the other materials that are responsive to the Plaintiffs' RFPs.  To whatever extent the City fails to produce these materials, Plaintiffs respectfully seek a direction that it is established for the purposes of this action that the Involved Officers were not certified or qualified in the use of less-lethal weapons or service weapons between 2020 and 2023.

## III. THE COURT SHOULD ORDER THE CITY TO PAY PLAINTIFFS' REASONABLE EXPENSES, INCLUDING ATTORNEYS' FEES, IN SEEKING THE CITY'S COMPLIANCE WITH ITS DISCOVERY OBLIGATIONS

The language of Rule 37(b)(2)(C) is mandatory: "the Court 'must' award the expenses, including attorneys' fees, caused by [a party's] failure to comply with the Court's orders, unless the failure was substantially justified or other circumstances make an award unjust."  *Karsch v. Blink Health Ltd.*, 2019 WL 2708125, at *26 (S.D.N.Y. June 20, 2019) (cleaned up).  There is no justification for the City's failure to abide by its obligations.  Consistent with this Rule, this Court has previously imposed monetary sanctions on the City for its failures to comply with discovery orders in similar cases.  *See Casaccia*, 2020 WL 1042149, at *10 ("The Court believes the proper sanction is to direct payment of the costs of bringing the motion to compel and engaging in two appearances in relation to it."); *see also Wishart*, 2022 WL 737156, at *3-6 (imposing sanctions by awarding attorneys' fees calculated at out-of-district rates); *Travco Ins. Co*, 2022 WL 16945747, at *5 (imposing costs and attorneys' fees as sanctions on defendants for being "habitually non-compliant with discovery obligations.").  Considering these precedents, and in accordance with Rule 37(b)(2)(C), Plaintiffs respectfully submit that they are entitled to

recover "reasonable expenses, including attorney's fees," calculated at out-of-district rates, by way of sanctions against the City.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that this Court (1) impose the aforementioned non-monetary sanctions against the City; and, in addition, (2) award monetary sanctions against the City in the form of the Plaintiffs' attorney's fees and costs associated with making all efforts to gain the City's compliance (including by preparing this motion).

Dated:  August 8, 2025

Respectfully submitted,

*Attorneys for Plaintiffs*
*Kennetha Short and Pernell Jones, Sr., in their*
*capacity as administrators of the Estate of Tyshon*
*Jones*

By:   /s/ Amy N. Vegari

| | |
|---|---|
| Alanna Kaufman | Amy N. Vegari |
| Douglas E. Lieb | David S. Kleban |
| | Ian Eppler |
| KAUFMAN LIEB LEBOWITZ | Madeline More Lane |
| & FRICK LLP | PATTERSON BELKNAP |
| 18 E. 48th Street, Suite 802 | WEBB & TYLER LLP |
| New York, New York 10017 | 1133 Avenue of the Americas |
| (212) 660-2332 | New York, New York 10036 |
| dlieb@kllf-law.com | Tel: (212) 336-2000 |
| akaufman@kllf-law.com | avegari@pbwt.com |
| | dkleban@pbwt.com |
| | ieppler@pbwt.com |
| | dxu@pbwt.com |
| | mlane@pbwt.com |

15883677

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all counsel of record.

Dated:  August 8, 2025

Respectfully submitted,

*Attorneys for Plaintiffs*
*Kennetha Short and Pernell Jones, Sr., in their*
*capacity as administrators of the Estate of Tyshon*
*Jones*

By:   /s/ Amy N. Vegari

| | |
|---|---|
| Alanna Kaufman | Amy N. Vegari |
| Douglas E. Lieb | David S. Kleban |
| | Ian Eppler |
| KAUFMAN LIEB LEBOWITZ | Madeline More Lane |
| & FRICK LLP | PATTERSON BELKNAP |
| 18 E. 48th Street, Suite 802 | WEBB & TYLER LLP |
| New York, New York 10017 | 1133 Avenue of the Americas |
| (212) 660-2332 | New York, New York 10036 |
| dlieb@kllf-law.com | Tel: (212) 336-2000 |
| akaufman@kllf-law.com | avegari@pbwt.com |
| | dkleban@pbwt.com |
| | ieppler@pbwt.com |
| | mlane@pbwt.com |

24

15883677