UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

KENNETH SHORT and PERNELL JONES, SR.,
In their capacity as administrator of the ESTATE OF
TYSHON JONES,

|  |  |  |
|---|---|---|
| | Plaintiffs | Case No. 6:22-cv-06263 |
| v. | | |
| CITY OF ROCHESTER, | | |
| | Defendant. | |

**CITY OF ROCHESTER MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

DATED: July 17, 2026

PATRICK BEATH, Corporation Counsel
BY: s/ *Patrick B. Naylon*
PATRICK B. NAYLON, Esq., of Counsel
Attorneys for City Defendants
30 Church Street, Room 400A City Hall
Rochester, NY 14614
Telephone: (585) 428-6906

**TABLE OF CONTENTS**

Table of Contents............................................................................................................... i

Table of Authorities ......................................................................................................... ii

Preliminary Statement........................................................................................................1

Statement of Facts..............................................................................................................2

Legal Standard ...................................................................................................................2

Point I: There Was No Constitutional Violation................................................................4

Point II: Plaintiffs Cannot Establish Monell Liability Against the City of Rochester....................9

    Plaintiffs' claims fail under any and all such theories .........................................10

        A)   The City's policies are constitutionally sound ...............................................10

        B)   Plaintiffs do not allege that Officer Drake's actions were directed by policy makers ...................................................................................................10

        C)   There is no evidence of any widespread practice that amounts to a custom that policy makers of the city should have been aware ...................10

        D)   The City's training program is exemplary ......................................................12

Point III: There Was No ADA or Rehabilitation Act Violation .......................................15

Point IV: The State Law Assault and Battery Claims Must Be Dismissed ..................................20

Point V: The Wrongful Death Claim Must Be Dismissed................................................22

# TABLE OF AUTHORITIES

**Cases**

*Agosto v. New York City Dep't of Educ.*, 982 F.3d 86 (2d Cir. 2020) ...................................... 9, 10

*Amnesty America v. Town of West Hartford.*, 361 F.3d 113 (2d Cir 2004)................................. 12

*Anderson v Burlington Insurance Co.* 2023 WL 3751929 (W.D.N.Y. 2023 19-cv-297)............. 22

*Anderson v Liberty Lobby, Inc.* 477 U.S. 242 (1986) ........................................................... 3

*Andino v. Fischer* 698 F. Supp 2d 362 (SDNY 2010) ........................................................ 18

*Barnes v Felix,* 605 U.S. 73, 145 S.Ct. 1353, 221 L.Ed.2d 751 (2025)........................................... 4

*Bates v Chesterfield Cnty.*, 216 F.3d 367 (4th Cir. 2000)........................................................ 18, 19

*Board of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397 (1997) ............................................... 12

*Brandon v. City of New York*, 705 F. Supp. 2d 261 (S.D.N.Y. 2010) ........................................... 13

Bridenbaker v. City of Buffalo, 137 A.D.3d 1729 28 N.Y.S.3d 545 [4th Dept. 2016] ............... 20

*Brown v. City of New York*, 798 F.3d 94 (2d Cir. 2015)........................................................ 6

*Brunette v City of Burlington, Vermont*, 15-cv-00061-CR, 2018 WL 4146598
(D Vt. Aug. 30, 2018) ........................................................................................... 7

*Celotex Corp. v Catrett*, 477 U.S. 317 (1986) ........................................................................ 2, 3

*Ching as Trustee for Jordan v City of Minneapolis*, 73 F.4th 617 (8th Cir. 2023) ....................... 8

*City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765 (2015).................................... 6

*City of Canton v. Harris*, 489 U.S. 378 (1989)......................................................................... 12

*City of Los Angeles v Mendez*, 581 U.S. 420 (2017) .............................................................. 18

*Connick v. Thompson*, 563 U.S. 51, 61 (2011) ....................................................................... 13

*Cox v City of Rochester,* 22-cv-6207 FPG, 2025 WL 50340
(W.D.N.Y. January 8, 2025) ................................................................................. 13, 14

*Davis v Shaw* 821 F.3d 231 (2d Cir 2016)............................................................................. 15

*Deferio v. City of Syracuse,* 770 F. App'x 587 (2d Cir. 2019)....................................................... 10

*Doe v Franklin Square Union Free School District,* 100 F.4th 86 (2nd Cir. 2024) .................... 15

*Estate of Richards by Stephens v City of New York*, 18-cv-11287-MKV,
  2024 WL 3607220 (S.D.N.Y. July 31, 2024) ............................................................... 6

*Ferreira v City of Binghamton*, 38 N.Y.3d 298 (2022) ................................................. 21

*Friend v. Gasparino*, 61 F.4th 77 (2d Cir. 2023)........................................................... 10

*Garza v Briones*, 943 F.3d 740 (5th Cir. 2019) .............................................................. 7

*Graham v Connor* 490 U.S. 386 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ....................... 4, 5, 6, 7

*Green v Morse*, 2009 WL 1401642 (W.D.N.Y. 2009) ..................................................... 3

*Hainze v Richards* 207 F.3d 795 (5th Cir. 2000) ...................................................... 16, 17

*Henrietta v Bloomberg* 331 F.3d 261 (2nd Cir. 2003) .................................................. 18

*Hernandez v Denny's Corporation*, 177 AD3d 1372 (4th Dept 2019) ............................ 20

*Hu v. City of New York*, 927 F.3d 81 (2d Cir. 2019) ................................................ 10, 11

*Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) ............ 11

*Jones v Kent*, 35 AD2d 622 (3rd Dept. 1970) ............................................................... 22

*Jones v Treubig*, 963 F.3d 214 (2d Cir. 2020) .......................................................... 5, 11

Jones v. Town of East Haven, 691 F.3d 72 (2d Cir. 2012) .............................................. 14

*Jones v. Westchester County*, 182 F. Supp. 3d 134 (S.D.N.Y. 2016) ............................... 13

*Lane Capital Mgmt., Inc. v Lane Capital Mgmt., Inc.*, 192 F.3d 337 (2d Cir. 1999) ................... 3

*Loveall v Walker*, 807 F. Supp. 3d 148 (N.D.N.Y) ......................................................... 6

*Lucente v. Cnty. of* Suffolk, 980 F.2d 284 (2d Cir. 2020) .............................................. 11

*Mastromonaco v. Cnty. of Westchester*, 779 F. App'x 49 (2d Cir. 2019) .......................... 9

*Mazzaferro v Albany Motel Enterprises, Inc.*, 127 AD2d 374 (3rd Dept. 1987) ................ 22

*McElwee v Cnty of Orange,* 700 F.3d 635 (2d Cir. 2012) ............................................. 15

*Monell v Dept. of Social Services,* 436 ........................................................... 1, 9, 13

*Montalvo v. Lamy*, 139 F. Supp. 3d 597 (W.D.N.Y. 2015) ............................................. 9

*Murillo v City of Los Angeles*, 707 F. Supp. 3d 947 (9th Cir. 2023) ................................ 8

*O'Brien v City of Syracuse* 2023 WL 6066036 (N.D.N.Y. Sept 18, 2023) ......................... 17

*Pembaur v. Cincinnati*, 475 U.S. 469 (1986) ................................................................. 13

*Plumhoff v Rickard*, 572 U.S. 765, 134 S. Ct 2012, 188 L. Ed 2d 1056 (2014)........................ 4, 6

*Polk County v. Dodson*, 454 U.S. 312 (1981)................................................................. 13

*Quarantino v Tiffany & Co.* 71 F.3d 58 (2d Cir. 1995) ....................................................... 3

*RDK NY Inc. v. City of New York*, No. 21-CV-01529, 2024 WL 4333704
   (E.D.N.Y. Sept. 28, 2024) ..................................................................................... 13

*Reynolds v. Giuliani*, 506 F.3d 183 (2d Cir. 2007)..................................................... 13, 14

*Rivera v State of New Yo*rk 34 NY3d 383 (2019) cited by *Marcus v City of Buffalo*,
   2023 WL 5154167; 20-CV-316  (W.D.N.Y. August 10, 2023) ...................................... 20, 21

*Salaam v Wolfe,* 806 F.3d 90 (3d Cir. 2020) ................................................................. 7

*Scott v Harris* 550 U.S. 372 (2007) ............................................................................ 3

*Scotto v Almenas*, 143 F.3d 105 (2d Cir. 1998) ............................................................. 3

*Stevens-Rucker v City of Columbus, OH*, 739 Fed. Appx. 834 (6th Cir. 2018)........................... 7

*Sullivan v Gagnier* 225 F.3d 161 (2nd Cir 2000)............................................................. 5

*Tardif v City of New York*, 991 F.3d 394 (2d Cir 2021)..................................................... 15

*Taylor v. Schaffer*, 2015 WL 541058 (D. Vt. Feb. 10, 2015) ............................................. 16

*Tenn. v. Garner*, 471 U.S. (1985) .............................................................................. 4

*Tieman v. City of Newburgh*, No. 13-cv-4178, 2015 WL 1379652
   (S.D.N.Y. Mar. 26, 2015)....................................................................................... 11

*Tucker v Hardin County Tennessee*, 558 U.S. 816 (2009) ................................................. 16

*Tucker v State of Tennesee* 539 F.3d 526 (6th Cir 2008).................................................. 16

*Twin laboratories Inc. v Weider Health & Fitness,* 900 F.2d 566 (2d Cir. 1990)......................... 3

*United Natl. Ins. Co. v Waterfront N.Y. Realty Corp,* 994 F.2d 105 (2d Cir 1993)...................... 20

Vasquez v. City of New York, No. 20-CV-4641, 2023 WL 8551715
   (S.D.N. Y Dec. 11, 2023)....................................................................................... 14

*Waller*.............................................................................................................. 17

*Waller ex rel. Estate of Hunt v Danville VA*, 556 F.3d 171 (4th Cir. 2009)........................... 16, 17

*Williams v City of New York*, 2025 WL 2381569 (S.D.N.Y. Aug. 15, 2025) ............................... 7

Williams v. City of New York, 129 A.D.3d 1066 12 N.Y.S.3d 256 [2d Dept. 2015].................. 20

*Wingard v. Pa. State Police*, No. Civ. A. 12 1500, 2013 WL 3551109
  (W.D. Pa. July 11, 2013) ...................................................................... 16

*Wright v Goord,* 554 F.3d 255 (2d Cir. 2009).................................................. 3

*Yan Zhao v United States* 273 F. Supp.3d 372 (W.D.N.Y2017) ................................. 22

*Ying Jing Gan v City of New York* 996, F.2d 522 (2d Cir. 1993)...................................... 3

Young v. City of Providence ex rel. Napolitano, 404 F.3d 4 27 (1st Cir. 2005) ......................... 14

**Statutes**

CPL 140.25[1][a] ........................................................................... 20

Penal Law § 35.30[1].......................................................................... 20

The Defendant, City of Rochester, submits this Memorandum of Law in support of its Motion for Summary Judgment seeking dismissal of the Complaint and the action in its entirety as set forth below.

## PRELIMINARY STATEMENT

The Plaintiffs in this action assert causes of action all predicated on an unfortunate and tragic incident that occurred in the early morning hours of March 10, 2021 when the Plaintiffs' decedent was shot and killed by a Rochester police officer as he charged the officer with a long blade knife.

Plaintiffs assert a cause of action pursuant to 42 USC 1983 and pendant state law claims for assault, battery and wrongful death against the City of Rochester only. The alleged constitutional claim against the City is premised upon *Monell v Dept. of Social Services,* 436 U.S. 658 (1978*).* Plaintiffs also assert causes of action under the Americans with Disabilities Act and the Rehabilitation Act, asserting that the decedent was either discriminated against because of a disability, or he was not afforded reasonable accommodations.

As set forth below, the City of Rochester moves for Summary Judgment upon the grounds that there was no underlying constitutional violation as the force used was reasonable under the circumstances as a matter of law. The ADA and Rehabilitation Act claims must be dismissed as under the circumstances where the safety of the officers was in jeopardy and the circumstances unsafe, the decedent was not entitled to any ADA accommodation and in any event, even if he were, there was no alternative reasonable accommodations. There is of course no evidence that he was treated differently because of his alleged disability.

Plaintiffs will likely encourage the Court to engage in speculation and second guessing; would have, could have and should haves. The Court, however, is guided by ample authority that its determination is to be premised upon the totality of the circumstances the officer was facing. Plaintiffs' claims premised upon after the fact speculation as to what might have occurred if other officers responded differently or bifurcation of the shooting officer's five shots fired in 1.37 seconds cannot be accepted as it is simply an effort to create a false vision of the circumstances encountered.

In any event, even if there were a question of fact as to the underlying constitutional

1

violation, indeed even in the event that there was a constitutional violation, the *Monell* claim necessarily fails as the Plaintiffs cannot establish a custom, policy or practice of the City of Rochester that was so deliberately indifferent to the rights of the decedent as to have actually caused the alleged constitutional violation.

## STATEMENT OF FACTS

The relevant facts on this Motion for Summary Judgment are set forth in the Rule 56 Statement of Undisputed Facts and the supporting documents referenced therein. While certainly of importance, the body worn camera ("BWC") footage of the three officers present captures the encounter from various perspectives, though not necessarily the 'totality of the circumstances." The cognitive interview of Officer Drake, versus leading questions from counsel, likewise capture the totality of the circumstances from those handling the situation.

The undisputed facts are that on March 10, 2021 in the early morning hours, police were caused to investigate an incident at the Open Door Mission regarding someone who had stolen knives.  As a result, they came into contact with Tyshon Jones at Industrial St and Cascade Alley, a few blocks from the initial call at 210 W. Main St.  He possessed a long blade knife and upon first contact was told to put it down.  Unfortunately, he refused to do so.  Instead, he refused to heed the officers' directions to drop the knife and stop walking toward the officers. Instead, Mr. Jones continued to walk towards the officers, verbally threatened them, and demanded they shoot him. This led to the police backing away from Mr. Jones, off Industrial St to Cascade, down Cascade to Main St, then west on Main St. for approximately three minutes and approximately 1/10 of a mile.

Despite numerous commands to stop and drop the knife, Mr. Jones not only failed to stopand drop the knife, but he eventually increased his advance at Officer Drake as he back-peddled away from Mr. Jones.  Finally, Mr. Jones charged towards Officer Drake with the knife. Officer Drake necessarily fired his service weapon at Mr. Jones five times in 1.37 seconds to stop the threat of imminent deadly harm.

## LEGAL STANDARD

Summary judgment is appropriate if the record "show(s) that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ. P. 56(c); see also *Celotex Corp. v Catrett*, 477 U.S. 317, 322 (1986); *Anderson v*

*Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). The Court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion. *Quarantino v Tiffany & Co.* 71 F.3d 58, 64 (2d Cir. 1995); *Twin laboratories Inc. v Weider Health & Fitness,* 900 F.2d 566, 568 (2d Cir. 1990).

If the moving party meets this burden, the non-moving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. @ 248; *Celotex* 477 U.S. @ 323-24; *Wright v Goord,* 554 F.3d 255, 266 (2d Cir. 2009). The non-moving party must produce evidence to support their case and "may not rely simply on conclusory statements or on contentions that the (admissible evidence) supporting the motion (is) not credible." *Ying Jing Gan v City of New York* 996, F.2d 522, 532 (2d Cir. 1993). Evidence that is "merely colorable or not significantly probative" is insufficient to defeat a motion for summary judgment. *Lane Capital Mgmt., Inc. v Lane Capital Mgmt., Inc.*, 192 F.3d 337, 346 (2d Cir. 1999); see also *Scotto v Almenas*, 143 F.3d 105, 114-15 (2d Cir. 1998). Additionally, "(w)hen opposing parties tell two different stories, one of which is blatantly contradicted by the record so that no reasonable juror could believe it, a court should not adopt that version of events for purposes of ruling on a motion for summary judgment." *Scott v Harris* 550 U.S. 372, 380 (2007).

*Scott v Harris* is particularly on point in this matter as the case involved analysis of video tape on a summary judgment motion involving a police chase. Likewise, in *Green v Morse*, 2009 WL 1401642 (W.D.N.Y. 2009), Judge Siragusa, noting that while excessive force cases typically involve questions of fact to be resolved by a jury, granted summary judgment in an excessive force case specifically relying on video footage of the subject incident. Plaintiffs will offer numerous speculative propositions to deflect attention from what actually occurred as seen on the BWC to speculation as to what 'could' have been done to potentially lead to a different result. However, this type of analysis is faulty. The analysis is whether the officer's use of force violated the Plaintiff's constitutional rights as excessive. What else might have occurred or what didn't occur is of no moment. In this action, there is only one version of events and what other officers did or didn't do does not alter the analysis of whether the force used was constitutionally justified.

**POINT I**

**THERE WAS NO CONSTITUTIONAL VIOLATION**

"Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon, or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Tenn. v. Garner*, 471 U.S. 1 (1985).

There is no doubt whatsoever that Mr. Jones presented a threat of serious physical harm to Officer Drake and others. He had stolen a butcher knife, he refused to drop it, refused to heed warnings to stop advancing toward the officers, threatened the officers and finally ran towards Officer Drake with the butcher knife in hand. This is all there for the Court to view on the BWC submitted with the motion. The BWC captures the entire interaction between the Rochester police officers and Mr. Jones, though not exactly from the officer's perspective.

Second guessing as to what other means or methods might have been employed are of no moment. The applicable law does not call for a post-incident analysis of what might have been done differently, but rather an analysis simply whether the use of force was justified under the circumstances then and there existing. In *Barnes v Felix*, 605 U.S. 73, 145 S.Ct. 1353, 221 L.Ed.2d 751 (2025) a unanimous Supreme Court found that the use of force analysis is determined under the Fourth Amendment from 'the perspective of a reasonable police officer on the scene" quoting *Graham v Connor* 490 U.S. 386, 396 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) and that such inquiry requires an analysis of the 'totality of the circumstances." *Id.* (citations omitted)

While Plaintiffs here seek to look elsewhere, "the situation at the precise time of the shooting will often matter most, earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Id*. The court cited *Plumhoff v Rickard*, 572 U.S. 765, 134 S. Ct 2012, 188 L. Ed 2d 1056 (2014) as a reference to why the use of deadly force at the moment of a shooting may be justified partially due to what lead up to that

4

point. *Id*, 572 U.S. @ 777. In short, the analysis is premised upon what was "then known to the officer" *Id* 572 U.S @ 80 at the time. Indeed, "it is, after all, the officer's choice in that moment that is under review." *Id.*

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v Connor,* 490 U.S. 386, 96, 109 S. Ct. 1865 (1989). The calculus of reasonableness must embody allowance for the fact that officers are often forced to make split-second judgments – in circumstances that are tense, uncertain and rapidly evolving - about the amount of force that is necessary in a particular situation. *Id.* @ 396 – 397. In this action we are most certainly dealing with a tense, uncertain, constantly and rapidly evolving situation. Finally, there was an immediate imminent threat to the life of Officer Drake, a necessarily determinative factor to be considered in the analysis. See *Sullivan v Gagnier* 225 F.3d 161, 165 (2nd Cir 2000).

Here the Court is able to review the BWC footage to determine that at the moment that Mr. Jones was subjected to the Fourth Amendment seizure, the use of deadly physical force was reasonable as a matter of law. As such, there was no unreasonable seizure and hence no Constitutional violation.

Plaintiffs will undoubtedly ask this Court to review the case, not by the totality of the circumstances that then and there existed, but by viewing paused, stopped, and still photographs of the shooting that depict not how it occurred, but frozen hundredths of a second to try and demonstrate that while the initial shots were justified, the fourth and fifth shots were not. Of course the shooting did not take place in slow motion or stop action, but rather real time with all five shots being discharged in 1.37 seconds. Plaintiffs' proposed analysis does not at all reflect the actual circumstances, but rather a fabricated bifurcation of hundredths of a second after the fact hindsight breakdown of what actually occurred in less than a second and a half.

Even before the Supreme Court decided *Felix v Barnes* , the Second Circuit recognized that when considering whether a use of force is excessive, , "[i]t is . . . important that courts not isolate a particular act of force by an officer if it was intertwined with other acts of force in rapid succession where there was no reasonable opportunity to re-assess." *Jones v Treubig*, 963 F.3d 214, 236 (2d Cir. 2020). Consequently, with the assumption that Drake's initial use of force, i.e.,

the first shot, will be found reasonable, then the pertinent question becomes whether during the 1.37 seconds the shots were fired, there was a reasonable opportunity to re-assess the threat posed. See *Estate of Richards by Stephens v City of New York*, 18-cv-11287-MKV, 2024 WL 3607220 (S.D.N.Y. July 31, 2024), *appeal withdrawn* 24-2147, 2025 WL 470710 (2d Cir. Jan. 23, 2025). There, the Court observed that "[g]iven that the initial use of force was reasonable, and the short period of time between that use of force and the subsequent shots fired, there was no reasonable opportunity for the officers to reassess the situation until [decedent] was subdued." *Estate of Richards*, 2024 WL 3607220, at *9. Notably, the space of time at issue in Richards was significantly more than in this matter. In *Estate of Richards* two officers discharged a combined 16 rounds in under 5 seconds. *Id.* As in this action, in *Estate of Richards* plaintiff argued that decedent was no longer a threat because decedent was falling as the officers continued to shoot. Here, not even a second and a half passed between all five shots. It would be wholly impermissible to allow a jury to speculate as to an Officer's ability to asses and re-assess in less than a second and a half.

Significantly, the *Estate of Richards* court expressly declined plaintiff's invitation to "isolate individual frames of the body-worn camera footage to highlight a fraction of a second when [decedent] may no longer have posed a threat." *Id.* The court cited *Graham v. Connor*, 490 U.S. 386, 396 (1989) and *Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015) and reiterated the long-standing principle that the reasonableness of the use of force must be assessed from the perspective of a reasonable officer at the scene, and the rule against second-guessing officer's split-second judgments. *Id.*; *see also Loveall v Walker*, 807 F. Supp. 3d 148, 158 (N.D.N.Y) ("commonly, the video evidence will capture only part of the relevant events. Under those circumstances, courts should resist the temptation to uncritically assume that the video evidence inherently possesses a unique kind of reliable factual conclusiveness") (quotations omitted).

In a relevant District of Vermont case, the Court noted that "if the officer is 'justified in firing at a suspect in order to end a severe threat to public safety,' he or she 'need not stop shooting until the threat has ended.' *Plumhoff v. Richard*, 134 S. Ct. 2012, 2022 (2014); *see also City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1775 (2015) ('Nothing in the Fourth Amendment barred [the officers] from protecting themselves, even though it meant firing

multiple rounds.').  The court must make 'allowance[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.' *Graham v. Connor*, 490 U.S. 386, 397 (1989)." *Brunette v City of Burlington, Vermont*, 15-cv-00061-CR, 2018 WL 4146598, at *23 (D Vt. Aug. 30, 2018).

In *Brunette*, the officers were responding to a call about a person having a mental health crisis who later confronted the officers with a shovel, which the officers appropriately perceived as a threat. The *Brutnette* court held that the officer "made a split second judgment in responding to an imminent threat and fired a fusillade in an emergency situation, and the third and fourth shots cannot be found unreasonable for failure to perfectly calibrate the amount of force required to protect himself." *Brunette*, 2018 WL 4146598, at *24, quoting *Berube v Conley*, 506 F.3d 79, 85 (1st Cir. 2007); *see also Williams v City of New York*, 2025 WL 2381569, *8 (S.D.N.Y. Aug. 15, 2025) (pointing to *Jones v Treubig* guidance regarding intertwined uses of force and holding that no reasonable juror could second-guess officer's split second use-of-force decisions where "the body-worn camera footage reflects fluid and continuous resistance by Plaintiff to any efforts to place him under arrest, including after [officer's] first use of the Taser, as the officers struggled to subdue Plaintiff and secure handcuffs on him while he continued to resist arrest").

Other circuits have followed suit. In *Salaam v Wolfe,* 806 F.3d 90, 94 (3d Cir. 2020) where

in rapidly evolving circumstances, there were 9 bullets fired from a semi-automatic police handgun in "continuous, rapid succession" at an armed subject who fell next to his gun – and there was no evidence that officers continued to fire after the "perceived threat had been eliminated" – no reasonable jury could find that the officers' actions constituted a constitutionally impermissible use of force in rapidly evolving circumstances.

In *Garza v Briones*, 943 F.3d 740, 745-746 (5th Cir. 2019), the Fifth Circuit found that in 5 seconds, 61 shots were fired at an apparently armed arrestee before he hit the ground and was no longer a threat, and that was not an objectively unreasonable use of force.

The 6th Circuit likewise held in *Stevens-Rucker v City of Columbus, OH*, 739 Fed. Appx. 834, 844 (6th Cir. 2018), that an apparently unwell man armed with a knife and ignoring

commands – was moving towards officers with a knife, and an officer's *4 shots fired in 8-10 seconds* "were fired in such rapid succession that they constituted a single event."

Perhaps closest to the subject action is the 8th Circuit case of *Ching as Trustee for Jordan v City of Minneapolis*, 73 F.4th 617, 619-622 (8th Cir. 2023).  There, officers responded to a call of an emotionally disturbed man who was suicidal. The  man approached officers with a knife, ignored officers commands to drop the knife and advanced on them yelling "Come on, just do it" and, when the subject was 6-12 feet from the shooting officer, that officer started firing. The officer never paused while shooting – the shooting lasted less than two seconds – and the officer continued shooting for one second after the subject fell to the ground, dropping the knife. The officer fired 3 shots while the subject was standing and 4 shots while the subject was on the ground. Rejecting the district court's decision to bifurcate the analysis into (1) the initial use of force and (2) the continued use of force after decedent had fallen to the ground, the 8th Circuit held that "[g]iven the swift and continuous progression of the incident and [the officer's] limited time to observe and process the circumstances, a jury could not find that [the officer] had sufficient time to reassess the threat [decedent] presented before he stopped firing." The 8th Circuit observed "we are not aware of[] any case  in which a court has bifurcated a shooting when an entire continuous shooting lasted less than two seconds, and the alleged excessive force occurred only one second after the threat was arguably dissipated."   The Court here must likewise follow suit as no reasonable juror could find that Officer Drake had sufficient time to reassess in 1.37 seconds.

The 9th Circuit, the home of Plaintiffs' purported expert, in *Murillo v City of Los Angeles*, 707 F. Supp. 3d 947, 963-964 (9th Cir. 2023) found five shots fired nearly simultaneously within two seconds of the first shot against a suspect armed with a knife was obviously justified. Those shots were treated as a single event for Fourth Amendment purposes because they happened so quickly and were nearly indistinguishable on the BWC.

Based upon the foregoing, this Court should not fall into the trap of post-incident bifurcation of the event into distinct events which simply did not exist at the time.  Indeed, to do so runs contrary to the Supreme Court directive that the analysis concerns what was 'then known' to the officer.

Officer Drake and the other officers spent nearly three minutes attempting to get Mr. Jones to simply drop the knife or even to simply stop his advance towards the officers. As Jones rushed Officer Drake, he discharged five rounds in rapid succession over 1.37 seconds. Plaintiffs asking this Court to divide up 10ths of a second is exactly the type of second guessing the Court has been directed to not engage in, or worse, leave the case for a jury to engage in such speculation. Moreover, such a precedent would likely create a chill that would put officers' safety in jeopardy going forward.

## POINT II

### PLAINTIFFS CANNOT ESTABLISH MONELL LIABILITY AGAINST THE CITY OF ROCHESTER

As there was no constitutional violation, the Court need not address the *Monell* issue. The 2nd Circuit has stated "[i]t is well-settled that a *Monell* claim cannot succeed without an underlying constitutional violation." *Mastromonaco v. Cnty. of Westchester*, 779 F. App'x 49, 51 (2d Cir. 2019); see also *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Similarly, this Court has held that a "*Monell* claim cannot exist independently without an underlying constitutional violation related to a municipal policy or custom." *Montalvo v. Lamy*, 139 F. Supp. 3d 597, 609 (W.D.N.Y. 2015).

Assuming, *arguendo*, the Court were to determine there was a question of fact as to whether a constitutional violation existed, the action must nevertheless be dismissed as the Plaintiffs cannot establish *Monell* liability against the City of Rochester. Indeed, even if the Court determined that the decedent's constitutional rights were violated, this is a *Monell* claim only and thus failure to establish a *Monell* claim mandates dismissal.

In *Monell v. Department of Social Services*, the Supreme Court established that "municipalities and other local government units" are "persons" who may be liable under Section 1983. 436 U.S. at 690, 98 S.Ct. 2018. Still, "a municipality cannot be held liable under Section 1983 on a *respondeat superior* theory." *Id.* at 691, 98 S.Ct. 2018. In other words, the plaintiff must show that, "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 98 (2d Cir. 2020) (emphasis in original). Accordingly, in order to bring a *Monell* claim against a municipality or other local government unit, the plaintiff must allege facts supporting: "(1) a

9

municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023). A plaintiff may establish the existence of a municipal policy giving rise to *Monell* liability in four different ways: (1) a formal policy endorsed by the municipality ...; (2) actions directed by the government's authorized policy makers; (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware; or (4) a constitutional violation resulting from policymakers' failure to train municipal employees. *Deferio v. City of Syracuse*, 770 F. App'x 587, 589–90 (2d Cir. 2019).

**Plaintiffs' claims fail under any and all such theories**.

### A)  The City's Policies are Constitutionally Sound

It is undisputed here that the City's official policies relating to non-discrimination and use of force are constitutionally sound. Indeed, it does not appear Plaintiffs are challenging any official policy. Chief Smith's declaration and the General Orders, Rules, Regulations, and SOPs submitted governing the use of force, deadly force, the ADA and anti-discrimination all clearly fall within constitutional standards and legal precedent.

### B)  Plaintiffs do not allege that Officer Drake's actions were directed by policy makers

In this particular case, it is clear that all of the actions taken by each of the officers were fluid responses taken individually and the decision to shoot was Officer Drake's and Drake's alone. There is no claim or evidence that the actions in issue here were taken under the direction of any City of Rochester policymakers, or for that matter, even line supervisors.

### C)  There is no evidence of any widespread practice that amounts to a custom that policy makers of the City should have been aware

In order to establish *Monell* liability based on a custom theory, the Plaintiff must establish "an unwritten practice that is so widespread as to have the force of law." *Agosto*, 982 F.3d at 98. Such a theory does not require "an express rule or regulation that embodies the alleged unconstitutional practice among subordinate municipal employees." *Hu v. City of New York*, 927 F.3d 81, 106 (2d Cir. 2019). However, the Plaintiff must show a "practice by a subordinate municipal employee (or employees) other than a policymaker" that is "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Lucente v. Cnty. of*

Suffolk, 980 F.2d 284, 297–98 (2d Cir. 2020).  In other words, there must be a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity." *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *see also Tieman v. City of Newburgh*, No. 13-cv-4178, 2015 WL 1379652, at *16 (S.D.N.Y. Mar. 26, 2015).

Under this standard, "instances of reprehensible and at times illegal and unconstitutional conduct by individual [government officials]" are not enough absent evidence that such conduct was "so *widespread* as to support an inference that it must have been known and tolerated by supervisors." *Jones v. Town of E. Haven*, 691 F.3d 72, 82 (2d Cir. 2012) (emphasis added).  For example, in considering a *Monell* claim against the East Haven Police Department for an alleged custom of discriminatory police abuse in *Jones*, the Second Circuit held that "two instances [of unlawful conduct], or at the most three, over a period of several years, in which a small number of officers abused the rights of [B]lack people" fell short of establishing conduct "so persistent" as to constitute a custom. *Id.* at 85.  Likewise, in *Hu*, the Second Circuit affirmed the dismissal of a *Monell* claim alleging a custom of discriminatory enforcement of New York City's building codes by the City's Assistant Chief Inspector and other Department of Building ("DOB") employees because the amended complaint "only identifie[d] four instances in which the plaintiffs were alleged to have been unfairly sanctioned by DOB." *Hu*, 927 F.3d at 106. In doing so, the Second Circuit found critical that the amended complaint "did not allege how many DOB employees were involved in the scheme, whether these accomplices represented a large or small share of DOB inspectors or personnel, the frequency with which [they] assisted in discriminatory enforcement actions, or any other facts that might indicate the extent to which DOB personnel helped [the Assistant Chief Inspector] carry out" the challenged conduct. *Id.* The Court reasoned that this made it "entirely unclear whether" the challenged conduct was "the product of a few rogue officials, a department-wide effort, or something in between." *Id.*

Here plaintiffs attempt to amplify their numbers by referencing thirty (30) instances of *alleged, though not established,* excessive force against people of color over a fifty (50) year period commencing in 1975. That number alone is less than was held insufficient to establish a *Monell* claim in *Jones*, supra.  More importantly, the instances referenced by plaintiff are allegations of excessive force running the gamut from pepper spray to deadly force. However, there is no evidence before the court that any of those instances involved constitutional violations

11

placing the City on notice which would mandate a response.  As such, they do not present evidence of anything. To hold otherwise would be the equivalent of arguing that the City made 7500 arrests therefore they have a custom of falsely arresting citizens. Based upon the RPD calls for service found in the submissions before the court, in round numbers RPD responds to at least 250,000 calls annually with a unit response, i.e., number of officers responding, of approximately 400,000.  In addition they typically make at least 10,000 arrests annually. Accordingly, the 30 instances plaintiff asserts must be viewed against a backdrop of 12,500,000 calls, 20,000,000 officer responses and 500,000 arrests. Hence even if the 30 instances referenced by plaintiff all were proven constitutional violations, as 0.006 of one percent of all arrests and obviously significantly lesser percentages of officer responses, would be clearly insufficient to put the City on notice of any need for a change in policy, practice or training.

### D)      The City's Training Program is Exemplary

The City of Rochester is not deliberately indifferent to the rights of the Citizenry or in its training of its officers, "[T]he Supreme Court emphasized in *City of Canton* that plaintiffs must establish that "the officer's shortcomings ... resulted from ... a faulty training program" rather than from the negligent administration of a sound program or other unrelated circumstances." *Amnesty America v. Town of West Hartford.*, 361 F.3d 113, 129 - 130 (2d Cir 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 391 (1989).  As such, "[i]t is impossible to prevail on a claim that the [ ] training program was inadequate without any evidence as to ... how the training was conducted, how better or different training could have prevented the challenged conduct, or how 'a hypothetically well-trained officer would have acted under the circumstances'.... *Id.* (quoting *City of Canton*, 489 U.S. at 391).

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Board of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)).  However, "[p]olicymakers' 'continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the "deliberate indifference"— necessary to trigger municipal liability.' " *Id.* (quotation omitted).  "Without notice that a course of training is deficient in a particular respect, decision makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*; *see*

*also RDK NY Inc. v. City of New York*, No. 21-CV-01529, 2024 WL 4333704, *12 (E.D.N.Y. Sept. 28, 2024).

"[S]uch inadequacy must [also] reflect a deliberate choice among various alternatives, rather than negligence or bureaucratic inaction." *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007) (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 483-84 (1986)). "Plaintiffs must prove in the end that the state defendants' inadequate (training) actually caused or was the moving force behind the alleged violations." *Id.* (citing *Polk County v. Dodson*, 454 U.S. 312, 326 (1981)).

First, as to Plaintiffs' failure to train theory, as this Court previously explained, "[a] 'municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.' " Dkt. No. 48 at 45 (quoting *Connick*, 563 U.S. at 61). While plaintiff's purported expert may offer speculative alternatives as to how this incident could have been handled, the fact is he has no evidence whatsoever to establish that the training program was deficient in any regard, much less deliberately indifferent so as to have "actually caused or was the moving force behind the alleged violations. " *Monell* 436 U.S @ 694; *Reynolds*, 506 F.3d @ 193.

As this court held in *Cox v City of Rochester,* 22-cv-6207 FPG, 2025 WL 50340 (W.D.N.Y. January 8, 2025):

> "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). A plaintiff may satisfy this "policy or custom" requirement by showing:
> ....
> (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees. *Jones v. Westchester County*, 182 F. Supp. 3d 134, 158 (S.D.N.Y. 2016) (quoting *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010)).

In order to establish a viable failure to train claim, "a plaintiff must demonstrate that a local government was faced with a "pattern of misconduct" and in response did "nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds, supra*. @ 192; See also *Connick*, 563 U.S. at 62 (holding that a "pattern of similar constitutional violations by untrained employees is 'ordinarily

necessary' " to meet the policy or custom requirement on a failure to train theory. And see *Vasquez v. City of New York*, No. 20-CV-4641, 2023 WL 8551715, at \*6 (S.D.N. Y Dec. 11, 2023) holding that a plaintiff must establish a pattern of allegations or complaints about similar unconstitutional activity to meet the policy or custom requirement under a failure to supervise theory. *Jones v. Town of East Haven*, 691 F.3d 72, 82 (2d Cir. 2012) likewise held that the plaintiff failed to establish municipal liability under a custom or usage theory because she failed to show a pattern of abusive conduct among police officers. Such a pattern must be "sufficiently persistent or widespread as to acquire the force of law" in order to state a claim. *Reynolds*, 506 F.3d at 192. Here the plaintiffs have failed in the first instance to demonstrate a pattern of conduct to even suggest a need for different or additional training. Yet, even if they had, the evidence before the Court demonstrating the RPD training in all areas of interest here far exceeds the training which the NYS Division of Criminal Justice Services believes is sufficient.

Just as in *Cox*, the failure to train claim must be dismissed as the plaintiff has no evidence to establish that any of the instances referenced in the complaint actually involved misconduct or evidence that the officers involved acted unreasonably. Notably, in *Cox*, plaintiff provided evidence of 50 dogs shot in five years was insufficient to establish the necessary notice to the City to sustain a failure to train claim. Here plaintiff alleges 'excessive force' of various degrees of approximately 30 instances in nearly 50 years! The court held that 'three instances of misconduct over three years are insufficient to establish a pattern of misconduct for a *Monell* claim, Cox @ \*7 citing Jones, 691 F.3d @ 85.

Finally, as this court noted in Cox @ \*8

"The Second Circuit has also offered guidance on when an inadequacy in training reaches the level of deliberate indifference, saying a "training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing." *Reynolds*, 506 F.3d at 193 (quoting *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 27 (1st Cir. 2005))."

Accordingly, the *Monell* claims against the City of Rochester must be dismissed because there was no underlying constitutional violation; there is insufficient evidence to establish a pattern of misconduct, and there is insufficient evidence the level of training provided was deliberately indifferent.

## POINT III

## THERE WAS NO ADA or REHABILITATION ACT VIOLATION

Claims under the ADA or Rehabilitation Act are evaluated via the same standards. *Doe v Franklin Square Union Free School District,* 100 F.4th 86 (2nd Cir. 2024) citing *McElwee v Cnty of Orange,* 700 F.3d 635, 640 (2d Cir. 2012).

To establish a claim under Title II, a plaintiff must establish:

1) That they are a qualified individual with a disability;
2) That they were excluded from participation in a public entity's service, programs, or otherwise discriminated against by a public entity; and
3) That such exclusion was due to their disability.

*Davis v Shaw* 821 F.3d 231, 259 (2d Cir 2016)

The claims asserted here are premised upon one or two theories of liability: disparate treatment (intentional discrimination), or failure to make a reasonable accommodation (Docket #1) *See Tardif v City of New York*, 991 F.3d 394, 403 (2d Cir 2021). While the complaint seems to imply a disparate treatment claim, the complaint fails to indicate any intentional discrimination on Officer Drake's part, but does allege the decedent was not afforded reasonable accommodation (Complaint Docket #1 paragraph 89 and 96). Ultimately, the claim fails because there is no evidence plaintiff was a qualified individual. While apparently in crisis this particular evening, there is no evidence in the record of the decedent having any particular diagnosis or treatment for any particular disease or disability.

Assuming for purposes of argument that decedent was a qualified individual, the Plaintiffs must establish that the decedent was discriminated against because of his disability. There is no evidence or reason whatsoever to believe that Mr. Jones was shot for any other reason other than the fact that he was wielding a knife and running towards an officer after threatening to kill him. He was subject to the use of force because of his use of force, not because he was suffering from a disability. (See Drake declaration.)

The argument that Plaintiff was entitled to a reasonable accommodation also must fail. First, the Defendant had no obligation to accommodate until the threat of the use of deadly

physical force had ended.  District Courts in this Circuit have held "where the incident presents an immediate danger because the individual is armed and charging at police . . . then no reasonable accommodation of a disability may be required or possible." *Taylor v. Schaffer*, 2015 WL 541058, at *7 (D. Vt. Feb. 10, 2015) (citing *Wingard v. Pa. State Police*, No. Civ. A. 12 1500, 2013 WL 3551109, at *6 (W.D. Pa. July 11, 2013))  Here, it is undisputed by the BWC that at no time from arrival until after the actual shooting was the situation safe due to his refusal to stop walking towards the officers and/or drop the knife he was wielding. "We rely on and expect law enforcement officers to respond fluidly to changing situations and indiviudals they encounter. Imposing a stringent requirement under the ADA is inconsistent with that expectation and impedes their ability to perform their duties." *Tucker v State of Tennesee* 539 F.3d 526 (6th Cir 2008) *cert denied sub nom Tucker v Hardin County Tennessee*, 558 U.S. 816 (2009)

More importantly, the right afforded by the ADA to a qualified individual is of a *reasonable* accommodation. It would be beyond reason or rationality and seemingly unfathomable to hold that an individual under deadly attack would not have the right to defend themselves from such an attack, but instead be obligated to resort to some lesser means and accommodate the individual's attempt to inflict injury or death upon them.  Even assuming, for the sake of argument, a duty of reasonable accommodation existed, "[t]o say that officers should have taken certain other actions during the standoff is to lean far in the direction of

impermissible hindsight." *Waller ex rel. Estate of Hunt v Danville VA*, 556 F.3d 171, 175-76 (4th Cir. 2009).  Given the circumstances, it would be impractical for the officers to determine which actions to take to accommodate the disability without posing a significant risk to their safety and the safety of other innocent bystanders.  Further, the 5th Circuit has stated it is "not persuaded that requiring . . . officers to use less than reasonable force in defending themselves and others, or to hesitate to consider other possible actions in the course of making such split-second decisions, is the type of 'reasonable accommodation' contemplated by Title II." *Hainze v Richards* 207 F.3d 795, 801 (5th Cir. 2000).  "To require officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians would pose an unnecessary risk to innocents, thus going beyond what is required to be reasonable. " *Id.*

16

Notably, 28 CFR 35.139(a) specifically provides that a public entity is not required to permit an individual to participate in or benefit from the services programs, or activities of the entity when that individual poses a direct threat to the health or safety of others. Any contrary determination would itself seemingly raise constitutional/issues if the Court were to find that people not under a disability could in appropriate circumstances be subject to deadly physical force while holding individuals with disabilities under identical circumstances were entitled to some accommodation, seemingly creating a class of individuals whose rights overcome another individuals right to life, the very first unalienable right recognized in the Declaration of Independence which ultimately lead to the creation and ratification of the Constitution itself.

Indeed, in *Hainze v Richards* 207 F.3d 795, 801 (5th Cir. 2000) the court necessarily held:

> *Title II does not apply to an officers on-the-street responses to reported disturbances or other similar incidents whether or not those calls involve subjects with mental disabilities prior to the officers securing the scene and ensuring that there is not a threat to human life.(Italics added)*

See also *Waller ex rel. Estate of Hunt v Danville VA*, 556 F.3d 171 (4th Cir. 2009) ("In *Hainze . . . the suspect came toward police across a parking lot, brandishing a knife and refusing orders to halt. Therefore, officers had no duty to accommodate his mental illness before securing the scene and ensuring public safety.") *Waller* involved an individual known to suffer from mental health issues shot and killed when an emergency response team entered his apartment after a two-hour standoff. Plaintiff's claims of what police might have done differently to accommodate plaintiff during the two hour stand-off was deemed "unreasonable and impermissible hindsight." *Id @* 176.

While there is no doubt the Second Circuit has applied the ADA to police interactions with arrestees, it is clear that the District Courts in this Circuit agree with the *Hainze* court that the test as to whether the ADA applies is ultimately the same as is required under the Fourth Amendment "reasonable" analysis. See *O'Brien v City of Syracuse* 2023 WL 6066036 (N.D.N.Y. Sept 18, 2023). Just as the Court did in this case, the *O'Brien* Court refused to dismiss the ADA claim at the motion to dismiss stage because the factual allegations of the complaint asserted the police were not faced with exigent circumstances. *O'Brien* nevertheless referenced and detailed various circuit and district court case law concluding the ADA does not apply in exigent circumstances such as those faced here by Officer Drake. Notably, *O'Brien* references

the Fourth Circuit case of *Bates v Chesterfield Cnty.*, 216 F.3d 367 (4th Cir. 2000), wherein the court dismissed an ADA claim in the context of an excessive force claim holding that an independent ADA inquiry was not necessary because the analysis under the Fourth Amendment necessarily took into account the totality of the circumstances and, finding them reasonable, necessarily dismissed the excessive force claim and consequently the ADA claim.

To the extent Plaintiffs attempt to allege the decedent was denied access to a public service under the ADA, it too must be dismissed. To state such a claim, the plaintiff must allege he has been denied access to a "public service." *Henrietta v Bloomberg* 331 F.3d 261, 272 (2nd Cir. 2003) as amplified in *Andino v. Fischer* 698 F. Supp 2d 362 (SDNY 2010). While the Complaint fails to allege what specific public service the decedent was denied, regardless under the exigent circumstances presented, the claim must fail for the reasons cited above.

Plaintiffs here are seeking to attempt via their ADA claim to find a different path to liability as the force used was undoubtedly reasonable under the circumstances, effectively asserting that it was the officers' actions or inactions prior to the use of force that caused the violation. *City of Los Angeles v Mendez*, 581 U.S. 420, 428 (2017) prohibits such inquiry. Plaintiffs seek to proceed with an excessive force claim that cannot succeed on its own merits, attempting to find a backdoor to pursue the claim under the auspices of an ADA claim. In *Mendez*, the Supreme Court rejected the 9th Circuit's attempt to allow an excessive force claim to proceed when the use of deadly force was reasonable as a matter of law, under the guise that some other prior constitutional violation set the wheels in motion for the admittedly reasonable use of deadly force. In *Mendez*, police officers searching for a reportedly armed and dangerous individual who allegedly unlawfully entered a peripheral building on property where the suspect was supposed to be located. They shot an individual who was sleeping in the building when he was awakened and pointed a BB gun he used to shoot pests at the police. Police opened fired when an officer shouted "gun." The trial court held the use of deadly force to be objectively reasonable under the circumstances. The District and Circuit courts held the use of deadly force was unreasonable and constituted a constitutional violation because of the unlawful entry in the first instance.

The Supreme Court reversed, and rejected the argument, holding that a separate and distinct constitutional violation cannot transform a later reasonable use of force into an unreasonable seizure. Specifically, deadly force used during the course of an unlawful and hence

unconstitutional entry, which force is justified, cannot be undermined by reference to peripheral circumstances. The only question for the court to determine is whether the force used was unreasonable in the circumstances then and there existing. In any event, as noted in *O'Brien, supra*, citing *Bates v Chesterfield Cnty, supra,* the analysis under the Fourth Amendment and the ADA is the same. Accordingly, dismissal of the constitutional claim as reasonably justified under the Fourth Amendment necessarily mandates dismissal of the ADA and Rehabilitation Act claims.

Here, Plaintiffs effectively are maintaining that an alleged violation of the ADA can turn an otherwise reasonable use of force into an unreasonable seizure via the ADA. In short, if a separate and distinct constitutional violation cannot taint an otherwise reasonable use of force, certainly a violation of a subordinate statute or law likewise cannot. Plaintiffs' reliance on various claims of what could have or should have been done prior to the encounter are premised upon complete speculation and hindsight. There is no evidence whatsoever that RPD knew or had an opportunity to determine that Mr. Jones was a person with a disability. Their entire focus on what the police could have or should have done prior to arrival, assumes and speculates, without any support, that RPD should have assumed they were dealing with a person with a disability before they even arrived at the call, and further would require RPD officers to ignore the threat of deadly physical force and subject themselves to possible injury or death in addressing the situation they faced. Such questioning and second guessing actions prior to the use of force is not the Court's role.

Effectively, Plaintiffs want a determination from this Court that the police must use less than lethal force to combat lethal force against them if dealing with a mental health crisis. Perhaps in an ideal world that would be attainable. However, as illustrated by the cases referenced previously, in the real world, officers have to make split second decisions and the Courts are not going to allow impermissible hindsight and second guessing into the calculous of whether police actions were reasonable thus placing the officer's safety in peril.

Under the circumstances presented, while certainly not the result anyone wished for, the action of the RPD officers was lawful and violated neither the Fourth Amendment, the ADA nor the Rehabilitation Act. The Court should not be tempted to lose its focus on the applicable law by mulling over Plaintiffs' suppositions, surmise, speculation and ideals as to how such

19

situations might turn out differently. No doubt all involved wish it would have turned out differently, but the legal question is not what could have been done, but rather, whether what was done violated Decedent's constitutional right to be free from excessive force and/or violated the ADA & Rehabilitation Act. To leave such an issue to a jury in a clear cut case such as this would only open the door to a new standard of "what could have been done differently."

**POINT IV**

**THE STATE LAW ASSAULT & BATTERY CLAIMS MUST BE DISMISSED**

Battery is the unjustified touching of another person, without that person's consent, with intent to cause bodily contact that a reasonable person would find offensive; an assault involves putting a person in fear of an actual battery. *Rivera v State of New Yo*rk 34 NY3d 383 (2019) cited by *Marcus v City of Buffalo*, 2023 WL 5154167; 20-CV-316 (W.D.N.Y. August 10, 2023); See *United Natl. Ins. Co. v Waterfront N.Y. Realty Corp,* 994 F.2d 105, 108 (2d Cir 1993) and cases cited therein.

> With respect to the cause of action for assault and battery,
>
> "[a] police officer or a peace officer, in the course of effecting or attempting to effect an arrest ... of a person whom he or she reasonably believes to have committed an offense, may use physical force when and to the extent he or she reasonably believes such to be necessary to effect the arrest" (Penal Law § 35.30[1]; see CPL 140.25[1][a] ). " 'Claims that law enforcement personnel used excessive force in the course of an arrest are analyzed under the Fourth Amendment and its standard of objective reasonableness' " (Bridenbaker v. City of Buffalo, 137 A.D.3d 1729, 1730, 28 N.Y.S.3d 545 [4th Dept. 2016]; see Williams v. City of New York, 129 A.D.3d 1066, 1066, 12 N.Y.S.3d 256 [2d Dept. 2015] ). "The reasonableness of a particular use of force ... takes into account 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he [or she] is actively resisting arrest or attempting to evade arrest by flight' " (Williams, 129 A.D.3d at 1066, 12 N.Y.S.3d 256).
>
> *Hernandez v Denny's Corporation*, 177 AD3d 1372, 1374 (4[th] Dept 2019)

Accordingly, for the same reason the underlying claim that a Fourth Amendment excessive force claim must be dismissed, so too must the state law claims.

As noted, a civil assault involves the intentional placing of another in apprehension of imminent, harmful or offensive contact. *Rivera*, *supra*. Despite the lengthy Complaint and recitation of facts, nowhere does the Complaint allege that the responding officers intentionally placed the Plaintiffs' decedent in fear of imminent, harmful or offensive contact. Moreover, the BWC footage suggests the opposite is true: the decedent threatened and indeed, attempted to carry out offensive bodily contact versus Officer Drake. Moreover, the officers retreated and suggested ways to avoid imminent harm. The decedent was not placed in fear or apprehension of imminent, harmful conduct, in fact asking the officers to "just shoot (him.)" Regardless, assuming arguendo, the brandishing of their service revolvers might be construed as an assault, it was clearly justified given the Plaintiff's threat of inflicting imminent harm upon the officers.

## POINT IV

## THE WRONGFUL DEATH CLAIM MUST BE DISMISSED

EPTL 5-4.1 authorizes the personal representative of a decedent to maintain an action to recover damages for a "wrongful act, neglect or default" which caused the decedent's death against a person who would have been liable to the decedent by reason of such wrongful conduct if death had not ensued.

As the asserted wrongful conduct is the alleged battery, and the battery was not unlawful as it was justified, then the wrongful death cause of action must likewise be dismissed as no wrongful conduct occurred.

To the extent Plaintiffs are attempting to subsume a negligence claim in their Wrongful Death cause of action, it likewise must be dismissed. As noted in *Ferreira v City of Binghamton*, 38 N.Y.3d 298 (2022), in order to proceed with a negligence claim relating to a police shooting, the plaintiff must establish a "special duty." Again, clearly no negligence claim or special duty claim is properly alleged. Nevertheless, to the extent Plaintiffs may wish to claim it is part and parcel of the wrongful death claim it must fail as no special duty existed with respect to the decedent in these circumstances. *Ferreira*, supra @ 281.

A review of the factual allegations of the Complaint demonstrates no claims of an intentional assault, but instead suggests, while not plead, that the Complaint is attempting to

21

assert a negligence claim. Plaintiffs must effectively pick their poison as when a plaintiff asserts excessive force and assault claims premised upon intentional conduct, such claims eliminate the viability of a negligence claim. *Yan Zhao v United States* 273 F. Supp.3d 372, 398 (W.D.N.Y2017). See also *Anderson v Burlington Insurance Co.* 2023 WL 3751929 (W.D.N.Y. 2023 19-cv-297) distinguishing between negligence and assault in a coverage context. Notably, assault is an intentional tort, and it is intent which distinguishes an assault claim from a negligence claim. *Jones v Kent*, 35 AD2d 622 (3rd Dept. 1970) See also *Mazzaferro v Albany Motel Enterprises, Inc.*, 127 AD2d 374 (3rd Dept. 1987). As this is the sole allegation of the Complaint, to the extent the Wrongful Death claim might be deemed to include a claim of negligence, it must be dismissed as while not wrongful, the act of discharging the weapon was unquestionably an intentional act undertaken by Officer Drake to stop Mr. Jones' deadly attack.

## CONCLUSION

While the result was most certainly tragic, the use of deadly force in this circumstance was reasonable as a matter of law. As such, no constitutional violation occurred and hence no *Monell* claim against the City may proceed. Furthermore, assuming Plaintiff to be a qualified individual under the ADA, his claim fails because he was not discriminated against because of his disability. Moreover, given the display and threat of deadly physical force, Defendant had no obligation to afford any accommodation under the circumstances. Allowing the claim to proceed would be affording Plaintiffs relief in circumstances where the Supreme Court has established that one may not slip what is effectively an excessive force claim through the back door when the excessive force claim is barred by the front door. Finally, even assuming there was an underlying constitutional violation, there is no evidence to support a *Monell* claim. As such, the action must be dismissed.

DATED: July 17, 2026

PATRICK BEATH, Corporation Counsel
BY: *s/ Patrick B. Naylon*
PATRICK B. NAYLON, Esq., of Counsel
Attorneys for City Defendants
30 Church Street, Room 400A City Hall
Rochester, NY 14614
Telephone: (585) 428-6906